Page 1

1                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WISCONSIN
2

3    CRAIG CUNNINGHAM,

4         Plaintiff,

5         vs.                    CASE NO. 3:16-cv-00761-jdp

6    MICHAEL MONTES, et al.,

7         Defendants.
     _____/

8

9

     DEPOSITION OF:        Michael James Montes
10

     DATE:                 April 18, 2019
11

     TIME:                 2:18 p.m. to 4:04 p.m.
12

     LOCATION:             135 Riverview Road
13                         Fort Myers, Florida 33905

14   TAKEN BY:             Plaintiff

15   REPORTER:             Darla R. Rowe

16

17

18

19

20

21

22

23

24

25

Page 2

1 APPEARANCES:
2 For the Plaintiff:     DAVID B. LEVIN, ESQ.
  (via Skype)        Law Offices of
3                  Todd M. Friedman, P.C.
                   333 Skokie Boulevard
4                  Suite 103
                   Northbrook, Illinois  60062
5
  For the Defendants:    KEVIN D. TROST, ESQ.
6 (via Skype)       Axley Brynelson
                   2 East Mifflin Street
7                  Suite 200
                   Madison, Wisconsin  53703
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2 WITNESS                        PAGE
3 Michael James Montes
4 DIRECT EXAMINATION
  BY MR. LEVIN                     4
5
6
7
          N O  E X H I B I T S  M A R K E D
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1 THEREUPON,
2           MICHAEL JAMES MONTES,
3 a witness, having been first duly sworn, upon his oath,
4 testified as follows:
5      THE WITNESS:  I do.
6      MR. LEVIN:  Just for the record, I'd like to
7 reflect this is the supplemental deposition of Michael
8 Montes taken pursuant to agreement after the -- I'm
9 sorry.  Off the record.
10      (A discussion was held off the record.)
11           DIRECT EXAMINATION
12 BY MR. LEVIN:
13   Q.  All right.  This is going to be tricky.  As I was
14 saying, let the record reflect that this is the
15 supplemental deposition of Michael Montes taken pursuant
16 to agreement of the parties after a supplemental discovery
17 production and subpoena response was served.
18      This is being taken pursuant to a Skype video
19 conference.  The court reporter is located with Mr. Montes
20 at his home in Florida.  And also appearing are myself,
21 David Levin, attorney for the Plaintiff; the Plaintiff,
22 Craig Cunningham; and counsel for Mr. Montes, Kevin Trost.
23      Mr. Montes, do you recall the guidelines that we
24 discussed prior to your initial deposition?
25   A.  Yes.

Page 5

1   Q.  Okay.  Those same guidelines will apply for
2 today's deposition as well.  Did you review any documents
3 or records to prepare for this deposition today?
4   A.  No.
5   Q.  Okay then.  I'm going to ask you some questions
6 about some exhibits that I understand have been shared
7 with you electronically.  I sent those -- there should be
8 eight exhibits, seven PDFs and one video file, that I sent
9 to Mr. Trost this morning, and he told me he had forwarded
10 those on to you.
11      Do you have those eight files available?
12   A.  I'm looking at my e-mail.  I see that Kevin sent
13 me one, two, three, four, five, six, seven, eight --
14 eight.  Yes.
15   Q.  Okay.  Good.  Okay.  To begin with I'd like you
16 to please open the document that was labeled as Exhibit
17 No. 2.  And I'll share this all with the court reporter as
18 well once this is completed, so they can become part of
19 the record here.
20      Sorry I'm out of order.  Exhibit No. 2, please.
21   A.  It's open.
22   Q.  Okay.  And just make sure we're looking at the
23 same thing.  You have there the subpoena that was served
24 on you in this case previously?
25   A.  It appears so, yes.

2 (Pages 2 - 5)

Page 6

1    Q.   Okay.  And then if you could, please, open the
2  PDF that was marked as Exhibit No. 1.
3    A.   Okay.  It's open.
4    Q.   All right.  Exhibit No. 1 was provided to me by
5  your attorney after the Court granted the Plaintiff's
6  motion to compel the response to the subpoena.  Can you
7  please confirm for me -- the documents that were produced
8  in PDF form that consist of 1,290 page and have been
9  labeled for this deposition as Exhibit No. 1, is that a
10  complete response to all 17 paragraphs -- categories of
11  information listed in the rider to this subpoena?
12    A.   Without going through all thousand-plus pages, if
13  this is what Kevin sent you based on what I sent him, then
14  yes.
15    Q.   Okay.  I don't want us to have to go through all
16  1,290 pages this afternoon either, so I'm going to ask you
17  some questions based on my review of these documents and
18  how they appear to be grouped together.  So if you can
19  start at page 1 of Exhibit No. 1, to begin with there's a
20  company named -- I assume it's a company in the middle of
21  page there -- Zochnet, Z-o-c-h-n-e-t, in Lincoln, Texas.
22      Are you familiar with that company?
23    A.   Yes.
24    Q.   Is that a customer of yours?
25    A.   No.  Zochnet is Robert Zoch.  He's a gentleman

Page 7

1  who was appointed to me as a tech support.
2    Q.   Tech support for what?
3    A.   For the use of Technologic, Inc.'s platform.
4    Q.   So was he your initial contact to connect to
5  Technologic?
6    A.   No.  He was given to me by Technologic, Inc.,
7  that I had to pay for as technical support.
8    Q.   Okay.  So he provided technical support to you
9  for the Technologic system when you needed it?
10    A.   Yes.
11    Q.   Okay.  If you could scroll down to page number 4
12  of Exhibit 1, please, towards the bottom.  Let me know
13  when you're there.
14    A.   Okay.  Okay.  Towards the bottom.
15    Q.   Okay.  There's somebody's name there, Danila
16  Hardon, identified as vice president and general manager,
17  Technologic, Inc.  Have you ever met Danila Hardon?
18    A.   No.  I have never met her, nor have I ever spoken
19  to her.
20    Q.   Have you ever communicated with her in any other
21  way besides e-mail?
22    A.   No.  E-mail is it.
23    Q.   Do you know where she is located?
24    A.   I want to say she's in Panama.
25    Q.   Do you know that for certain, or you're just

Page 8

1  assuming that because that's where Technologic is located?
2    A.   That's where Technologic is located, and that's
3  the address she gives on all of her correspondence.
4    Q.   For what purpose did you communicate with Danila
5  Hardon at Technologic?
6    A.   She sends me invoices.
7    Q.   Did you communicate with her about anything other
8  than payment of Technologic invoices?
9    A.   No.
10    Q.   And it appears that the first several pages --
11  the first 80 pages or so of this PDF, Exhibit No. 1, are
12  mainly communications with Ms. Hardon regarding payments
13  made to Technologic; is that correct?
14    A.   Yes.  That's correct.
15    Q.   Okay.  And is that intended to be in response to
16  paragraph number 1 of the rider to the subpoena, Exhibit
17  2?
18    A.   Can you read me what it says?
19    Q.   "Any e-mails and other written communications
20  sent by Michael Montes to or received by Montes from
21  anyone associated with Technologic USA, Incorporated."
22    A.   Then yes, that would be it.
23    Q.   Okay.  So within this PDF, Exhibit No. 1, you
24  have provided any e-mail communications you had with
25  anyone associated with Technologic; correct?

Page 9

1    A.   Correct.
2    Q.   How did you put all of these e-mails together
3  into the form that we have received here?
4    A.   I went in and searched my e-mail and copied and
5  pasted everything that I found.
6    Q.   What did you search for?
7    A.   I searched for Technologic, Inc.
8    Q.   So you were searching for any e-mails that
9  mentioned the word Technologic?
10    A.   Correct.
11    Q.   And what sort of e-mail system do you use on your
12  personal computer?
13    A.   Gmail.
14    Q.   So you were searching within the Gmail web
15  browser interface?
16    A.   Correct.
17    Q.   When did you first start doing business with
18  Technologic?
19    A.   I don't recall.  I would have to look that up.
20    Q.   Okay.  In your first deposition that took place
21  on January 14th of this year -- bear with me just a moment
22  -- you testified that you switched from Shoutpoint
23  Technologic in late 2016 or early 2017.  Does that sound
24  about right?
25    A.   You know, again, without looking -- that was an

3 (Pages 6 - 9)

Page 10

1  estimate, and I need to look to find out exactly when that
2  was before I answer that.
3       MR. LEVIN:  Okay.  Kevin, I'd like to ask that
4  some supplemental answer be provided if he has a
5  chance to review just to confirm the date that he
6  first began doing business with Technologic.
7       MR. TROST:  Just send me an e-mail after
8  summarizing your requests.  We can respond to those.
9       MR. LEVIN:  Sure.
10       MR. TROST:  I also just want to point out this is
11  a supplemental deposition based upon the documents
12  that were produced in response to the subpoena after
13  the court hearing.  So I imagine your questions are
14  going to be tailored to the subpoena response and not
15  wander over into the topics that were already covered
16  in the January dep.
17       MR. LEVIN:  No.  But I think when he first began
18  doing business with a company from whom he's produced
19  80 pages of communications is a relevant question to
20  the subpoena response.
21       MR. TROST:  And that's fine.  I'm just making
22  that statement just so we're all on the same page.
23       MR. LEVIN:  Okay.  Fair enough.
24  BY MR. LEVIN:
25  Q.  Mr. Montes, is there any reason to think there

Page 11

1  are any other written communications that you had with
2  anyone associated with Technologic other than what you've
3  produced in Exhibit No. 1?
4  A.  No.  No.
5  Q.  Okay.  Then if you could please skip ahead in
6  Exhibit No. 1 to page 8 -- 83 of the PDF.  Let me know
7  when you're there.
8  A.  Okay.  I'm just waiting for it to load.  Bear
9  with me.  Okay.
10  Q.  All right.  Are you looking at the page that says
11  at the top, "Welcome to Stratics Network, activate your
12  account"?
13  A.  No.  I am at 883, but I don't see that.  I'm at
14  dialerleads.com, credentials and instructions.
15  Q.  No, just 83.
16  A.  Oh.  I'm sorry.  Eighty-three.  Let me go back.
17  Okay.  "Welcome to Stratics Network."  Yes.
18  Q.  Okay.  What is Stratics Network?
19  A.  Stratics Network is a platform that we use for
20  polling.
21  Q.  For what?  I'm sorry.
22  A.  Political polling.
23  Q.  Okay.  And what relevance does Stratics Network
24  have to this case?
25  A.  Zero.

Page 12

1  Q.  Was that responsive to paragraph 2 of the rider
2  to the subpoena?
3  A.  Without looking at it -- you've got to read it to
4  me.
5  Q.  "Any e-mails and other written communication sent
6  by Montes to or received by Montes from anyone associated
7  with any dialing platform or software utilized by
8  customers of Montes."
9  A.  Yes.  They are a dialer platform that we use.
10  But our client is a company called Rosetta Stone, and they
11  are a political polling company.
12  Q.  If you could please skip ahead to page 87 in
13  Exhibit No. 1.
14  A.  Okay.
15  Q.  All right.  These appear to be some
16  communications with somebody named Aftab Baig.
17  A.  Yes, sir.
18  Q.  I'm not sure if I'm pronouncing that correctly.
19  A-f-t-a-b, last name B-a-i-g.
20  A.  Yes, sir.
21  Q.  Is that someone associated with Stratics Network?
22  A.  Yes, sir.  He is my contact there.
23  Q.  Do you have any reason to believe that he would
24  have any knowledge relevant to the issues that we're
25  dealing with in this case?

Page 13

1  A.  No.  But you're free to contact him.
2  Q.  If you could please skip ahead in the PDF to page
3  number 120.  It says, "Shoutpoint direct to voice mail,"
4  at the top.
5  A.  Waiting for it to load.  Okay.  Okay.  I'm there.
6  Q.  Okay.  From my review of these records, it
7  appears that -- starting there through about the next 12
8  pages or so appear to be e-mails with various individuals
9  at Shoutpoint; is that correct?
10  A.  Yes.
11  Q.  And were these also produced in response to
12  paragraph number 2, e-mails that you sent to or received
13  from representatives of other dialers with whom you work?
14  A.  Yes.
15  Q.  And you ceased working with Shoutpoint at the
16  time that you started working with Technologic; correct?
17  A.  Without looking I couldn't tell you, but it was
18  around that time.
19  Q.  I believe you testified in your last deposition
20  that you switched to Technologic because they were
21  cheaper, and Shoutpoint had cut off your line of credit at
22  that point.  So without telling me the date, at any point
23  were you working with Shoutpoint and Technologic at the
24  same time?  Do you know?
25  A.  I would have to look if we still have a platform

4 (Pages 10 - 13)

Page 14

1  with them.  I want to say no, but I cannot guarantee that
2  without looking at it.
3      Q.  Okay.  If you could please skip ahead to page 129
4  in Exhibit No. 1.
5      A.  Okay.
6      Q.  It says, "Ignite payments and First Data merchant
7  account," at the top?
8      A.  Yes.
9      Q.  And below that it appears to be the e-mail that
10  you copied from somebody named Bridget Sanders at First
11  Data?
12      A.  Correct.
13      Q.  Okay.  What does this e-mail reflect?
14      A.  You had wanted to know who my credit card
15  processer was at the time.
16      Q.  So paragraph number 3 in the rider to the
17  subpoena requests all documents identifying any companies
18  and merchant accounts used by Montes or any entity owned
19  or controlled by Montes to process credit card
20  transactions.
21      A.  Correct.
22      Q.  This is in response to that request?
23      A.  Correct.
24      Q.  Okay.  At the top of page 129, there's a black
25  box with some information that's been redacted.  Is that

Page 15

1  your merchant account number that's been redacted?
2      A.  I would assume so.  I don't know.
3      Q.  Did you redact that, or did your attorney redact
4  that?
5      MR. TROST:  This is Kevin.  My office redacted
6  it.  It appeared to be a merchant account number.
7      MR. LEVIN:  Well, it appears that the number
8  would be responsive to the request in the subpoena for
9  which the Court had compelled a response, but I guess
10  we can talk about that later.
11      Q.  So these other e-mails that we've been talking
12  about with First Data, with Shoutpoint and with the other
13  dialer, Stratics Network -- sorry -- did you put those
14  together in the same way that you did the e-mails with
15  Technologic?
16      A.  I did.  I searched my e-mails, and what I found I
17  copied --
18      Q.  Can't hear you, Mr. Montes.
19      A.  Yes.  I did.  I searched my Gmail, and what I
20  found I was able to copy and paste in this document.
21      Q.  And what did you search for, just the company
22  names again?
23      A.  Yes, company names.
24      Q.  Turn to page 132, please, in Exhibit No. 1.
25      A.  Okay.

Page 16

1      Q.  This appears to be an e-mail correspondence with
2  an e-mail address, payments@intuit.com.  Did you use
3  Intuit Payment Solutions as a credit card processor at
4  some point?
5      A.  It's the same as First Data.  It's just another
6  name that they use.
7      Q.  Same company?
8      A.  I believe it's the same company.  Yeah.
9      Q.  Okay.  Please turn ahead to page 135.
10      A.  Okay.
11      Q.  Okay.  Are you looking at the page identifying
12  contact information for Fernando Ugarte?
13      A.  I am.
14      Q.  Okay.  From my review of your production from
15  page 135 through the end of the documents, over 1,100
16  pages appears to be the same set of data and information
17  for a number of different people along with any
18  correspondence that you had with those individuals.
19          Is that a correct characterization of what you
20  produced?
21      A.  Yes.
22      Q.  And the page we're looking at, 135, has different
23  information for Fernando Ugarte including his address,
24  daytime phone, evening phone, e-mail address and so on.
25  Was that information that was entered through your

Page 17

1  AutoDialer123 website?
2      A.  Yes.
3      Q.  Okay.  How did you put this information together
4  for these various individuals?
5      A.  I went to the Gmail, and I typed in "sign-up
6  form" and loaded up everything I found.
7      Q.  So when somebody fills out that form, you receive
8  an e-mail with this information at your Gmail address?
9      A.  Yes, sir.
10      Q.  And you're copying and pasting the contents of
11  that e-mail into this document?
12      A.  Correct.
13      Q.  All right.  So towards the bottom of page 135,
14  there is an entry where it says, "800 Link or press 1
15  number."  Do you see that?
16      A.  Yes, sir.
17      Q.  What does that mean?
18      A.  If they have a -- that's essentially their caller
19  I.D.  So they all have to give us a caller I.D., and
20  that's what that is.
21      Q.  So if Fernando Ugarte is placing calls through
22  your system, that is the number that would show on the
23  caller I.D. of the recipient of any of his calls; is that
24  correct?
25      A.  Correct.  Unless they change it, but we would

Page 18

1 have a record of it.
2 Q. So what is 800 Link exactly? What does that
3 mean?
4 A. 800 Link is a company that a lot of people will
5 go to to get -- it's just one of many, but it's one of
6 them that was popular with this group. And they get an
7 800 Link number, which could be a local line or an 800
8 number, and they use that as either their caller I.D. or a
9 back-in message or whatever they're doing with their
10 program, whatever their program is.
11    But they have to give us a caller I.D. So no
12 matter what, they have to give us something. And
13 sometimes it's with 800 Link. Sometimes it's with who
14 knows what service. But at the end of the day, that's
15 what it's there for.
16 Q. What is a press 1 number?
17 A. A press 1 is where if they are going out with a
18 message and somebody wants to hear more information, they
19 can press 1 and our system will route it to that number.
20 So if this is their press 1 number, for instance, it's
21 also their caller I.D. usually. And we will transfer any
22 people who answered live and have more interest in
23 whatever it is that they're doing to that number.
24 Q. So the number that you have for Mr. Ugarte does
25 not appear to be a valid telephone number; correct?

Page 19

1 A. I have no idea. I haven't called it, but --
2 Q. Well, it's 11 digits, so I don't know how it
3 could be. That's why I'm asking.
4 A. Well, we probably lopped off a zero or test
5 called it first.
6 Q. So do you require that the 800 Link or press 1
7 number that's going to show up on a recipient's caller
8 I.D. be an actual working telephone number?
9 A. Usually we'll call them and verify they go
10 somewhere. We don't mandate it, but I don't know anybody
11 that would do anything different.
12 Q. So you call and check those phone numbers for
13 every new customer when they provide them to you?
14 A. If we feel like we need to. We don't always do
15 it, especially when we're busy. But I don't know anybody
16 that would waste telemarketing without a valid caller I.D.
17 They want people to call them back, so -- no. The answer
18 is no. I don't always call them.
19 Q. Okay. If you could please skip ahead to page
20 138. It says, "Dialer credentials and instructions," at
21 the top.
22 A. Okay.
23 Q. So what does this page of the production reflect?
24 A. This would be our -- we would send this out, if
25 I'm not mistaken, once we got their account set up. It

Page 20

1 gives them instructions to go to YouTube and figure out
2 how to use the system. It talks about a number of other
3 things, but if they need help, call us.
4 Q. So if you skip ahead to the next page, 139, we
5 have some information regarding somebody named Ron Long.
6 Do you see that?
7 A. Yes.
8 Q. And if you go back to page 138, is this an e-mail
9 that you sent to Ron Long, or where did this come from?
10 How and why did you put it into this production response?
11 A. This would have been something we sent back to
12 Ron Long.
13 Q. So that would be an e-mail that you sent him
14 after you received his data requesting an account as a new
15 customer?
16 A. Correct.
17 Q. For Mr. Long's information, there's no entry
18 under 800 Link or press 1 number. Would you have set up
19 an account for somebody without having that caller I.D. or
20 call-back number?
21 A. We would. It wouldn't be -- they wouldn't be
22 able to use it. And if you notice on top of page 138, I
23 sent it with a bold thing there in parentheses. It says,
24 "I need your press 1 number."
25 Q. Okay. Under comments Ron Long apparently

Page 21

1 entered, "I am a part of Brian Kaplan's SSM group." Do
2 you require any of your customers to identify their
3 affiliation or the purpose for which they're going to use
4 the system to make these calls?
5 A. No. Because they all send us their data and
6 their audio file, or they load it themselves or whatever
7 the case is. Some people -- you know, we need to get on
8 the phone -- in fact, a lot of them we need to get on the
9 phone and do a training session on how to use the system.
10    Most of these people would load their stuff
11 themselves, so we don't really -- we don't really care who
12 they -- what team they belong to, or if they belong to a
13 team or whatever company. I mean, it wasn't our business,
14 so we didn't care. We just wanted to get the calls out
15 for them.
16 Q. Okay. If you could skip down, please, to page
17 number 160, 1-6-0.
18 A. Okay.
19 Q. So at the bottom of that page, we have some
20 information apparently related to somebody named Brandon
21 Spence. Do you see that?
22 A. Yes.
23 Q. And starting at this point in the PDF there's now
24 a data field that says "country." But next to that it
25 says "SSM." Do you know what SSM is?

6 (Pages 18 - 21)

Page 22

1    A.  I know what SSM is.  It was a -- some business
2  that these guys were pushing, but I don't know why they
3  filled it out in country.
4    Q.  On your AutoDialer123 website that we discussed
5  at the last deposition, we went through that form.  And
6  there is a drop-down menu where the person filling out the
7  form could indicate the company or business with which
8  they're affiliated; correct?
9    A.  Correct.
10    Q.  Is it possible that the entry selected on that
11  drop-down menu populates into this field titled "Country"?
12    A.  No.
13    Q.  The next several instances in this PDF of that
14  data field, country, contain an entry that just reads
15  "MMM."  Is that one of the businesses that is affiliated
16  with Dana Urlich?
17    A.  I don't know if that was Dana Urlich's offering
18  or not without looking.
19    Q.  Okay.  If you go to page 208, as another example,
20  under country it says "Tidom," T-i-d-o-m.  And there are
21  many other instances throughout this document where the
22  country field says SSM, MMM or Tidom.  That's why I'm
23  asking you if it appears that that might be the entry from
24  that drop-down menu.
25    A.  Yeah.  No.  Those people are putting that in

Page 23

1  there by themselves.  At this time I don't think we have
2  that in there.  I don't think that was a field that we
3  offered.
4    Q.  Okay.  So they're filling in their business
5  affiliation in the country?
6    A.  Evidently.  I didn't ask anybody to do that, and
7  it wasn't one of our fields at the time, I don't believe.
8  If you want you can go to autodialer123.com and fill out a
9  sign-up form, and I'll send you what we have.
10    Q.  So if I fill out your sign-up form on the
11  website, you will provide your attorney the e-mail address
12  you received --
13    A.  Yes, sir.
14    Q.  -- so I can see the form once you received it?
15    A.  Yes, sir.
16    Q.  Okay.  Maybe I'll do that.  All right.  If you
17  could please turn to page 163, 1-6-3, in the PDF, Exhibit
18  number 1.
19    A.  Okay.
20    Q.  Okay.  So the next five or six pages consists of
21  a table with these columns of information.  What does this
22  reflect?
23    A.  So these are call reports.  These are the
24  skeletal remains of any calls that were made by this
25  particular client.

Page 24

1    Q.  So if we back up, the last named client before
2  that report is Brandon Spence in Louisville, Kentucky, at
3  the bottom of page 160.  So are you saying that that is
4  Mr. Spence's call report?
5    A.  If I filled that out below his name, it more than
6  likely would be.  Yes.
7    Q.  So why do we have those call reports for some
8  people but not most that you've identified in this
9  production?
10    A.  You know, I don't know.  I might have done it
11  because that might have been one of the 11 caller I.D.'s
12  that we identified in our system that we have.
13    Q.  The previous page, 162, is blank and just says
14  "Confidential."  Was there something redacted from that
15  page?
16      THE WITNESS:  Kevin?
17      MR. TROST:  This is Kevin.  I'm jumping in here.
18  I believe when my firm was putting together the
19  production there was some blank pages that got
20  incorporated into the production.  I do not recall any
21  entire page being, you know, labeled "Confidential" or
22  blacked out.
23      If there had been information redacted, they
24  would have made it obvious that it was redacted with,
25  you know, a black blacking out or something of that

Page 25

1  nature.  I think this is just a blank page that got
2  incorporated into the production.
3    Q.  Okay.  Mr. Montes, where did you -- from where
4  did you obtain this call data?
5    A.  From the Dialer.2 platform, Technologic, Inc.
6    Q.  And it's your testimony that you included it
7  because this is one of the caller I.D.'s identified by
8  Mr. Montes -- excuse me, by Mr. Cunningham that you were
9  able to find in the Technologic system?
10    A.  I need to look and verify that that's what that
11  was.  I remember putting them in here, if that's what it
12  was, but without looking I can't tell you off the top of
13  my head.
14    Q.  Well, we're taking this deposition today for the
15  purpose of questioning you regarding these documents that
16  you produced.  And you're telling me you don't -- you're
17  not sure what this is or why you put it there?
18    A.  Yeah.  Correct.  Without looking at it, I can't
19  tell you why I put it there.
20    Q.  But --
21    A.  But those are call reports.  And I remember doing
22  it because that was -- I would have done it because it
23  would have been one of the 11 caller I.D.'s that we found
24  in our system that Mr. Cunningham is alleging called him.
25  But without going through it, I can't guarantee that.  I

7 (Pages 22 - 25)

Page 26

1  need to verify that.
2  Q.  What is it that you need to look at to verify?
3  A.  I just need to look and see why I put that in
4  there.  I would almost guarantee it, but really I've got
5  to -- I've got to think about it.
6  MR. LEVIN:  All right.  Kevin, I'll include this
7  in the e-mail that I'm going to send you, but I'm
8  going to need some kind of confirmation.  He can't
9  tell me what this is and why it's there when that's
10  the purpose of setting up this deposition today.
11  Q.  Anyway, can you tell me, Mr. Montes, what these
12  headings mean in the various columns on page 163?
13  A.  Yes.  So let me go back to 163.
14  Q.  Start from left to right, please.
15  A.  Okay.  From left to right, you have the company
16  name.  And then the first column and numbers is agent
17  busy -- or, I'm sorry, calls -- the number of calls.  So
18  the second column is number of calls.  The third column is
19  how many live people answered.
20  Q.  I'm sorry.  Mr. Montes, I'm sorry to interrupt
21  you.  Let's do this differently, so everybody is clear.
22  So the first -- the names don't really line up with the
23  columns, but it appears the first entry in the left-hand
24  most column on page 163 says "WED-reminder."
25  A.  Yes.  That is the campaign name.

Page 27

1  Q.  Okay.  And then next to that is a number, 2,188.
2  A.  That's the total number of calls that the person
3  made.
4  Q.  Okay.  And next to that is number 784.
5  A.  That's how many live people answered the phone.
6  Q.  And next to that, 1,019?
7  A.  That's how many answering machines picked up.
8  Q.  Then next to that, number 19?
9  A.  That's how many phone numbers were busy at the
10  time that the system made the attempt to call them.
11  Q.  Okay.  Then the next --
12  A.  No answer.
13  Q.  -- 366.
14  A.  366 is no answer, so nobody answered the phone.
15  Q.  Okay.  The next column we have a zero.
16  A.  Fax numbers.
17  Q.  Another zero after that.
18  A.  Agent connected.  That means --
19  Q.  What does that --
20  A.  So if someone had pressed 1, it would show up
21  here under agent connected.
22  Q.  If they pressed 1 to be directed back to a live
23  person?
24  A.  To either -- whatever the number is that they
25  give us for press 1.

Page 28

1  Q.  Okay.  So then the fourth column in order, that
2  has a zero after that.
3  A.  That is agent busy.  So if our system has a press
4  1 being transferred to another phone number and that phone
5  number is busy and it bounces, it would show up under this
6  column.
7  Q.  Okay.  And then in order, the fifth column in a
8  row, that contains a zero.
9  A.  Agent, no answer.  And that means that the phone
10  rang and rang and rang, and nobody at that transfer number
11  picked up.
12  Q.  Okay.  The next column over appears to carry down
13  to the next line.  If I'm reading it correctly, it appears
14  to be a date entered, 9/23/2015.
15  A.  Yeah.  The next one is in progress.  So if it was
16  a live campaign and press 1 transfers were sent, this
17  would show in progress.  So it would -- you would see --
18  you could watch your campaign go out if this was live, and
19  you would be able to see how many people are in talking to
20  wherever that number -- press 1 number goes to.
21  Q.  So there's no numerical entry that reflects the
22  in progress?
23  A.  There would be, but this probably wasn't a press
24  1 campaign.
25  Q.  So it looks like actually the in progress would

Page 29

1  be the last of the five zeros then?
2  A.  Correct.
3  Q.  Okay.  And then the next column would be the
4  heading date, 9/23/2015.  Is that when those calls were
5  placed?
6  A.  Correct.
7  Q.  And then the next column, total cost, what does
8  that reflect?
9  A.  Total cost to the customer.
10  Q.  $28.11?
11  A.  Correct.
12  Q.  And then after that, minutes?
13  A.  Those are the total minutes that they used on
14  this campaign.
15  Q.  1,654?
16  A.  Correct.
17  Q.  And then the final column percent, P1?
18  A.  That's the percentage of live people that pressed
19  1.  And it zeroed out, so this probably was not a press 1
20  campaign.  It was probably -- for all I know, they
21  probably sent this to answering machines.
22  Q.  And those columns are the same for every line of
23  data where you've provided this format?
24  A.  Correct.
25  Q.  And this data was only provided for telephone

8 (Pages 26 - 29)

Page 30

1 numbers that match those that you said were identified by
2 Mr. Cunningham?
3    A.  I believe so.  Yeah.
4    Q.  The data that you provided in Exhibit No. 1, did
5 you limit it by date range in any way?
6    A.  I did, from 2015 to 2017.
7    Q.  The full length of all three of those years?
8    A.  Correct.
9    Q.  Okay.  If you could please open up the document
10 that's marked as Exhibit No. 3.
11    A.  Okay.
12    Q.  All right.  This is the spreadsheet that you
13 provided to your attorney, who, in turn, provided it to
14 me.  Does that look correct?
15    A.  Correct.
16    Q.  Okay.  And if I'm understanding the description
17 of this correctly, this is -- the highlighted in yellow
18 entries on this exhibit are the telephone numbers that you
19 say Mr. Cunningham identified which also showed as caller
20 I.D.'s in your system; is that correct?
21    A.  Correct.
22    Q.  How did you come up with this list of numbers
23 that you say Mr. Cunningham identified?  Where did you
24 take those from?
25    A.  I believe I got them from the lawsuit.

Page 31

1    Q.  There's been a number of different documents
2 produced with lists of phone numbers on them.  Do you have
3 any recollection of what you looked at when you prepared
4 this?
5    A.  I don't remember.  I'm certain it had something
6 to do with this case, though.  Otherwise, I wouldn't have
7 done it.
8    Q.  Okay.  Can you take a look at Exhibit No. 4,
9 please.
10    A.  Okay.
11    Q.  Okay.  This is a list that was prepared by
12 Mr. Cunningham that we provided to your attorney early in
13 discovery.  Did you review this list when you were
14 preparing your list of caller I.D.'s?
15    A.  I might have.  I do have the list that I -- I had
16 to hand type them into Excel, and this looks pretty
17 familiar.
18    Q.  But you're not sure?
19    A.  Not off the top of my head, no.
20    Q.  Do you have any notes or anything anywhere that
21 would tell you whether you reviewed that list in Exhibit
22 No. 4 when you were preparing your list in Exhibit No. 3?
23    A.  I would.  I would.  I have a file, so I'll look
24 at it and see which list it was.
25    Q.  If that file is accessible to you, we can take a

Page 32

1 short break and you can take a look at it now.
2    A.  Let me --
3    Q.  Because I'm going to ask you the same questions
4 about some other lists as well.
5    A.  All right.  Let me take a look here.
6       MR. LEVIN:  All right.  Why don't we go off the
7 record for a few minutes.
8       (A short break was held from 3:13 p.m. to
9       3:20 p.m.)
10 BY MR. LEVIN:
11    Q.  All right.  While we were off the record,
12 Mr. Montes, you were starting to say something about the
13 notes that you were looking for, as to how you prepared
14 your spreadsheet that is labeled as Exhibit 3?
15    A.  Yeah.  I couldn't find the form that I took those
16 numbers down.  I couldn't find it, so I'll have to look
17 for it in further detail.
18    Q.  Was it one form, to use your word, that you
19 pulled those numbers from, or was it multiple sources?
20    A.  I don't remember.  I typed them into that Excel
21 spreadsheet a while ago, so I don't remember where I got
22 it.
23    Q.  Okay.  So you prepared this spreadsheet yourself
24 from scratch; correct?
25    A.  Correct.

Page 33

1    Q.  Okay.  And what did you do to determine whether a
2 number was on our system, as it says here?
3    A.  Kevin sent you a video that I did showing you
4 exactly how I did it.  We go into our system, and all of
5 the caller I.D.'s that we've used are in there.  And I can
6 go numerically and just go down a list and find them.
7    Q.  Okay.  Well, I recall exactly what you're talking
8 about from the video.  It didn't show -- you searched for
9 those caller I.D.'s to show at the beginning of that list.
10 So you're just saying you scrolled through the list and
11 looked for each number in numerical order?
12    A.  Yes, sir.  And we have over 6,000 of them in our
13 system, so it takes a while to do it.
14    Q.  And that is every caller I.D. number that has
15 been used in any dialing campaigns?
16    A.  Correct.
17    Q.  That's set up through the system using
18 Technologic to route the calls?
19    A.  Correct.
20    Q.  So any caller I.D.'s that you used -- for
21 example, when you had the Shoutpoint system -- would not
22 reflect in this list?
23    A.  No.  They would not show up because I have no
24 access to Shoutpoint.
25    Q.  And each of the highlighted entries in your

1 spreadsheet under your column labeled "Status," it says
2 "active." What does that mean?
3   A.  It just means their account is still in our
4 system.
5   Q.  Does it mean they're actively placing calls with
6 you still?
7   A.  No.  It just means they have the ability to if
8 they want to.
9   Q.  So I guess I'm trying to understand if that
10 column has some kind of independent meaning.  Because by
11 listing the number, you've indicated that it is in your
12 system?
13   A.  Correct.  Yes.  And even if it was a nonactive
14 account, the caller I.D.'s would still show up.
15   Q.  So what is the definition of an active versus not
16 active account, as you're describing it?
17   A.  Honestly, I don't know.  I've never had an
18 inactive account.  I mean, I have accounts that people
19 don't use, but they're still active in our system.  We
20 don't get rid of them.
21   Q.  Okay.  And then the furthest column on the right
22 of this spreadsheet says "customer number"?
23   A.  Correct.
24   Q.  And that's just an internal reference number for
25 you?

1   A.  Correct.
2   Q.  And you mentioned in the video that two of the
3 caller I.D.'s went to the same customer, which would be
4 customer number 64, I assume?
5   A.  Correct.
6   Q.  Okay.  In that video you said there could only be
7 11 calls maximum having been made through your system
8 because we have 11 caller I.D.'s.  How do you know that
9 there would be only 11 calls maximum?
10   A.  I don't think that's what I meant.  What I meant
11 was that there's 11 customers that could have called those
12 numbers.
13   Q.  So it's possible that any of these numbers could
14 have called Mr. Cunningham multiple times; correct?
15   A.  Sure.
16   Q.  Okay.  Do you have access to any records that
17 would show how many calls were placed to Mr. Cunningham's
18 numbers from these numbers?
19   A.  I do not.
20   Q.  Okay.  I think I know what you're going to say.
21 But just for the record, since we have these exhibits
22 marked, can you open up Exhibit 5, please?
23   A.  Sure.
24   Q.  This is another spreadsheet that was prepared by
25 Mr. Cunningham that we provided to your attorney in

1 discovery in this case.  Do you know if you reviewed this
2 spreadsheet when preparing --
3   A.  Yes.
4   Q.  -- Exhibit No. 3?
5   A.  This is the one.
6   Q.  Okay.  You believe this is the one that you were
7 working off of?
8   A.  I do.
9   Q.  So if that's correct, then every phone number
10 other than the ones that belong to Mr. Cunningham listed
11 on Exhibit No. 5 should be in your Exhibit No. 3?
12   A.  Correct.
13   Q.  Okay.  Could you please open Exhibit No. 6?  This
14 was previously marked as Exhibit No. 12 in
15 Mr. Cunningham's deposition.  Your attorney had printed
16 out a list of screenshots, essentially, of the files that
17 we produced with recordings of phone calls that he had
18 received.
19   A.  Okay.
20   Q.  Did you check the caller I.D.'s reflected on
21 these recording files when you prepared your Exhibit No.
22 3?
23   A.  I did not.
24   Q.  Okay.  And if you could, please, open up Exhibit
25 No. 7.

1   A.  (Witness complies with the request.)
2   Q.  This is a list of calls provided to us by
3 Connexum via the subpoena we served on them, which I also
4 provided to your attorney.
5   A.  Okay.
6   Q.  Did you use any of these numbers in searching
7 your system for caller I.D.'s?
8   A.  I do not -- no.  I've never seen this, so no.
9   Q.  Have you heard of Connexum?
10   A.  Yes.
11   Q.  What company is that, to the best of your
12 knowledge?
13   A.  They are a tel. co., and they service not only
14 Technologic, Inc., but probably 30 other dialer companies.
15   Q.  So calls placed through Technologic are then
16 routed to the end user via Connexum?
17   A.  Maybe.  Like I explained in my testimony last
18 time, this -- Connexum is a long distance company, and
19 they provide long distance service.  And Technologic, Inc.
20 may or may not utilize their system.  And the reason is is
21 all dialer companies have what's called an LCR, a least
22 cost routing, platform within.  And you insert rate decks
23 from a dozen different telecommunications companies.  So
24 Technologic Inc. may have used them; maybe they didn't.
25 It's hard to say.  But they have -- but Connexum is used

10 (Pages 34 - 37)

Page 38

1 by a whole bunch of different companies.
2    Q.   So is your testimony, then, that Exhibit No. 5
3 was the only list of caller I.D.'s that you used in
4 preparing your list reflected in Exhibit No. 3?
5    A.   Correct.
6    Q.   Okay.   Exhibit No. 8 is the video that you
7 provided to us that you referenced earlier.
8    A.   Uh-huh.
9    Q.   The date stamp that I see on that video just
10 through Windows shows it's 4/1/2019.   Is that the date you
11 made that video?
12    A.   Yeah.   It was really recent.   I would -- yeah.   I
13 just sent it to Kevin, so --
14    Q.   Okay.   And we don't have to play the whole thing
15 on the record.   We can pull up pieces of it, if necessary.
16 But I'm going to ask you some questions about different
17 things you said in that video based on my notes.   If you
18 want to listen back to it or view it before you answer any
19 questions, by all means you can do so.
20    A.   Okay.
21    Q.   All right.   So you started off -- you were giving
22 a demonstration of how you believe that call data reports
23 are not available for different date ranges that we had
24 requested.
25    A.   Correct.

Page 39

1    Q.   And you started off saying you are in one of the
2 accounts, as if you were showing us a demonstration of
3 what it looks like when they're not available.
4    A.   Correct.
5    Q.   Do you know what account that was that you were
6 in?
7    A.   I don't.   I can go into any account that is that
8 old, and the same result will happen.
9    Q.   How do you know that?
10    A.   I've gone into several accounts looking for them.
11    Q.   Okay.   So there are various dates of reports that
12 you tried to pull up that I noted here, the call data
13 reports; correct?   That's what CDR stands for; right?
14    A.   Call detail report.   Yes.
15    Q.   Call detail report.   Sorry.   Those were
16 April 7th, 2015, December 29th, 2017, January 1st, 2018,
17 March 8, 2018, May 22nd, 2018.   And each one of those came
18 up with probably have no CDRs with that disposition.
19    A.   Correct.
20    Q.   So what does that mean to you when the system
21 sends back that message, no CDRs with that disposition?
22    A.   It means that that data is no longer available.
23    Q.   It's no longer available to you, or it no longer
24 exists?
25    A.   No.   It's purged.

Page 40

1    Q.   How do you know that it has been purged?
2    A.   Because it's not on there anymore, and I'm told
3 that it's been purged.
4    Q.   Who told you that?
5    A.   I talked to a guy at Connexum that knows the
6 system, and he said it's programmed to purge out.   They
7 can't warehouse all of that old data, so they purge it
8 out.
9    Q.   Who is the person that you spoke with?
10    A.   A guy named Scott.
11    Q.   How did you connect with Scott?
12    A.   Scott is the owner of Connexum.
13    Q.   How does he know when Technologic purges data
14 from its system?
15    A.   I don't know.
16    Q.   When did you speak with him about it?
17    A.   Probably about a month ago.
18    Q.   Do you recall Scott's last name?
19    A.   Yeah, yeah, yeah.   Hang on one second.   It's
20 Scott Kettle, K-e-t-t-l-e.   Would you like his e-mail
21 address?
22    A.   Sure.
23    A.   Letters sk@gawk -- g-a-w-k -- .com.   And I can
24 give you his phone number.
25    Q.   Okay.

Page 41

1    A.   I can't give you his phone number.   It's not -- I
2 didn't save it.   I'll find it for you.   I'll put it
3 into -- I'll put it -- just e-mail Kevin.   And when he
4 gives me the list, it's one of the things I'll give to
5 you.
6    Q.   Have you ever communicated with somebody at
7 Connexum named Christopher Hall?
8    A.   Not that I'm aware of, no.
9    Q.   Do you know who that is?
10    A.   I don't.
11    Q.   Did Mr. Kettle tell you how long Technologic
12 maintains call data -- call detail reports in its system
13 before they're purged?
14    A.   No.   I've got his number whenever you're ready.
15    Q.   Okay.
16    A.   323-2 --
17    Q.   I'm sorry.   Say that again, please.   You faded
18 out.
19    A.   323-286-3564.
20    Q.   So paragraph 17 of the rider to the subpoena,
21 what's been marked as Exhibit 2 for this deposition, asks
22 for all documents reflecting records of calls placed on
23 behalf of any individuals or entities identified in the
24 documents produced, pursuant to number 16, to the three
25 telephone numbers owned by Craig Cunningham.

11 (Pages 38 - 41)

Page 42

1      And was your demonstration in that video to show
2  us that none of those records exist?
3      A.  Correct.
4      Q.  We don't know for sure if they might not exist
5  somewhere, they're just not accessible to you?
6      A.  If you know where they're at, have at them.  But
7  they're not accessible to me.
8      Q.  Okay.  So how did you go about searching for each
9  of these different individuals or entities to ensure that
10 there were no records?
11     A.  I logged into our system and attempted to pull up
12 records, and they show up as not available.
13     Q.  Did you attempt to pull up all the records in
14 those date ranges for each of the individuals and
15 businesses listed in the subpoena?
16     A.  I pulled up everybody that I found that -- of the
17 caller I.D.'s that were in our system that -- on the
18 page -- on Exhibit 3.  So everybody in yellow I made an
19 effort to pull up.
20     Q.  So you can search by caller I.D., and then it's
21 going to show you the various call campaigns that they
22 did?
23     A.  No.  I can find out who the client is and then
24 log in to their system and go through their call detail
25 reports -- or, I'm sorry, their call summary reports.

Page 43

1      Q.  So you only searched for the 11 caller I.D.'s
2  that are highlighted in Exhibit No. 3?
3      A.  Correct.
4      Q.  But you attempted to download any call detail
5  reports for any of those numbers for the years 2015, 2016
6  and 2017?
7      A.  Correct.
8      Q.  And every single one of those came back as no
9  CDRs with that disposition?
10     A.  Correct.  And you guys -- in the information that
11 I sent you, I'm sure you read a whole lot of user I.D.'s
12 and passwords.  They still work.  Help yourself.  Feel
13 free to log in to any of them.
14     Q.  Well, I'm just trying to verify if you checked
15 each of those numbers and every call campaign that they
16 uploaded to your system to see if the data is available,
17 or did you just stop at some point thinking records have
18 been purged?
19     A.  No.  I went through each and every one of the 11
20 that I found, and none of them had call detail reports
21 available for that date range.
22     Q.  Well, it happens that your response to the
23 subpoena is incomplete then because that's not what was
24 requested in paragraph 17.  You chose to narrow it to 11
25 caller I.D.'s that you assumed were the only ones he got

Page 44

1  calls from.
2      A.  Okay.  Well, I don't know what you deem complete.
3  But if those are the calls in question, then I did my job.
4  And I deem it as complete.
5      Q.  In the video you made a statement clients are not
6  allowed to put their own caller I.D.'s in or take them
7  out.
8      A.  Correct.
9      Q.  What did you mean by that?
10     A.  It means they have to -- it's the one thing that
11 I have to do for every customer.  They have to send me
12 their caller I.D.  As we go back -- you remember when you
13 asked me, well, the caller I.D. is -- the guy didn't list
14 it?  And I said, well, if you go up, you'll see I asked
15 him for his caller I.D.  I can't activate an account
16 without a caller I.D., and they are not allowed to input
17 their own or take them out.
18     Q.  So you personally have to enter all those caller
19 I.D.'s?
20     A.  Yes.  So that's why it's imperative that they
21 give them to us when we set up the campaign.  Otherwise,
22 they'll got lost in the shuffle, and who knows if they
23 ever get launched.
24     Q.  Any of the call detail reports that you were
25 looking for that refer to a message that there were none

Page 45

1  with that disposition, do you know at what point those
2  records would have been purged?
3      A.  I have no idea.  You can ask Scott that when you
4  talk to him.  Maybe he knows.
5      Q.  At any point during this lawsuit, did you take
6  any steps to try to preserve any of those call detail
7  reports?
8      A.  No.  Because I was under the assumption that they
9  would always be there.  I mean, why would they purge them
10 and then -- evidently they get purged.
11     Q.  Have you ever had occasion to pull up one of
12 those call detail reports in the past?
13     A.  No.  No.  Because by the time there's call detail
14 reports, most customers are on their own and know how to
15 use the system.  So we don't get really wrapped up in
16 pulling reports for them.
17     Q.  Have you ever done that before?
18     A.  I've pulled up reports many times, but I've never
19 had to go back so far -- nobody has ever asked me to go
20 back that far.  Usually if somebody asks me to pull up a
21 report for them, it's within, you know, 30, 90 days.
22     Q.  Have you ever seen that message before, no CDRs
23 with that disposition --
24     A.  Yes.
25     Q.  -- prior to this --

12 (Pages 42 - 45)

1   A.  Yes, I have.

2   Q.  Okay.  And so, then, you were aware prior to

3   preparing your video and your spreadsheet, Exhibit No. 3,

4   that there were instances where detail reports would be

5   purged?

6   A.  I didn't know they were being purged.  I just

7   assumed they were a glitch.  That's how few times I've

8   ever had to do it.

9   Q.  So you're saying you did not know that they were

10  being purged until Scott Kettle told you that?

11  A.  Correct.

12  Q.  When did you first become aware that

13  Mr. Cunningham had filed this lawsuit against you?

14  A.  When I got notice that there was a court date

15  pending for a default judgment.

16  Q.  Okay.  So maybe since the hearing on the motion

17  for default judgment you've been aware that this lawsuit

18  was pending against you?

19  A.  Yes.

20  Q.  And were you aware at that time that this lawsuit

21  related to calls that the data of which was maintained by

22  Technologic Systems?

23  A.  I was made aware that there was a lawsuit.  And I

24  read the lawsuit, and I contacted an attorney.

25  Q.  Okay.  My question was:  When you first read the

1   lawsuit, were you aware that it related to phone calls,

2   the data from which was maintained by Technologic Systems?

3   A.  Yes.

4   Q.  And during the entire time this lawsuit has been

5   pending, you've had access to that Technologic system;

6   correct?

7   A.  Yes, sir.

8   Q.  Okay.  And prior to the motion to compel being

9   granted in this case, had you ever made any attempt to

10  download any call detail reports that you thought might

11  relate to this lawsuit?

12  A.  No.

13  MR. LEVIN:  All right.  Let's go off the record

14  again for a moment.  I might have a few more

15  questions.

16  (A short break was held from 3:48 p.m. to

17  3:52 p.m.)

18  MR. LEVIN:  Okay.  We can go back on the record.

19  BY MR. LEVIN:

20  Q.  In Exhibit No. 3, you listed the customer numbers

21  for those 11 caller I.D.'s?

22  A.  Yes.

23  Q.  Do you have any way to identify those users by

24  name as opposed to customer number?

25  A.  I do.

1   Q.  Okay.  Is that contained somewhere within Exhibit

2   No. 1 that you produced?

3   A.  No.

4   Q.  Okay.  Is that something you can do while we are

5   on the record here?

6   A.  No.

7   Q.  What would you have to do in order to find out,

8   for example, who is customer number 64?

9   A.  I could find out for you, but it's going to be

10  something you're going to ask Kevin for.  It takes a

11  while.

12  Q.  So can you describe for me in a minute or less

13  what you do to figure out who is customer number 64?

14  A.  So I have to go into our list of caller I.D.'s.

15  I have to find the caller I.D. because -- I have to do it

16  manually.  We don't have a caller I.D. search feature

17  within our system.  So I have to sort them by numerical

18  order, and then I have to go find them.

19  And then I have to find out who the -- who that

20  code belongs to, and then I can go in and find that.  But

21  it's a tedious process with 6,000 numbers.  So am I going

22  to do it today?  No.  But I might do it later if you ask

23  Kevin.

24  Q.  But whoever those individuals are, their

25  information is contained somewhere within Exhibit No. 1?

1   A.  It should be.

2   Q.  Did you ever see a copy of a letter that

3   Mr. Cunningham sent to your attorney asking that any

4   evidence or call records related to this case be

5   preserved?

6   A.  I don't recall seeing that letter, but I'll ask

7   Kevin.

8   Q.  Okay.  It appears that letter was dated February

9   26th of 2018.  Do you recall taking any steps to preserve

10  any data maintained in the Technologic system since the

11  filing of this lawsuit, or you became aware of it anyways?

12  A.  No.  I took no steps whatsoever because my

13  assumption was that all that information would be kept on

14  Technologic, Inc.

15  Q.  Do you know if Technologic has any data retention

16  policy?  Have you ever seen one?

17  A.  I've never seen one.  No.

18  Q.  Have you ever discussed in all your e-mails with

19  Technologic that -- I'm sorry.  In all the e-mails that

20  you have with Technologic representatives, have you ever

21  discussed any of their policies regarding their technical

22  data?

23  A.  No.

24  Q.  Are you familiar that companies generally keep

25  purged call records after an extended amount of time?

13 (Pages 46 - 49)

Page 50

1   A.  No.
2   Q.  So do you believe that a cell phone provider, for
3   example, has all call records -- any calls ever made and
4   any texts for ten years or longer?
5   A.  I have no idea.
6   Q.  I think we're about done here.  Bear with me just
7   a moment.
8       In the example that you provided in your video,
9   you were able to download call records for October 5th of
10  2018 and December 19th of 2018.
11  A.  Okay.
12  Q.  So in all of the searching that you did, your
13  response to the subpoena, what was the most recent record
14  that you were able to find?
15  A.  It's in the video.  Whatever that was was the
16  earliest that I could find.
17  Q.  That video is just one example; correct?
18  A.  Sure.
19  Q.  You did many more searches that were not
20  reflected in the video?
21  A.  Correct.
22  Q.  But that's the one that was the most recent that
23  you could find that you --
24  A.  I believe so.  Like I said, you guys have user
25  I.D.'s and passwords to a whole lot of accounts.  Help

Page 51

1   yourself.
2   Q.  And the call detail reports in which you were
3   searching are just the 11 caller I.D.'s listed on Exhibit
4   3 highlighted in yellow; correct?
5   A.  Correct.
6   Q.  Okay.  So you did not try searching by any of the
7   names that we listed in the rider to the subpoena?  For
8   example, Exhibit 2, the rider to the subpoena, on page 5,
9   numbers 12 and 13 reference Rich Holman (phonetic).  So
10  did you specifically search for Rich Holman?
11  A.  Oh, yeah.  Rich Holman is a 2018 client.  It's
12  outside of your realm.
13  Q.  So you did search for his records, or you did
14  not?
15  A.  No.  I did.
16  Q.  So he's one of the 11 caller I.D.'s on that
17  report?
18  A.  No, not that I'm aware of.  But you mentioned
19  him, so I looked him up.  But he's a 2018 customer.
20  Q.  So your searches were limited to 2015 through
21  2017?
22  A.  Correct.  That's what I was told.
23  Q.  By whom?
24  A.  By Kevin.  The judge said 2015 to 2017.
25      MR. TROST:  Mike, our function is not to get into

Page 52

1   what you and I talk about.
2       THE WITNESS:  Okay.
3       MR. LEVIN:  Sorry.  That wasn't my intention.
4       MR. TROST:  The magistrate/judge did limit the
5   scope and the time frame for the response to '15 to
6   '17.
7       MR. LEVIN:  Right.  Well, it appears Mr. Montes
8   limited the scope much further on his own.
9       THE WITNESS:  Well, I had to find out what year
10  he was in, so I looked for him.
11      MR. LEVIN:  Okay.  That's all I have.
12      THE WITNESS:  Okay.  Thank you, gentlemen.
13      MR. LEVIN:  Kevin, no questions?  Can't hear you,
14  Kevin.
15      MR. TROST:  No.  I think we're good.
16      MR. LEVIN:  Okay.  I would like an electronic
17  copy of the transcript.  We can go off the record.
18  I'm sorry.  How about signature?
19      MR. TROST:  Yes.  We'll read.
20      MR. LEVIN:  Reserved?  Is that what you mean?
21      MR. TROST:  Yeah.
22      MR. LEVIN:  Okay.  We'd like a copy of the
23  transcript.  Electronic is fine.  You don't have to
24  put this part on the record.
25      (Deposition concluded at 4:04 p.m.)

Page 53

1       CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4   COUNTY OF LEE
5
6   I, the undersigned authority, certify that
7   MICHAEL JAMES MONTES personally appeared before me and was
8   duly sworn.  He provided his driver's license as
9   identification.
10     WITNESS my hand and official seal this 25th day of
11  April, 2019.
12
13
14
15      Darla R. Rowe
        Notary Public - State of Florida
16      My Commission No:  GG 250771
        Expires:  10/6/2022
17
18
19
20
21
22
23
24
25

14 (Pages 50 - 53)

Page 54

REPORTER'S DEPOSITION CERTIFICATE

1

2

3  STATE OF FLORIDA)

4  COUNTY OF LEE)

5

6    I, Darla R. Rowe, Computerized Stenotype Reporter and

7  Notary Public in and for the State of Florida at Large,

8  certify that I was authorized to and did stenographically

9  report the deposition of MICHAEL JAMES MONTES; that a

10  review of the transcript was requested; and that the

11  transcript is a true and complete record of my

12  stenographic notes.

13    I further certify that I am not a relative, employee,

14  attorney, or counsel of any of the parties, nor am I a

15  relative or employee of any of the parties' attorney or

16  counsel connected with the action, nor am I financially

17  interested in the action.

18

19    DATED this 25th day of April, 2019.

20

21

22                    *Darla R. Costello*
                      Darla R. Rowe

23

24

25

---

Page 55

1                    Veritext Legal Solutions
                     1100 Superior Ave
2                    Suite 1820
                     Cleveland, Ohio 44114
3                    Phone: 216-523-1313
4
  April 25, 2019
5
  To: Mr. Trost
6
  Case Name: Cunningham, Craig v. Montes, Michael, et al.
7
  Veritext Reference Number: 3295767
8
  Witness:  Michael James Montes      Deposition Date:  4/18/2019
9
10  Dear Sir/Madam:
11
  The deposition transcript taken in the above-referenced
12
  matter, with the reading and signing having not been
13
  expressly waived, has been completed and is available
14
  for review and signature.  Please call our office to
15
  make arrangements for a convenient location to
16
  accomplish this or if you prefer a certified transcript
17
  can be purchased.
18
19  If the errata is not returned within thirty days of your
20  receipt of this letter, the reading and signing will be
21  deemed waived.
22
23  Sincerely,
24  Production Department
25
      NO NOTARY REQUIRED IN CA

---

Page 56

1                    DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3295767
3  CASE NAME: Cunningham, Craig v. Montes, Michael, et al.
  DATE OF DEPOSITION: 4/18/2019
4  WITNESS' NAME: Michael James Montes
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have made no changes to the testimony
  as transcribed by the court reporter.
8

9  Date _____      Michael James Montes
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11  the referenced witness did personally appear
  and acknowledge that:
12
      They have read the transcript;
13      They signed the foregoing Sworn
      Statement; and
14      Their execution of this Statement is of
      their free act and deed.
15
    I have affixed my name and official seal
16
  this _____ day of_____, 20____.
17
    _____
18    Notary Public
19
    _____
20    Commission Expiration Date
21
22
23
24
25

---

Page 57

1                    DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3295767
3  CASE NAME: Cunningham, Craig v. Montes, Michael, et al.
  DATE OF DEPOSITION: 4/18/2019
4  WITNESS' NAME: Michael James Montes
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
  as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
  that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  Date _____      Michael James Montes
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
  the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
      They have listed all of their corrections
18      in the appended Errata Sheet;
      They signed the foregoing Sworn
19      Statement; and
      Their execution of this Statement is of
20      their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20____.
23      _____
      Notary Public
24
      _____
25      Commission Expiration Date

---

15 (Pages 54 - 57)

Page 58

1            ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 4/18/2019
3    PAGE/LINE(S) /      CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____   _____
20   Date          Michael James Montes
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
          Notary Public
24
     _____
25        Commission Expiration Date

16 (Page 58)

**[00761 - action]**                                                        Page 1

| 0 |
|---|

**00761**   1:5

| 1 |
|---|

**1**   6:2,4,9,19,19
   7:12 8:11,16,23
   11:3,6 12:13 14:4
   15:24 17:14 18:16
   18:17,19,20 19:6
   20:18,24 23:18
   27:20,22,25 28:4
   28:16,20,24 29:19
   29:19 30:4 48:2
   48:25
**1,019**   27:6
**1,100**   16:15
**1,290**   6:8,16
**1,654**   29:15
**1-6-0**   21:17
**1-6-3**   23:17
**10/6/2022**   53:16
**103**   2:4
**11**   19:2 24:11
   25:23 35:7,8,9,11
   43:1,19,24 47:21
   51:3,16
**1100**   55:1
**12**   13:7 36:14 51:9
**120**   13:3
**12323**   53:14 54:22
**129**   14:3,24
**13**   51:9
**132**   15:24
**135**   1:12 16:9,15
   16:22 17:13
**138**   19:20 20:8,22
**139**   20:4
**14th**   9:21
**15**   52:5
**16**   41:24

**160**   21:17 24:3
**162**   24:13
**163**   23:17 26:12,13
   26:24
**17**   6:10 41:20
   43:24 52:6
**18**   1:10
**1820**   55:2
**19**   27:8
**19th**   50:10
**1st**   39:16

| 2 |
|---|

**2**   2:6 5:17,20 8:17
   12:1 13:12 41:21
   51:8
**2,188**   27:1
**20**   56:16 57:22
   58:22
**200**   2:7
**2015**   30:6 39:16
   43:5 51:20,24
**2016**   9:23 43:5
**2017**   9:23 30:6
   39:16 43:6 51:21
   51:24
**2018**   39:16,17,17
   49:9 50:10,10
   51:11,19
**2019**   1:10 53:11
   54:19 55:4
**208**   22:19
**216-523-1313**   55:3
**22nd**   39:17
**25**   55:4
**250771**   53:16
**25th**   53:10 54:19
**26th**   49:9
**28.11**   29:10
**29th**   39:16
**2:18**   1:11

| 3 |
|---|

**3**   14:16 30:10
   31:22 32:14 36:4
   36:11,22 38:4
   42:18 43:2 46:3
   47:20 51:4
**30**   37:14 45:21
**323-2**   41:16
**323-286-3564**
   41:19
**3295767**   55:7 56:2
   57:2
**333**   2:3
**33905**   1:13
**366**   27:13,14
**3:13**   32:8
**3:16**   1:5
**3:20**   32:9
**3:48**   47:16
**3:52**   47:17

| 4 |
|---|

**4**   3:4 7:11 31:8,22
**4/1/2019**   38:10
**4/18/2019**   55:8
   56:3 57:3 58:2
**44114**   55:2
**4:04**   1:11 52:25

| 5 |
|---|

**5**   35:22 36:11 38:2
   51:8
**53703**   2:7
**5th**   50:9

| 6 |
|---|

**6**   36:13
**6,000**   33:12 48:21
**60062**   2:4
**64**   35:4 48:8,13

| 7 |
|---|

**7**   36:25
**784**   27:4
**7th**   39:16

| 8 |
|---|

**8**   11:6 38:6 39:17
**80**   8:11 10:19
**800**   17:14 18:2,4,7
   18:7,13 19:6
   20:18
**83**   11:6,15
**87**   12:12
**883**   11:13

| 9 |
|---|

**9/23/2015**   28:14
   29:4
**90**   45:21

| a |
|---|

**ability**   34:7
**able**   15:20 20:22
   25:9 28:19 50:9
   50:14
**access**   33:24 35:16
   47:5
**accessible**   31:25
   42:5,7
**accomplish**   55:16
**account**   11:12
   14:7 15:1,6 19:25
   20:14,19 34:3,14
   34:16,18 39:5,7
   44:15
**accounts**   14:18
   34:18 39:2,10
   50:25
**acknowledge**
   56:11 57:16
**act**   56:14 57:20
**action**   54:16,17

activate  11:11
  44:15
active  34:2,15,16
  34:19
actively  34:5
actual  19:8
address  8:3 16:2
  16:23,24 17:8
  40:21
affiliated  22:8,15
affiliation  21:3
  23:5
affixed  56:15
  57:21
aftab  12:16
afternoon  6:16
agent  26:16 27:18
  27:21 28:3,9
ago  32:21 40:17
agreement  4:8,16
ahead  11:5 12:12
  13:2 14:3 16:9
  19:19 20:4
al  1:6 55:6 56:3
  57:3
alleging  25:24
allowed  44:6,16
amount  49:25
answer  10:2,4
  19:17 27:12,14
  28:9 38:18
answered  18:22
  26:19 27:5,14
answering  27:7
  29:21
anybody  19:10,15
  23:6
anymore  40:2
anyway  26:11
anyways  49:11

apparently  20:25
  21:20
appear  6:18 12:15
  13:8 18:25 56:11
  57:15
appearances  2:1
appeared  15:6
  53:7
appearing  4:20
appears  5:25 8:10
  13:7 14:9 15:7
  16:1,16 22:23
  26:23 28:12,13
  49:8 52:7
appended  57:11
  57:18
apply  5:1
appointed  7:1
april  1:10 39:16
  53:11 54:19 55:4
arrangements
  55:15
asked  44:13,14
  45:19
asking  19:3 22:23
  49:3
asks  41:21 45:20
assignment  56:2
  57:2 58:2
associated  8:21,25
  11:2 12:6,21
assume  6:20 15:2
  35:4
assumed  43:25
  46:7
assuming  8:1
assumption  45:8
  49:13
attached  57:7
attempt  27:10
  42:13 47:9

attempted  42:11
  43:4
attorney  4:21 6:5
  15:3 23:11 30:13
  31:12 35:25 36:15
  37:4 46:24 49:3
  54:14,15
audio  21:6
authority  53:6
authorize  57:11
authorized  54:8
autodialer123
  17:1 22:4
autodialer123.co...
  23:8
available  5:11
  38:23 39:3,22,23
  42:12 43:16,21
  55:13
ave  55:1
aware  41:8 46:2
  46:12,17,20,23
  47:1 49:11 51:18
axley  2:6

**b**

b  2:2 3:7 12:19,19
back  11:16 18:9
  19:17 20:8,11,20
  24:1 26:13 27:22
  38:18 39:21 43:8
  44:12 45:19,20
  47:18
baig  12:16
based  6:13,17
  10:11 38:17
bear  9:21 11:8
  50:6
began  10:6,17
beginning  33:9
behalf  41:23

believe  12:23
  13:19 16:8 23:7
  24:18 30:3,25
  36:6 38:22 50:2
  50:24
belong  21:12,12
  36:10
belongs  48:20
best  37:11
black  14:24 24:25
blacked  24:22
blacking  24:25
blank  24:13,19
  25:1
bold  20:23
bottom  7:12,14
  17:13 21:19 24:3
boulevard  2:3
bounces  28:5
box  14:25
brandon  21:20
  24:2
break  32:1,8 47:16
brian  21:1
bridget  14:10
browser  9:15
brynelson  2:6
bunch  38:1
business  9:17 10:6
  10:18 21:13 22:1
  22:7 23:4
businesses  22:15
  42:15
busy  19:15 26:17
  27:9 28:3,5

**c**

c  6:21
ca  55:25
call  19:9,12,17,18
  20:3,20 23:23
  24:4,7 25:4,21

27:10 38:22 39:12
39:14,15 41:12,12
42:21,24,25 43:4
43:15,20 44:24
45:6,12,13 47:10
49:4,25 50:3,9
51:2 55:14
**called** 12:10 19:1,5
25:24 35:11,14
37:21
**caller** 17:18,19,23
18:8,11,21 19:7,16
20:19 24:11 25:7
25:23 30:19 31:14
33:5,9,14,20 34:14
35:3,8 36:20 37:7
38:3 42:17,20
43:1,25 44:6,12,13
44:15,16,18 47:21
48:14,15,16 51:3
51:16
**calls** 17:21,23 21:4
21:14 23:24 26:17
26:17,18 27:2
29:4 33:18 34:5
35:7,9,17 36:17
37:2,15 41:22
44:1,3 46:21 47:1
50:3
**campaign** 26:25
28:16,18,24 29:14
29:20 43:15 44:21
**campaigns** 33:15
42:21
**card** 14:14,19 16:3
**care** 21:11,14
**carry** 28:12
**case** 1:5 5:24
11:24 12:25 21:7
31:6 36:1 47:9
49:4 55:6 56:3

57:3
**categories** 6:10
**cdr** 39:13
**cdrs** 39:18,21 43:9
45:22
**ceased** 13:15
**cell** 50:2
**certain** 7:25 31:5
**certificate** 53:1
54:1 57:11
**certification** 56:1
57:1
**certified** 55:16
**certify** 53:6 54:8
54:13
**chance** 10:5
**change** 17:25 57:8
58:3
**changes** 56:7 57:7
57:9
**characterization**
16:19
**cheaper** 13:21
**check** 19:12 36:20
**checked** 43:14
**chose** 43:24
**christopher** 41:7
**civil** 56:5 57:5
**clear** 26:21
**cleveland** 55:2
**client** 12:10 23:25
24:1 42:23 51:11
**clients** 44:5
**code** 48:20
**column** 26:16,18
26:18,24 27:15
28:1,6,7,12 29:3,7
29:17 34:1,10,21
**columns** 23:21
26:12,23 29:22

**com** 40:23
**come** 20:9 30:22
**comments** 20:25
**commission** 53:16
56:19 57:25 58:25
**communicate** 8:4
8:7
**communicated**
7:20 41:6
**communication**
12:5
**communications**
8:12,19,24 10:19
11:1 12:16
**companies** 14:17
37:14,21,23 38:1
49:24
**company** 6:20,20
6:22 10:18 12:10
12:11 15:21,23
16:7,8 18:4 21:13
22:7 26:15 37:11
37:18
**compel** 6:6 47:8
**compelled** 15:9
**complete** 6:10
44:2,4 54:11
**completed** 5:18
55:13
**complies** 37:1
**computer** 9:12
**computerized**
54:6
**concluded** 52:25
**conference** 4:19
**confidential** 24:14
24:21
**confirm** 6:7 10:5
**confirmation** 26:8
**connect** 7:4 40:11

**connected** 27:18
27:21 54:16
**connexum** 37:3,9
37:16,18,25 40:5
40:12 41:7
**consist** 6:8
**consists** 23:20
**contact** 7:4 12:22
13:1 16:12
**contacted** 46:24
**contain** 22:14
**contained** 48:1,25
**contains** 28:8
**contents** 17:10
**controlled** 14:19
**convenient** 55:15
**copied** 9:4 14:10
15:17
**copy** 15:20 49:2
52:17,22
**copying** 17:10
**correct** 8:13,14,25
9:1,10,16 13:9,16
14:12,21,23 16:19
17:12,24,25 18:25
20:16 22:8,9
25:18 29:2,6,11,16
29:24 30:8,14,15
30:20,21 32:24,25
33:16,19 34:13,23
35:1,5,14 36:9,12
38:5,25 39:4,13,19
42:3 43:3,7,10
44:8 46:11 47:6
50:17,21 51:4,5,22
**corrections** 57:17
**correctly** 12:18
28:13 30:17
**correspondence**
8:3 16:1,18

**cost** 29:7,9 37:22
**counsel** 4:22 54:14
    54:16
**country** 21:24
    22:3,11,14,20,22
    23:5
**county** 53:4 54:4
    56:10 57:15
**court** 1:1 4:19
    5:17 6:5 10:13
    15:9 46:14 56:7
**covered** 10:15
**craig** 1:3 4:22
    41:25 55:6 56:3
    57:3
**credentials** 11:14
    19:20
**credit** 13:21 14:14
    14:19 16:3
**cunningham** 1:3
    4:22 25:8,24 30:2
    30:19,23 31:12
    35:14,25 36:10
    41:25 46:13 49:3
    55:6 56:3 57:3
**cunningham's**
    35:17 36:15
**customer** 6:24
    19:13 20:15 29:9
    34:22 35:3,4
    44:11 47:20,24
    48:8,13 51:19
**customers** 12:8
    21:2 35:11 45:14
**cut** 13:21
**cv** 1:5

**d**

**d** 2:5 3:1,7 22:20
**dana** 22:16,17
**danila** 7:15,17 8:4

**darla** 1:15 53:15
    54:6,22
**data** 14:6,11 15:12
    16:5,16 20:14
    21:5,24 22:14
    25:4 29:23,25
    30:4 38:22 39:12
    39:22 40:7,13
    41:12 43:16 46:21
    47:2 49:10,15,22
**date** 1:10 10:5
    13:22 28:14 29:4
    30:5 38:9,10,23
    42:14 43:21 46:14
    55:8 56:3,9,19
    57:3,13,25 58:20
    58:25
**dated** 49:8 54:19
**dates** 39:11
**david** 2:2 4:21
**day** 18:14 53:10
    54:19 56:16 57:22
    58:22
**days** 45:21 55:19
**daytime** 16:24
**dealing** 12:25
**dear** 55:10
**december** 39:16
    50:10
**decks** 37:22
**deed** 56:14 57:20
**deem** 44:2,4
**deemed** 55:21
**default** 46:15,17
**defendants** 1:7 2:5
**definition** 34:15
**demonstration**
    38:22 39:2 42:1
**dep** 10:16
**department** 55:24

**deposition** 1:9 4:7
    4:15,24 5:2,3 6:9
    9:20 10:11 13:19
    22:5 25:14 26:10
    36:15 41:21 52:25
    54:1,9 55:8,11
    56:1,3 57:1,3
**describe** 48:12
**describing** 34:16
**description** 30:16
**detail** 32:17 39:14
    39:15 41:12 42:24
    43:4,20 44:24
    45:6,12,13 46:4
    47:10 51:2
**determine** 33:1
**dialer** 12:9 15:13
    19:20 37:14,21
**dialer.2** 25:5
**dialerleads.com**
    11:14
**dialers** 13:13
**dialing** 12:7 33:15
**different** 16:17,22
    19:11 31:1 37:23
    38:1,16,23 42:9
**differently** 26:21
**digits** 19:2
**direct** 3:4 4:11
    13:3
**directed** 27:22
**discovery** 4:16
    31:13 36:1
**discussed** 4:24
    22:4 49:18,21
**discussion** 4:10
**disposition** 39:18
    39:21 43:9 45:1
    45:23
**distance** 37:18,19

**district** 1:1,1
**document** 5:16
    15:20 17:11 22:21
    30:9
**documents** 5:2 6:7
    6:17 10:11 14:17
    16:15 25:15 31:1
    41:22,24
**doing** 9:17 10:6,18
    18:9,23 25:21
**download** 43:4
    47:10 50:9
**dozen** 37:23
**driver's** 53:8
**drop** 22:6,11,24
**duly** 4:3 53:8

**e**

**e** 3:1,7,7 5:12 6:21
    7:21,22 8:19,24
    9:2,4,8,11 10:7
    12:5 13:8,12 14:9
    14:13 15:11,14,16
    16:1,2,24 17:8,11
    20:8,13 23:11
    26:7 40:20,20,20
    41:3 49:18,19
**earlier** 38:7
**earliest** 50:16
**early** 9:23 31:12
**east** 2:6
**effort** 42:19
**eight** 5:8,11,13,14
**eighty** 11:16
**either** 6:16 18:8
    27:24
**electronic** 52:16
    52:23
**electronically** 5:7
**employee** 54:13,15
**ensure** 42:9

**enter** 44:18
**entered** 16:25 21:1
28:14 57:9
**entire** 24:21 47:4
56:5 57:5
**entities** 41:23 42:9
**entity** 14:18
**entries** 30:18
33:25
**entry** 17:14 20:17
22:10,14,23 26:23
28:21
**errata** 55:19 57:7
57:10,18 58:1
**especially** 19:15
**esq** 2:2,5
**essentially** 17:18
36:16
**estimate** 10:1
**et** 1:6 55:6 56:3
57:3
**evening** 16:24
**everybody** 26:21
42:16,18
**evidence** 49:4
**evidently** 23:6
45:10
**exactly** 10:1 18:2
33:4,7
**examination** 3:4
4:11
**example** 22:19
33:21 48:8 50:3,8
50:17 51:8
**excel** 31:16 32:20
**excuse** 25:8
**executed** 57:10
**execution** 56:14
57:19
**exhibit** 5:16,20 6:2
6:4,9,19 7:12 8:11

8:16,23 11:3,6
12:13 14:4 15:24
23:17 30:4,10,18
31:8,21,22 32:14
35:22 36:4,11,11
36:13,14,21,24
38:2,4,6 41:21
42:18 43:2 46:3
47:20 48:1,25
51:3,8
**exhibits** 5:6,8
35:21
**exist** 42:2,4
**exists** 39:24
**expiration** 56:19
57:25 58:25
**expires** 53:16
**explained** 37:17
**expressly** 55:13
**extended** 49:25

**f**

**f** 12:19
**fact** 21:8
**faded** 41:17
**fair** 10:23
**familiar** 6:22
31:17 49:24
**far** 45:19,20
**fax** 27:16
**feature** 48:16
**february** 49:8
**feel** 19:14 43:12
**fernando** 16:12,23
17:21
**field** 21:24 22:11
22:14,22 23:2
**fields** 23:7
**fifth** 28:7
**figure** 20:1 48:13
**file** 5:8 21:6 31:23
31:25

**filed** 46:13
**files** 5:11 36:16,21
**filing** 49:11
**fill** 23:8,10
**filled** 22:3 24:5
**filling** 22:6 23:4
**fills** 17:7
**final** 29:17
**financially** 54:16
**find** 10:1 25:9
32:15,16 33:6
41:2 42:23 48:7,9
48:15,18,19,20
50:14,16,23 52:9
**fine** 10:21 52:23
**firm** 24:18
**first** 4:3 8:10,11
9:17,20 10:6,17
14:6,10 15:12
16:5 19:5 26:16
26:22,23 46:12,25
**five** 5:13 23:20
29:1
**florida** 1:13 4:20
53:3,15 54:3,7
**follows** 4:4
**foregoing** 56:13
57:18
**form** 6:8 9:3 17:6
17:7 22:5,7 23:9
23:10,14 32:15,18
**format** 29:23
**fort** 1:13
**forwarded** 5:9
**found** 9:5 15:16,20
17:6 25:23 42:16
43:20
**four** 5:13
**fourth** 28:1
**frame** 52:5

**free** 13:1 43:13
56:14 57:20
**friedman** 2:3
**full** 30:7
**function** 51:25
**further** 32:17 52:8
54:13
**furthest** 34:21

**g**

**g** 12:19 40:23
**gawk** 40:23
**general** 7:16
**generally** 49:24
**gentleman** 6:25
**gentlemen** 52:12
**gg** 53:16
**give** 17:19 18:11
18:12 27:25 40:24
41:1,4 44:21
**given** 7:6
**gives** 8:3 20:1 41:4
**giving** 38:21
**glitch** 46:7
**gmail** 9:13,14
15:19 17:5,8
**go** 6:15 11:16 18:5
19:9 20:1,8 22:19
23:8 26:13 28:18
32:6 33:4,6,6 39:7
42:8,24 44:12,14
45:19,19 47:13,18
48:14,18,20 52:17
**goes** 28:20
**going** 4:13 5:5
6:12,16 10:14
18:17 19:7 21:3
25:25 26:7,8 32:3
35:20 38:16 42:21
48:9,10,21
**good** 5:15 52:15

**granted** 6:5 47:9
**group** 18:6 21:1
**grouped** 6:18
**guarantee** 14:1
  25:25 26:4
**guess** 15:9 34:9
**guidelines** 4:23
  5:1
**guy** 40:5,10 44:13
**guys** 22:2 43:10
  50:24

**h**

**h** 3:7 6:21
**hall** 41:7
**hand** 26:23 31:16
  53:10
**hang** 40:19
**happen** 39:8
**happens** 43:22
**hard** 37:25
**hardon** 7:16,17
  8:5,12
**head** 25:13 31:19
**heading** 29:4
**headings** 26:12
**hear** 15:18 18:18
  52:13
**heard** 37:9
**hearing** 10:13
  46:16
**held** 4:10 32:8
  47:16
**help** 20:3 43:12
  50:25
**highlighted** 30:17
  33:25 43:2 51:4
**holman** 51:9,10,11
**home** 4:20
**honestly** 34:17
**huh** 38:8

**i**

**i.d.** 17:19,19,23
  18:8,11,21 19:8,16
  20:19 33:14 42:20
  44:12,13,15,16
  48:15,16
**i.d.'s** 24:11 25:7,23
  30:20 31:14 33:5
  33:9,20 34:14
  35:3 36:20 37:7
  38:3 42:17 43:1
  43:11,25 44:6,19
  47:21 50:25 51:3
  51:16
**i.d.'s.** 35:8 48:14
**idea** 19:1 45:3
  50:5
**identification** 53:9
**identified** 7:16
  24:8,12 25:7 30:1
  30:19,23 41:23
**identify** 21:2
  47:23
**identifying** 14:17
  16:11
**ignite** 14:6
**illinois** 2:4
**imagine** 10:13
**imperative** 44:20
**inactive** 34:18
**inc.'s** 7:3
**include** 26:6
**included** 25:6
**including** 16:23
**incomplete** 43:23
**incorporated** 8:21
  24:20 25:2 57:12
**independent** 34:10
**indicate** 22:7
**indicated** 34:11

**individuals** 13:8
  16:18 17:4 41:23
  42:9,14 48:24
**information** 6:11
  14:25 16:12,16,23
  16:25 17:3,8
  18:18 20:5,17
  21:20 23:21 24:23
  43:10 48:25 49:13
**initial** 4:24 7:4
**input** 44:16
**insert** 37:22
**instance** 18:20
**instances** 22:13,21
  46:4
**instructions** 11:14
  19:20 20:1
**intended** 8:15
**intention** 52:3
**interest** 18:22
**interested** 54:17
**interface** 9:15
**internal** 34:24
**interrupt** 26:20
**intuit** 16:3
**intuit.com.** 16:2
**invoices** 8:6,8
**issues** 12:24

**j**

**james** 1:9 3:3 4:2
  53:7 54:9 55:8
  56:4,9 57:4,13
  58:20
**january** 9:21
  10:16 39:16
**jdp** 1:5
**job** 44:3
**judge** 51:24 52:4
**judgment** 46:15
  46:17

**jumping** 24:17

**k**

**k** 3:7 40:20,23
**kaplan's** 21:1
**keep** 49:24
**kentucky** 24:2
**kept** 49:13
**kettle** 40:20 41:11
  46:10
**kevin** 2:5 4:22
  5:12 6:13 10:3
  15:5 24:16,17
  26:6 33:3 38:13
  41:3 48:10,23
  49:7 51:24 52:13
  52:14
**kind** 26:8 34:10
**know** 7:12,23,25
  9:25 11:6 13:24
  14:14 15:2 19:2
  19:10,15 21:7,25
  22:1,2,17 24:10,10
  24:21,25 29:20
  34:17 35:8,20
  36:1 39:5,9 40:1
  40:13,15 41:9
  42:4,6 44:2 45:1
  45:14,21 46:6,9
  49:15
**knowledge** 12:24
  37:12
**knows** 18:14 40:5
  44:22 45:4

**l**

**l** 40:20
**labeled** 5:16 6:9
  24:21 32:14 34:1
**large** 54:7
**late** 9:23

**launched**  44:23
**law**  2:2
**lawsuit**  30:25 45:5
  46:13,17,20,23,24
  47:1,4,11 49:11
**lcr**  37:21
**lee**  53:4 54:4
**left**  26:14,15,23
**legal**  55:1 58:1
**length**  30:7
**letter**  49:2,6,8
  55:20
**letters**  40:23
**levin**  2:2 3:4 4:6
  4:12,21 10:3,9,17
  10:23,24 15:7
  26:6 32:6,10
  47:13,18,19 52:3,7
  52:11,13,16,20,22
**license**  53:8
**limit**  30:5 52:4
**limited**  51:20 52:8
**lincoln**  6:21
**line**  13:21 18:7
  26:22 28:13 29:22
  57:7 58:3
**link**  17:14 18:2,4,7
  18:13 19:6 20:18
**list**  30:22 31:11,13
  31:14,15,21,22,24
  33:6,9,10,22 36:16
  37:2 38:3,4 41:4
  44:13 48:14
**listed**  6:11 36:10
  42:15 47:20 51:3
  51:7 57:7,17
**listen**  38:18
**listing**  34:11 57:7
**lists**  31:2 32:4
**live**  18:22 26:19
  27:5,22 28:16,18

29:18
**load**  11:8 13:5
  21:6,10
**loaded**  17:6
**local**  18:7
**located**  4:19 7:23
  8:1,2
**location**  1:12
  55:15
**log**  42:24 43:13
**logged**  42:11
**long**  20:5,9,12,25
  37:18,19 41:11
**long's**  20:17
**longer**  39:22,23,23
  50:4
**look**  9:19 10:1
  13:25 25:10 26:2
  26:3 30:14 31:8
  31:23 32:1,5,16
**looked**  31:3 33:11
  51:19 52:10
**looking**  5:12,22
  9:25 11:10 12:3
  13:17 14:2 16:11
  16:22 22:18 25:12
  25:18 32:13 39:10
  44:25
**looks**  28:25 31:16
  39:3
**lopped**  19:4
**lost**  44:22
**lot**  18:4 21:8 43:11
  50:25
**louisville**  24:2

**m**

**m**  2:3 3:7 22:20
**machines**  27:7
  29:21
**madam**  55:10

**madison**  2:7
**magistrate**  52:4
**mail**  5:12 7:21,22
  8:24 9:4,11 10:7
  13:3 14:9,13 16:1
  16:2,24 17:8,11
  20:8,13 23:11
  26:7 40:20 41:3
**mails**  8:19 9:2,8
  12:5 13:8,12
  15:11,14,16 49:18
  49:19
**maintained**  46:21
  47:2 49:10
**maintains**  41:12
**making**  10:21
**manager**  7:16
**mandate**  19:10
**manually**  48:16
**march**  39:17
**marked**  6:2 30:10
  35:22 36:14 41:21
**match**  30:1
**matter**  18:12
  55:12
**maximum**  35:7,9
**mean**  17:17 18:3
  21:13 26:12 34:2
  34:5,18 39:20
  44:9 45:9 52:20
**meaning**  34:10
**means**  27:18 28:9
  34:3,7 38:19
  39:22 44:10
**meant**  35:10,10
**mentioned**  9:9
  35:2 51:18
**menu**  22:6,11,24
**merchant**  14:6,18
  15:1,6

**message**  18:9,18
  39:21 44:25 45:22
**met**  7:17,18
**michael**  1:6,9 3:3
  4:2,7,15 8:20 53:7
  54:9 55:6,8 56:3,4
  56:9 57:3,4,13
  58:20
**middle**  6:20
**midwest**  58:1
**mifflin**  2:6
**mike**  51:25
**minute**  48:12
**minutes**  29:12,13
  32:7
**mistaken**  19:25
**mmm**  22:15,22
**moment**  9:21
  47:14 50:7
**montes**  1:6,9 3:3
  4:2,8,15,19,22,23
  8:20,20 10:25
  12:6,6,8 14:18,19
  15:18 25:3,8
  26:11,20 32:12
  52:7 53:7 54:9
  55:6,8 56:3,4,9
  57:3,4,13 58:20
**month**  40:17
**morning**  5:9
**motion**  6:6 46:16
  47:8
**multiple**  32:19
  35:14
**myers**  1:13

**n**

**n**  3:1,7 6:21
**name**  7:15 12:19
  16:6 24:5 26:16
  26:25 40:18 47:24
  55:6 56:3,4,15

57:3,4,21
**named** 6:20 12:16
14:10 20:5 21:20
24:1 40:10 41:7
**names** 15:22,23
26:22 51:7
**narrow** 43:24
**nature** 25:1
**necessary** 38:15
**need** 10:1 19:14
20:3,24 21:7,8
25:10 26:1,2,3,8
**needed** 7:9
**network** 11:11,17
11:18,19,23 12:21
15:13
**never** 7:18 34:17
37:8 45:18 49:17
**new** 19:13 20:14
**nonactive** 34:13
**northbrook** 2:4
**notary** 53:15 54:7
55:25 56:10,18
57:15,23 58:23
**noted** 39:12
**notes** 31:20 32:13
38:17 54:12
**notice** 20:22 46:14
**number** 7:11 8:16
13:3,12 14:16
15:1,6,7 16:17
17:15,22 18:7,8,16
18:19,20,23,24,25
19:7,8 20:2,18,20
20:24 21:17 23:18
26:17,18 27:1,2,4
27:8,24 28:4,5,10
28:20,20 31:1
33:2,11,14 34:11
34:22,24 35:4
36:9 40:24 41:1

41:14,24 47:24
48:8,13 55:7
**numbers** 19:12
26:16 27:9,16
30:1,18,22 31:2
32:16,19 35:12,13
35:18,18 37:6
41:25 43:5,15
47:20 48:21 51:9
57:7
**numerical** 28:21
33:11 48:17
**numerically** 33:6

**o**

**o** 3:7 6:21 22:20
**oath** 4:3 53:1
**obtain** 25:4
**obvious** 24:24
**occasion** 45:11
**october** 50:9
**offered** 23:3
**offering** 22:17
**office** 15:5 55:14
**offices** 2:2
**official** 53:10
56:15 57:21
**oh** 11:16 51:11
**ohio** 55:2
**okay** 5:1,5,15,15
5:22 6:1,3,15 7:8
7:11,14,14,15 8:15
8:23 9:20 10:3,23
11:5,8,9,17,18,23
12:14 13:5,5,6
14:3,5,13,24 15:25
16:9,10,11,14 17:3
19:19,22 20:25
21:16,18 22:19
23:4,16,19,20 25:3
26:15 27:1,4,11,15
28:1,7,12 29:3

30:9,11,16 31:8,10
31:11 32:23 33:1
33:7 34:21 35:6
35:16,20 36:6,13
36:19,24 37:5
38:6,14,20 39:11
40:25 41:15 42:8
44:2 46:2,16,25
47:8,18 48:1,4
49:8 50:11 51:6
52:2,11,12,16,22
**old** 39:8 40:7
**once** 5:18 19:25
23:14
**ones** 36:10 43:25
**open** 5:16,21 6:1,3
30:9 35:22 36:13
36:24
**opposed** 47:24
**order** 5:20 28:1,7
33:11 48:7,18
**outside** 51:12
**owned** 14:18
41:25
**owner** 40:12

**p**

**p.c.** 2:3
**p.m.** 1:11,11 32:8
32:9 47:16,17
52:25
**p1** 29:17
**page** 3:2 6:8,19,21
7:11 10:22 11:6
11:10 12:12 13:2
14:3,24 15:24
16:9,11,15,22
17:13 19:19,23
20:4,8,22 21:16,19
22:19 23:17 24:3
24:13,15,21 25:1
26:12,24 42:18

51:8 57:7 58:3
**pages** 6:12,16 8:10
8:11 10:19 13:8
16:16 23:20 24:19
**panama** 7:24
**paragraph** 8:16
12:1 13:12 14:16
41:20 43:24
**paragraphs** 6:10
**parentheses** 20:23
**part** 5:18 21:1
52:24 57:9
**particular** 23:25
**parties** 4:16 54:14
54:15
**passwords** 43:12
50:25
**paste** 15:20
**pasted** 9:5
**pasting** 17:10
**pay** 7:7
**payment** 8:8 16:3
**payments** 8:12
14:6 16:2
**pdf** 6:2,8 8:11,23
11:6 13:2 21:23
22:13 23:17
**pdfs** 5:8
**pending** 46:15,18
47:5
**people** 16:17 18:4
18:22 19:17 21:7
21:10 22:25 24:8
26:19 27:5 28:19
29:18 34:18
**percent** 29:17
**percentage** 29:18
**person** 22:6 27:2
27:23 40:9
**personal** 9:12

**personally** 44:18
53:7 56:11 57:15
**phone** 16:24,24
19:12 21:8,9 27:5
27:9,14 28:4,4,9
31:2 36:9,17
40:24 41:1 47:1
50:2 55:3
**phonetic** 51:9
**picked** 27:7 28:11
**pieces** 38:15
**place** 9:20
**placed** 29:5 35:17
37:15 41:22
**placing** 17:21 34:5
**plaintiff** 1:4,14 2:2
4:21,21
**plaintiff's** 6:5
**platform** 7:3
11:19 12:7,9
13:25 25:5 37:22
**play** 38:14
**please** 5:16,20 6:1
6:7 7:12 11:5
12:12 13:2 14:3
15:24 16:9 19:19
21:16 23:17 26:14
30:9 31:9 35:22
36:13,24 41:17
55:14
**plus** 6:12
**point** 10:10 13:22
13:22 16:4 21:23
43:17 45:1,5
**policies** 49:21
**policy** 49:16
**political** 11:22
12:11
**polling** 11:20,22
12:11

**popular** 18:6
**populates** 22:11
**possible** 22:10
35:13
**prefer** 55:16
**prepare** 5:3
**prepared** 31:3,11
32:13,23 35:24
36:21
**preparing** 31:14
31:22 36:2 38:4
46:3
**preserve** 45:6 49:9
**preserved** 49:5
**president** 7:16
**press** 17:14 18:16
18:17,19,20 19:6
20:18,24 27:25
28:3,16,20,23
29:19
**pressed** 27:20,22
29:18
**pretty** 31:16
**previous** 24:13
**previously** 5:24
36:14
**printed** 36:15
**prior** 4:24 45:25
46:2 47:8
**probably** 19:4
28:23 29:19,20,21
37:14 39:18 40:17
**procedure** 56:5
57:5
**process** 14:19
48:21
**processer** 14:15
**processor** 16:3
**produced** 6:7
10:12,18 11:3
13:11 16:20 25:16

31:2 36:17 41:24
48:2
**production** 4:17
16:14 19:23 20:10
24:9,19,20 25:2
55:24
**program** 18:10,10
**programmed** 40:6
**progress** 28:15,17
28:22,25
**pronouncing**
12:18
**provide** 19:13
23:11 37:19
**provided** 6:4 7:8
8:24 10:4 29:23
29:25 30:4,13,13
31:12 35:25 37:2
37:4 38:7 50:8
53:8
**provider** 50:2
**public** 53:15 54:7
56:10,18 57:15,23
58:23
**pull** 38:15 39:12
42:11,13,19 45:11
45:20
**pulled** 32:19 42:16
45:18
**pulling** 45:16
**purchased** 55:17
**purge** 40:6,7 45:9
**purged** 39:25 40:1
40:3 41:13 43:18
45:2,10 46:5,6,10
49:25
**purges** 40:13
**purpose** 8:4 21:3
25:15 26:10
**pursuant** 4:8,15
4:18 41:24

**pushing** 22:2
**put** 9:2 15:13 17:3
20:10 25:17,19
26:3 41:2,3 44:6
52:24
**putting** 22:25
24:18 25:11

**q**

**question** 10:19
44:3 46:25
**questioning** 25:15
**questions** 5:5 6:17
10:13 32:3 38:16
38:19 47:15 52:13

**r**

**r** 1:15 3:7 53:15
54:6,22
**rang** 28:10,10,10
**range** 30:5 43:21
**ranges** 38:23
42:14
**rate** 37:22
**read** 8:18 12:3
43:11 46:24,25
52:19 56:5,6,12
57:5,6,17
**reading** 28:13
55:12,20
**reads** 22:14
**ready** 41:14
**really** 21:11,11
26:4,22 38:12
45:15
**realm** 51:12
**reason** 10:25
12:23 37:20 57:8
58:3
**recall** 4:23 9:19
24:20 33:7 40:18
49:6,9

**receipt** 55:20
**receive** 17:7
**received** 8:20 9:3
  12:6 13:12 20:14
  23:12,14 36:18
**recipient** 17:23
**recipient's** 19:7
**recollection** 31:3
**record** 4:6,9,10,14
  5:19 18:1 32:7,11
  35:21 38:15 47:13
  47:18 48:5 50:13
  52:17,24 54:11
  57:9
**recording** 36:21
**recordings** 36:17
**records** 5:3 13:6
  35:16 41:22 42:2
  42:10,12,13 43:17
  45:2 49:4,25 50:3
  50:9 51:13
**redact** 15:3,3
**redacted** 14:25
  15:1,5 24:14,23,24
**refer** 44:25
**reference** 34:24
  51:9 55:7 56:2
  57:2
**referenced** 38:7
  55:11 56:11 57:15
**reflect** 4:7,14
  14:13 19:23 23:22
  29:8 33:22
**reflected** 36:20
  38:4 50:20
**reflecting** 41:22
**reflects** 28:21
**regarding** 8:12
  20:5 25:15 49:21
**relate** 47:11

**related** 21:20
  46:21 47:1 49:4
**relative** 54:13,15
**relevance** 11:23
**relevant** 10:19
  12:24
**remains** 23:24
**remember** 25:11
  25:21 31:5 32:20
  32:21 44:12
**reminder** 26:24
**report** 24:2,4
  39:14,15 45:21
  51:17 54:9
**reporter** 1:15 4:19
  5:17 54:6 56:7
**reporter's** 54:1
**reports** 23:23 24:7
  25:21 38:22 39:11
  39:13 41:12 42:25
  42:25 43:5,20
  44:24 45:7,12,14
  45:16,18 46:4
  47:10 51:2
**representatives**
  13:13 49:20
**request** 14:22 15:8
  37:1 57:9,11
**requested** 38:24
  43:24 54:10
**requesting** 20:14
**requests** 10:8
  14:17
**require** 19:6 21:2
**required** 55:25
**reserved** 52:20
**respond** 10:8
**response** 4:17 6:6
  6:10 8:15 10:12
  10:14,20 13:11
  14:22 15:9 20:10

  43:22 50:13 52:5
**responsive** 12:1
  15:8
**result** 39:8
**retention** 49:15
**returned** 55:19
**review** 5:2 6:17
  10:5 13:6 16:14
  31:13 54:10 55:14
  56:1 57:1
**reviewed** 31:21
  36:1
**rich** 51:9,10,11
**rid** 34:20
**rider** 6:11 8:16
  12:1 14:16 41:20
  51:7,8
**right** 4:13 6:4 9:24
  11:10 12:15 17:13
  23:16 26:6,14,15
  30:12 32:5,6,11
  34:21 38:21 39:13
  47:13 52:7
**riverview** 1:12
**road** 1:12
**robert** 6:25
**ron** 20:5,9,12,25
**rosetta** 12:10
**route** 18:19 33:18
**routed** 37:16
**routing** 37:22
**row** 28:8
**rowe** 1:15 53:15
  54:6,22
**rules** 56:5 57:5

**s**

**s** 3:7 57:8,8 58:3
**sanders** 14:10
**save** 41:2
**saying** 4:14 24:3
  33:10 39:1 46:9

**says** 8:18 11:10
  13:3 14:6 17:14
  19:20 20:23 21:24
  21:25 22:20,22
  24:13 26:24 33:2
  34:1,22
**scope** 52:5,8
**scott** 40:10,11,12
  40:20 45:3 46:10
**scott's** 40:18
**scratch** 32:24
**screenshots** 36:16
**scroll** 7:11
**scrolled** 33:10
**seal** 53:10 56:15
  57:21
**search** 9:6 15:21
  42:20 48:16 51:10
  51:13
**searched** 9:4,7
  15:16,19 33:8
  43:1
**searches** 50:19
  51:20
**searching** 9:8,14
  37:6 42:8 50:12
  51:3,6
**second** 26:18
  40:19
**see** 5:12 11:13
  17:15 20:6 21:21
  23:14 26:3 28:17
  28:19 31:24 38:9
  43:16 44:14 49:2
**seeing** 49:6
**seen** 37:8 45:22
  49:16,17
**selected** 22:10
**send** 10:7 19:24
  21:5 23:9 26:7
  44:11

sends   8:6 39:21
sent   5:7,8,12 6:13
  6:13 8:20 12:5
  13:12 20:9,11,13
  20:23 28:16 29:21
  33:3 38:13 43:11
  49:3
served   4:17 5:23
  37:3
service   18:14
  37:13,19
session   21:9
set   16:16 19:25
  20:18 33:17 44:21
setting   26:10
seven   5:8,13
share   5:17
shared   5:6
sheet   57:7,10,18
  58:1
short   32:1,8 47:16
shoutpoint   9:22
  13:3,9,15,21,23
  15:12 33:21,24
show   17:22 19:7
  27:20 28:5,17
  33:8,9,23 34:14
  35:17 42:1,12,21
showed   30:19
showing   33:3 39:2
shows   38:10
shuffle   44:22
sign   17:5 23:9,10
signature   52:18
  53:14 54:22 55:14
signed   56:13 57:18
signing   55:12,20
sincerely   55:23
single   43:8
sir   12:17,20,22
  17:9,16 23:13,15

33:12 47:7 55:10
six   5:13 23:20
sk   40:23
skeletal   23:24
skip   11:5 12:12
  13:2 14:3 19:19
  20:4 21:16
skokie   2:3
skype   2:2,6 4:18
software   12:7
solutions   16:3
  55:1 58:1
somebody   12:16
  14:10 17:7 18:18
  20:5,19 21:20
  41:6 45:20
somebody's   7:15
sorry   4:9 5:20
  11:16,21 15:13
  26:17,20,20 39:15
  41:17 42:25 49:19
  52:3,18
sort   9:11 48:17
sound   9:23
sources   32:19
speak   40:16
specifically   51:10
spence   21:21 24:2
spence's   24:4
spoke   40:9
spoken   7:18
spreadsheet   30:12
  32:14,21,23 34:1
  34:22 35:24 36:2
  46:3
ssm   21:1,25,25
  22:1,22
stamp   38:9
stands   39:13
start   6:19 9:17
  26:14

started   13:16
  38:21 39:1
starting   13:7
  21:23 32:12
state   53:3,15 54:3
  54:7 56:10 57:15
statement   10:22
  44:5 56:13,14
  57:19,19
states   1:1
status   34:1
stenographic
  54:12
stenographically
  54:8
stenotype   54:6
steps   45:6 49:9,12
stone   12:10
stop   43:17
stratics   11:11,17
  11:18,19,23 12:21
  15:13
street   2:6
stuff   21:10
subpoena   4:17
  5:23 6:6,11 8:16
  10:12,14,20 12:2
  14:17 15:8 37:3
  41:20 42:15 43:23
  50:13 51:7,8
subscribed   56:10
  57:14 58:21
suite   2:4,7 55:2
summarizing   10:8
summary   42:25
superior   55:1
supplemental   4:7
  4:15,16 10:4,11
support   7:1,2,7,8
sure   5:22 10:9
  12:18 25:17 31:18

35:15,23 40:22
  42:4 43:11 50:18
switched   9:22
  13:20
sworn   4:3 53:8
  56:10,13 57:14,18
  58:21
system   7:9 9:11
  17:22 18:19 20:2
  21:4,9 24:12 25:9
  25:24 27:10 28:3
  30:20 33:2,4,13,17
  33:21 34:4,12,19
  35:7 37:7,20
  39:20 40:6,14
  41:12 42:11,17,24
  43:16 45:15 47:5
  48:17 49:10
systems   46:22
  47:2

| t |

t   3:7 6:21 12:19
  22:20 40:20,20
table   23:21
tailored   10:14
take   30:24 31:8,25
  32:1,5 44:6,17
  45:5
taken   1:14 4:8,15
  4:18 55:11
takes   33:13 48:10
talk   15:10 45:4
  52:1
talked   40:5
talking   15:11
  28:19 33:7
talks   20:2
team   21:12,13
tech   7:1,2
technical   7:7,8
  49:21

**technologic**  7:3,5
7:6,9,17 8:1,2,5,8
8:13,21,25 9:7,9
9:18,23 10:6 11:2
13:16,20,23 15:15
25:5,9 33:18
37:14,15,19,24
40:13 41:11 46:22
47:2,5 49:10,14,15
49:19,20
**tedious**  48:21
**tel**  37:13
**telecommunicati...**
37:23
**telemarketing**
19:16
**telephone**  18:25
19:8 29:25 30:18
41:25
**tell**  13:17 25:12,19
26:9,11 31:21
41:11
**telling**  13:22 25:16
**ten**  50:4
**test**  19:4
**testified**  4:4 9:22
13:19
**testimony**  25:6
37:17 38:2 56:6,7
57:6,9,12
**texas**  6:21
**texts**  50:4
**thank**  52:12
**thing**  5:23 20:23
38:14 44:10
**things**  20:3 38:17
41:4
**think**  10:17,25
23:1,2 25:1 26:5
35:10,20 50:6
52:15

**thinking**  43:17
**third**  26:18
**thirty**  55:19
**thought**  47:10
**thousand**  6:12
**three**  5:13 11:16
30:7 41:24
**tidom**  22:20,22
**time**  1:11 13:16,18
13:24 14:15 23:1
23:7 27:10 37:18
45:13 46:20 47:4
49:25 52:5
**times**  35:14 45:18
46:7
**titled**  22:11
**today**  5:3 25:14
26:10 48:22
**today's**  5:2
**todd**  2:3
**told**  5:9 40:2,4
46:10 51:22
**top**  11:11 13:4
14:7,24 19:21
20:22 25:12 31:19
**topics**  10:15
**total**  27:2 29:7,9
29:13
**training**  21:9
**transactions**  14:20
**transcribed**  56:7
**transcript**  52:17
52:23 54:10,11
55:11,16 56:5,12
57:5,11,17
**transfer**  18:21
28:10
**transferred**  28:4
**transfers**  28:16
**tricky**  4:13

**tried**  39:12
**trost**  2:5 4:22 5:9
10:7,10,21 15:5
24:17 51:25 52:4
52:15,19,21 55:5
**true**  54:11
**try**  45:6 51:6
**trying**  34:9 43:14
**turn**  15:24 16:9
23:17 30:13
**two**  5:13 35:2
**type**  31:16
**typed**  17:5 32:20

**u**

**ugarte**  16:12,23
17:21 18:24
**uh**  38:8
**undersigned**  53:6
**understand**  5:6
34:9
**understanding**
30:16
**united**  1:1
**uploaded**  43:16
**urlich**  22:16
**urlich's**  22:17
**usa**  8:21
**use**  7:3 9:11 11:19
12:9 16:2,6 18:8
20:2,22 21:3,9
32:18 34:19 37:6
45:15
**user**  37:16 43:11
50:24
**users**  47:23
**usually**  18:21 19:9
45:20
**utilize**  37:20
**utilized**  12:7

**v**

**v**  55:6 56:3 57:3
**valid**  18:25 19:16
**various**  13:8 17:4
26:12 39:11 42:21
**verify**  19:9 25:10
26:1,2 43:14
**veritext**  55:1,7
58:1
**versus**  34:15
**vice**  7:16
**video**  4:18 5:8
33:3,8 35:2,6 38:6
38:9,11,17 42:1
44:5 46:3 50:8,15
50:17,20
**view**  38:18
**voice**  13:3
**vs**  1:5

**w**

**w**  40:23
**waiting**  11:8 13:5
**waived**  55:13,21
**wander**  10:15
**want**  6:15 7:24
10:10 14:1 19:17
23:8 34:8 38:18
**wanted**  14:14
21:14
**wants**  18:18
**warehouse**  40:7
**waste**  19:16
**watch**  28:18
**way**  7:21 15:14
30:5 47:23
**we've**  15:11 33:5
**web**  9:14
**website**  17:1 22:4
23:11

| | |
|---|---|
| **welcome**  11:11,17 | **zoch**  6:25 |
| **went**  9:4 17:5 22:5 | **zochnet**  6:21,25 |
| 35:3 43:19 | |
| **western**  1:1 | |
| **whatsoever**  49:12 | |
| **windows**  38:10 | |
| **wisconsin**  1:1 2:7 | |
| **witness**  3:2 4:3,5 | |
| 24:16 37:1 52:2,9 | |
| 52:12 53:10 55:8 | |
| 56:1,4,11 57:1,4 | |
| 57:15 | |
| **word**  9:9 32:18 | |
| **work**  13:13 43:12 | |
| **working**  13:15,16 | |
| 13:23 19:8 36:7 | |
| **wrapped**  45:15 | |
| **written**  8:19 11:1 | |
| 12:5 | |

**x**

**x**  3:1,7

**y**

**yeah**  16:8 22:25
25:18 28:15 30:3
32:15 38:12,12
40:19,19,19 51:11
52:21
**year**  9:21 52:9
**years**  30:7 43:5
50:4
**yellow**  30:17 42:18
51:4
**youtube**  20:1

**z**

**z**  6:21
**zero**  11:25 19:4
27:15,17 28:2,8
**zeroed**  29:19
**zeros**  29:1

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.