UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CRAIG CUNNINGHAM,

            Plaintiff,         Case No. 16-CV-761-JDP

    vs.

MICHAEL MONTES, et al.,         Madison, Wisconsin
                           June 10, 2019
            Defendants.      11:45 a.m

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT EXCERPT - FIRST DAY OF JURY TRIAL
       **(TESTIMONY OF CRAIG CUNNINGHAM)**
     HELD BEFORE CHIEF JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Law Offices of Todd M. Friedman, P.C.
        BY:  DAVID B. LEVIN
            STEVEN G. PERRY
        333 Skokie Boulevard
        Suite 103
        Northbrook, Illinois  60062

For the Defendants:

        Axley Brynelson, LLP
        BY:  KEVIN D. TROST
        2 East Mifflin Street
        Suite 200
        Madison, Wisconsin  53703

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708

1                          **I-N-D-E-X**

2    PLAINTIFF'S WITNESS          EXAMINATION              PAGES

3    CRAIG CUNNINGHAM       Direct by Mr. Levin            3-37
                            Cross by Mr. Trost           37-46
4                           Redirect by Mr. Levin        46-49

5                          **E-X-H-I-B-I-T-S**

6    PLAINTIFF'S EXHIBITS                      IDENTIFIED   RECEIVED

7    Ex. 1  - Call Spreadsheet                    13          -
     Ex. 5  - Call Detail Records (9191)          25          -
8    Ex. 6  -        "            (7262)          25          -
     Ex. 7  -        "            (1977)          26          -
9    Ex. 8  -        "            (9191)          27          -
     Ex. 9  -        "            (7262)          27          -
10   Ex. 10 -        "            (1977)          27          -
     Ex. 11 - Declaration                         28          -
11   Ex. 14 - Sign-Up Form                         9          -
     Ex. 15 - Drop-Down Menu                      10          -

12

13                             * * *

14       (Trial proceedings at 11:45 a.m.)

15           THE COURT:  All right.  We will now begin the

16   plaintiff's case.  And the plaintiff can call his first

17   witness.

18           MR. LEVIN:  Plaintiff calls Mr. Craig Cunningham

19   to the stand.

20           THE COURT:  Very good.  Is the podium blocking

21   anyone's view?  Mr. Trost, is that in your way at all?

22           MR. TROST:  No.

23           THE COURT:  Okay.  We'll move it over the lunch

24   break, but let's just get working now.

25       Mr. Cunningham, the court reporter is going to swear

1  you to tell the truth.

2  **CRAIG CUNNINGHAM, PLAINTIFF'S WITNESS, SWORN**

3  THE COURT:  All right.  Mr. Cunningham, you don't

4  need to lean into the microphone every time you speak.

5  But if you'd keep your chair parked where you're about a

6  foot away from the microphone, as you are now, that should

7  be just fine.

8  THE WITNESS:  Thank you, Your Honor.

9  THE COURT:  Go ahead, Mr. Levin.

10  MR. LEVIN:  Thank you.

11  DIRECT EXAMINATION

12  BY MR. LEVIN:

13  Q.  I think by this point we all know who you are.  But

14  just for the record, would you please state your full

15  name?

16  A.  Yes.  Craig Ruselmani Cunningham.

17  Q.  And you are the plaintiff in this lawsuit, correct?

18  A.  Yes, I am.

19  Q.  Mr. Cunningham, what do you do for a living?

20  A.  Right now I have an e-commerce business; third-party

21  seller on Amazon; primarily sports nutrition products,

22  protein powders, preworkouts, a lot of stuff you would see

23  at a GNC store.

24  Q.  What kind of work did you do before you got into this

25  business?

1   A.   Prior to that I had a check cashing business in
2   Nashville.   I was in the Army for five and-a-half years,
3   honorably discharged.   And in 2003 I graduated from the
4   United States Military Academy at West Point, New York.
5   Q.   Okay.   And do you have any other formal education
6   after West Point?
7   A.   Yes.   I have a dual degree.   It's a master's in
8   business administration, a focus on supply chain, and a
9   master's in finance from Northeastern University.
10  Q.   Okay.   And can you just tell us a little bit about
11  your military service after you graduated from West Point?
12  What did you do while you were in the Army?
13  A.   Certainly.   I worked with the Patriot missile
14  systems.   So that's a surface-to-air missile.   Primarily
15  started off with focusing on Russian bombers in the Gulf
16  War.   We had the capability of shooting down large-caliber
17  rockets, such as scud missiles.   So that was the focus for
18  it.
19       Spent a year in South Korea on the DMZ, so literally
20  staring at the North Koreans closer than I am to you right
21  now at times.   So that was an interesting year-long
22  experience.   And one of the things that I'm most proud of
23  is I helped to get an act of Congress passed banning use
24  of financial products that were targeted at the military.
25  Q.   Okay.   Thank you.   So during the time frame at issue

CRAIG CUNNINGHAM - DIRECT

1 with this case going back to 2015, have you been the

2 registered owner of any cellular or mobile telephone

3 numbers during that time?

4 A.   Yes.  615-348-1977, 615-212-9191 and 615-331-7262.

5 Q.   Okay.  And those are all your phone numbers?

6 A.   Correct.

7 Q.   And again those are cellular or mobile numbers, not a

8 residential line or what some people call a *landline*?

9 A.   They're not landlines.  They are my personal cell

10 phone numbers.

11 Q.   Okay.  Why do you have three separate mobile phone

12 numbers?

13 A.   When I had my check cashing business, I had several

14 phone numbers, fax phone numbers for the store, and I just

15 decided to keep the three.  The 348-1977 is the one that I

16 had for a while as a cell phone number and I got the other

17 two.  Basically some were for business and then just as a

18 backup if I need to for traveling, doing things with one

19 phone.  For example, for driving, I can navigate with one

20 and, you know, just have the other phone if I were talking

21 on it or doing whatever.

22 Q.   Okay.  And I think we all know the answer to this

23 question already, but have you ever received any

24 telemarketing calls on those numbers?

25 A.   Quite -- quite a bit, yes.  I've received many

CRAIG CUNNINGHAM - DIRECT

1 telemarketing calls, probably several thousand a year.

2 Q.   Could you describe some of these telemarketing calls

3 you've received, what the people calling you were trying

4 to sell?

5 A.   Certainly.  A lot of typical calls that everybody

6 else gets: car warranties, vacation clubs.  Somehow, you

7 know, I've gotten a bunch of calls about multilevel

8 marketing products and so forth, get rich -- I call them

9 *get-rich-quick schemes* because that's what they are

10 basically, someone promising you, you know, "Blew my mind.

11 I couldn't believe when I got the message," basically

12 selling hope and promises that they can't possibly

13 fulfill.

14 Q.   When you say "multilevel marketing," what do you mean

15 by that?  What does that term mean to you?

16 A.   So these are essentially pyramid-type schemes where

17 you have a few people at the top making a bunch of money

18 and then they recruit followers and people under them.

19       Generally you're selling a product or service such as

20 Amway or AdvoCare.  AdvoCare sells sports and nutrition

21 products, protein powders and forth.  With these calls in

22 particular, they're just selling the opportunity to sell

23 the opportunity and the only way you make money is by

24 getting more people.  There's no product or service really

25 being sold.

1  Q.    And do you know if any of these telemarketing calls

2  that you received over the last few years were automated

3  calls?

4  A.    Yes.  The vast majority of them were automated calls.

5  You can generally tell.  There's sometimes an audible

6  tone, three or four seconds of dead air, and then the

7  prerecorded message starts.  Those are some of the

8  indications that it's an automated call.

9  Q.    Can you estimate in any way how many telemarketing

10  calls of this nature that you've received, say, going back

11  to the beginning of 2015 on any of your three mobile phone

12  numbers?

13  A.    If it's not a holiday or a weekend, I am going to get

14  a call from someone about something that I have no --

15  probably have no interest in, never asked for and don't

16  want, so easily three to five a day.  I think the most

17  I've gotten in a day was probably 40 or 50 in one single

18  day.  So probably five to ten a day if you're looking at

19  250 days, 260 days a year.  So not including holidays or

20  weekends, you're looking at probably several thousand

21  calls, 2,000 calls or so, every year.

22  Q.    Now, are you claiming that defendant in this case,

23  Michael Montes, is the one himself who actually placed

24  those calls to you?

25  A.    No.  I don't think he specifically hit the button to

1  start the calls.  I do think he did just about everything

2  else -- training the people, profiting from the calls,

3  instructing them how to do it, doing videos, webinars,

4  presentations, answering questions -- so everything but

5  hitting the final button to say send.

6  Q.   So how do you know that?  How are you able to draw

7  connections --

8          THE COURT:  Mr. Trost, I'm going to ask you to

9  not converse your client during the testimony.  You can

10  pass a little note if you need to communicate.

11          MR. TROST:  Okay.  Thank you.

12          THE COURT:  Sorry for the interruption.  Go

13  ahead.

14          MR. LEVIN:  That's all right.  Thank you.

15  BY MR. LEVIN:

16  Q.   So how did you know that?  How were you able to draw

17  any connection between the calls you received and the

18  defendants in this case?

19  A.   Well, so I would do some obviously investigation into

20  these callers and who's calling.  Sometimes I'd talk with

21  them and say, "Hey, so where did you get my number from?

22          "Oh, well, there's this guy named Mike Montes.  He

23  gave it to me.  He's the one who set me up with this."

24          Some wouldn't tell me directly.  Others, as part

25  of -- I know Jerry Maurer, for example, Maurer has a blog

CRAIG CUNNINGHAM - DIRECT

1  for his MLM followers.  And he will tell them, "If you

2  want to do automated calls, call Mike Montes.  Here's his

3  phone number."  And I pretty much inferred then Jerry

4  Maurer was a client of Michael Montes because he's

5  recommending his products and services.

6          MR. TROST:  Your Honor, I have to object.  It's

7  hearsay.

8          THE COURT:  Sustained.

9  BY MR. LEVIN:

10  Q.   Did you ever do any internet research trying to

11  figure out who Mr. Montes was once you became familiar

12  with his name?

13  A.   Yes.  I looked at his name -- looked up his name,

14  came across his company, AutoDialer123, or the website

15  AutoDialer123.  That is, I believe, one of his websites

16  that he owns and sells -- signs up people for automated

17  call services.

18  Q.   Okay.  I'd like you to please open the book in front

19  of you there and turn to what was previously marked as

20  Plaintiff's Exhibit No. 14.  Now, I'll warn you --

21  sorry -- when these were put together, the exhibit itself

22  is in front of the tab with the number on it.  So you're

23  looking at the exhibit, it says, *AutoDialer123.com* in the

24  upper left-hand corner?

25  A.   Yes.

1  Q.   Let's -- I'll display that on the screen for the

2  jury.

3       THE COURT:  Will you be having this

4  electronically?  So you'll need your computer, right?

5  BY MR. LEVIN:

6  Q.   So you've seen this AutoDialer123.com website before?

7  A.   Yes.  I'm familiar with it.

8  Q.   And the document that you're looking at in the

9  exhibit book there and the document that's displayed for

10 the jury on the screen, does that appear to be from the

11 AutoDialer123.com website?

12 A.   Yes.

13 Q.   Have you seen this sign-up form before?

14 A.   Yes, I have.

15 Q.   If you could now please turn to the next exhibit that

16 was marked as Exhibit No. 15.  Have you ever looked at

17 this drop-down menu from the AutoDialer123.com website

18 sign-up form?

19 A.   Yes.  This is part of my research, seeing if these

20 callers were related to Michael Montes.  And I noticed

21 many of the familiar names that I was being called from:

22 For example, 8 Figure Dream Lifestyle; Enagic; MMM, which

23 is Millionaire Marketing Machine.

24      THE COURT:  Are we looking at the drop-down menu

25 here?

                CRAIG CUNNINGHAM - DIRECT

1           MR. LEVIN:  Yes.

2           THE COURT:  It might be worth zooming in on that.

3           MR. LEVIN:  Sure.  Okay.

4  BY MR. LEVIN:

5  Q.   Go on, Mr. Cunningham.

6  A.   Yes, I saw several familiar names from companies that

7  were calling me at the time: for example, 8 Figure Dream

8  Lifestyle at the top; Enagic, which is another MLM

9  company, they do alkalized water and make -- you know,

10  people make all sorts of fantastic claims that it makes

11  dogs poop less stinky and it cures cancer and all sorts of

12  exaggerated claims; MMM, Millionaire Marketing Machine;

13  SSM, Secret Success Machine; and towards the bottom you

14  have TiDOM, which is TiDOM -- it's an acronym that's

15  supposed to be for *time freedom* -- and Elite Marketing

16  Alliances is kind of interchangeable entities.

17  Q.   In your research that you did, did you ever find any

18  evidence of Mr. Montes anywhere else on the internet?

19  A.   Yes.  I came across several press releases about --

20  and a judgment from Missouri and also -- I'm sorry, press

21  release from the State of Mississippi and a judgment

22  against him from the State of Missouri for breaking their

23  state telemarketing laws and also YouTube videos, a lot of

24  YouTube videos, from AutoDialer123 or Michael Montes's

25  personal YouTube account.

1  Q.   Did you watch any of these YouTube videos?

2  A.   Yes.  I watched almost all of them.  And they go into

3  various instruction that he's giving to how to make a

4  payment, how to upload calls, how to do this, how to do

5  that and pretty much step by step.  So if you're

6  completely unfamiliar with how to make automate calls

7  after going through these various videos, tutorials, I

8  think almost anyone should be able to do it with relative

9  ease.  I don't think -- I wouldn't have been able to look

10 at the system and make sense of it without looking through

11 those videos.

12 Q.   So did you ever do anything to track these calls to

13 kind of try to keep track of how many you were receiving

14 that you thought might be attributable to Mr. Montes and

15 his company?

16 A.   Yes.  I have an Apple iPhone that records calls,

17 dates, times, caller IDs and so forth.  You can put notes,

18 export them.  It's pretty handy for tracking calls.

19      So I just started, when I was getting so many calls

20 and a rash of these calls, I started keeping track of

21 them -- looking at any trends, who's calling, caller IDs

22 and so forth -- to try and figure out who's calling.

23      Sometimes they would even change systems.  So people

24 would start calling for SSM, Secret Success Machine, for

25 example, and then six months later the same people would

1  be calling trying to sell Enagic, the water machine.

2  Q.   If you could please turn to the first exhibit in the

3  book in front of you that's been marked as Exhibit No. 1

4  which I will explain for the jury in a moment.  Do you

5  recognize this document?

6  A.   Yes.  This is a spreadsheet of calls that I put

7  together.

8  Q.   Could you explain to us how you put this spreadsheet

9  together?

10  A.   This one was a basic export of an Excel spreadsheet

11  with the caller IDs identified and the dates of them.  So

12  in the top you have the phone number that I received calls

13  on, which was 212-9191, then the dates that I received the

14  calls and then of course caller IDs on the left column.

15  Q.   And how did you decide or determine that each of

16  these calls are ones that you were attributing to

17  customers of Mr. Montes?

18  A.   So these, I looked at the caller IDs and basically

19  saved the saved calls that I have and recorded calls and

20  then I would just go through my phone records and try and

21  see how many times they called and come up with a total

22  list of calls.

23  Q.   Okay.  And the jury obviously can't see this all on

24  the screen at once.  But if you could confirm, the exhibit

25  that you're looking at there, that spreadsheet consists of

CRAIG CUNNINGHAM - DIRECT

1  four print pages?

2  A.    Yes.  That's correct.

3  Q.    And you prepared all of this yourself?

4  A.    Yes.

5  Q.    And each of the telephone numbers and calls that

6  you've listed are people that -- some of the names that

7  you've already mentioned --

8  A.    Yes.  That's correct.

9  Q.    -- that were customers of Mr. Montes?

10  A.    Yes.  So these were people I've attributed to these

11  various MLM calls and that I believe were clients of

12  Michael Montes at the time.

13  Q.    And just to be clear, again when you say "MLM," what

14  do you mean by that?

15  A.    Multilevel marketing.

16  Q.    So prior to receiving any of these calls that you

17  have listed in this spreadsheet, Exhibit No. 1, did you

18  consent to any of these people or businesses calling you?

19  A.    No.

20  Q.    Did you give any of these callers any invitation or

21  permission to contact you on any of your mobile phone

22  numbers?

23  A.    No.  I had no idea who these people were.

24  Q.    Did it appear that any of these calls that you

25  received were being made to you for emergency purposes?

1  A.    No.

2  Q.    Were any of these calls made to you from a school

3  district or a municipality or a politician?

4  A.    No.  I don't believe I've received a political call

5  ever or a municipal call.

6  Q.    Okay.  I'd like to now play for the jury a few

7  recordings that we have.  And we'll listen to those and

8  we'll have a few questions for you about them.

9           MR. LEVIN:  Sorry, Your Honor.  Do I have to turn

10  the sound on from here?

11           THE COURT:  I believe this channel has been

12  muted, but let's see.  Okay.  Why don't you try it again

13  and see if it comes up.  So it's playing.  Do you have

14  your audio?  There's an audio channel there that's plugged

15  in.

16           MR. LEVIN:  It worked the other day from an HD

17  cable.

18           THE COURT:  So you've got an HDMI cable and

19  that's hooked up to our system?

20      (Audio recording played.)

21  BY MR. LEVIN:

22  Q.    Okay.  Mr. Cunningham, have you heard that recording

23  before?

24  A.    Yes, I have.

25  Q.    Is that a recording of a call that you received on

1    one of your three mobile phone numbers?

2    A.    Yes.

3    Q.    This gentleman who identifies himself as Coach Brian

4    from Colorado, do you have any idea who that is?

5    A.    Absolutely.  That's Brian Kaplan.  He's a partner of

6    Jerry Maurer.  And together they've pitched to me Secret

7    Success Machine, SSM; they did the water, the Enagic

8    Water; and then they also pitched the 8 Figure Dream

9    Lifestyle.  They're the principals/corporate

10   owners/managers of/corporate officers of 8 FDL, 8 Figure

11   Dream Lifestyle.

12   Q.    Okay.  So you've received other calls from Mr. Kaplan

13   in the past as well?

14   A.    Yes.

15   Q.    And again if you could explain for us how exactly did

16   you make this recording.

17   A.    That one was again from the app that I have on my

18   phone, Automatic Call Recorder.  As soon as a call comes

19   in, basically if the number is not one of my saved numbers

20   in my phone book, it automatically records it.

21   Q.    And then how do you get that recording off of your

22   phone?

23   A.    Oh, that's a great thing.  I can upload it to a share

24   drive or Google drive or Dropbox, for example.  I can

25   email it.  I've even sent it through Bluetooth from my

1  phone to my computer.  So it's very flexible.

2  Q.   And prior to receiving this particular prerecorded

3  message from Coach Brian in Colorado, did you provide any

4  kind of consent for him to call you?

5  A.   No.

6  Q.   Did you ever give him any invitation or permission to

7  call you on any of your three mobile phone numbers?

8  A.   No.

9       MR. LEVIN:  All right.  Let's play the second

10 recording now.

11      (Audio recording played.)

12 BY MR. LEVIN:

13 Q.   Okay.  Mr. Cunningham, at the very beginning the

14 person is saying "hello."  Did that sound to you to be

15 your own voice?

16 A.   Yes, that's my voice.

17 Q.   And so this is a recording that you made with the

18 call recorder app that you mentioned?

19 A.   That's correct.

20 Q.   And this particular website that was mentioned, did

21 you happen to go to that website to find out any more

22 information about what this call was for?

23 A.   I probably went there.  A lot of these people, they

24 have websites with similar-sounding names --

25 Q.   Have you -- did you recognize having received calls

CRAIG CUNNINGHAM - DIRECT

1  from this person in the past?

2  A.   It sounded a little bit familiar.  It might have been

3  Mark Barratt, but it sounds familiar.

4  Q.   Okay.  Let's move on to the third recording.  I

5  apologize.  Did you ever give this caller any consent to

6  call you?

7  A.   No.

8  Q.   Did you ever invite him or provide any permission for

9  him to call you?

10 A.   Absolutely not.

11         MR. LEVIN:  Okay.  Thank you.

12       (Audio recording played.)

13 BY MR. LEVIN:

14 Q.   Okay.  Mr. Cunningham, was that your voice on the

15 call there?

16 A.   Correct.

17 Q.   And is this another recording that you made with the

18 call recorder app that you were talking about?

19 A.   Yes, it is.

20 Q.   And did you give this person permission to call you

21 prior to receiving this message?

22 A.   No.

23 Q.   Did you ever invite this person or consent in any way

24 for them to call you prior to receiving this message?

25 A.   No.

1  Q.   Okay.  So we heard you at the end of that message

2  leaving your name and phone number.  Why did you do that?

3  A.   As part of the investigation inquiry into this, a lot

4  of caller IDs were spoofed.  It's very difficult, if not

5  impossible, to figure out who's calling and how to stop it

6  without some level of engagement with them.  That doesn't

7  mean I really want to get the calls.  It doesn't mean I

8  have any interest in their ongoing whatever get-rich-quick

9  deal.  But, you know, the calls do violate the TCPA and I

10  wanted to go up the chain, go up the ladder and figure out

11  who's making these and how to stop it.

12         MR. LEVIN:  Okay.  Let's move to the next

13  message.

14     (Audio recording played.)

15  BY MR. LEVIN:

16  Q.   Okay.  Mr. Cunningham, again is that a recording of a

17  call that you received?

18  A.   Yes, it is.

19  Q.   And did you make that recording with the call

20  recorder app that we were talking about earlier?

21  A.   Yes, I did.

22  Q.   And did you provide this caller with any invitation,

23  consent or permission to contact you prior to receiving

24  this call?

25  A.   No, I didn't.

1      MR. LEVIN:  And I'll play one more recording.

2      (Audio recording played.)

3  BY MR. LEVIN:

4  Q.  Okay.  Sorry to everyone.  That one was a little bit

5  longer.  But again, Mr. Cunningham, was that your voice on

6  the recording?

7  A.  Yes, it was.

8  Q.  And did you make this recording with the call

9  recorder app that we've been talking about?

10  A.  Yes, I did.

11  Q.  And this woman named Dana, did you ever give her your

12  consent or permission or invite her to call you on any of

13  your three cellular phone numbers?

14  A.  No.  That's Dana Ehrlich.  She's with TiDOM/Elite

15  Marketing Alliance.  But no, I never gave her consent to

16  call.

17  Q.  That's what I was going to ask next, if you knew who

18  she was.  Were you able to find any connection between

19  Dana Ehrlich and the defendant in this case, Michael

20  Montes?

21  A.  Absolutely.  Looking through the YouTube videos,

22  Michael Montes did about an hour-plus, hour-20,

23  hour-30-minutes webinar/coaching/training involving Dana

24  Ehrlich and several of her followers with the TiDOM or

25  Elite Marketing Alliance organization.

1  Q.   Now, you've made it a point to let us know your

2  feelings about receiving calls of this nature.  So again

3  can you tell us why did you leave your name and number at

4  the end of that call?

5  A.   Well, even though Dana Ehrlich's voice is on the

6  recording, that doesn't necessarily mean that Dana Ehrlich

7  is making the call.  There's a host of followers, and so

8  forth, below her that she's trained, coached and

9  encouraged to make calls and so forth.

10      So to really find out who's making the call and get

11  positive identification on that person again you have to

12  engage with them a little bit to find out who's really

13  making the calls after that.

14  Q.   So in leaving your name and number at the end of some

15  of these messages, were you asking or inviting these

16  people to leave you more automated prerecorded messages?

17  A.   Absolutely not.  I never said "Call me using an

18  autodialer or prerecorded message."  And honestly, most of

19  the calls after that were probably most likely manually

20  dialed by the individual.  It's not really actionable and

21  that's really not what I'm suing over; it's just the

22  initial call from the telemarketers.

23  Q.   So the calls that you would receive back after

24  leaving your name and number on some of these instances

25  were actual live callers calling you to talk about these

1  opportunity sales they were trying to make?

2  A.   Correct.  And that's how, you know, to basically get

3  inside the inner workings of these organizations, which

4  you're never going to find out just by listening to their

5  calls and so forth, and to ask questions like, "Hey, how

6  did you guys make these calls?"

7       "It's Michael Montes.  He's our guy that we work

8  with."

9            MR. TROST:  Object as hearsay.

10           THE COURT:  That's hearsay.  Sustained.

11 BY MR. LEVIN:

12 Q.   Okay.  Mr. Cunningham, there were many more

13 recordings of this nature that we turned over to the

14 defense as part of this case, correct?

15 A.   Yes.

16 Q.   Okay.  And all of those recordings that we turned

17 over, how did you draw a connection between those callers

18 and Mr. Montes or his company TollFreeZone?

19 A.   I just started to see trends with the various calls.

20 So say if it's Secret Success Machine, Jerry Maurer will

21 call.  He would refer people to his website and there's a

22 link to Michael Montes as a telemarketer on Jerry Maurer's

23 website.  Then I'd get calls about Enagic and same thing:

24 People with Enagic will refer me to --

25           MR. TROST:  Object again on hearsay.

CRAIG CUNNINGHAM - DIRECT

1          THE COURT:  Are you going to show these

2    documents?

3          MR. LEVIN:  Well, it's not a document; it's what

4    he was told.

5    BY MR. LEVIN:

6    Q.   Did you find any --

7          THE COURT:  The objection is sustained.  The

8    things that are recorded, if he can document the website

9    connection, that's a different matter.  But just reporting

10   what people told him is hearsay and it's excluded.

11   BY MR. LEVIN:

12   Q.   So going back to what we were looking at earlier,

13   Exhibit No. 15 --

14         MR. LEVIN:  I'm sorry.  Can we display that on

15   the screen again?

16         THE COURT:  Sure.

17         MR. LEVIN:  The control that existed on the iPad

18   doesn't seem to be there unless I'm doing something

19   incorrectly.

20         THE COURT:  Is there a *Jury Video*?  I've got a

21   button that says *Jury Video*.

22         MR. LEVIN:  It's looking for a passcode.

23         THE COURT:  That happens from time to time.

24         MR. LEVIN:  Okay.  Thank you.

25         THE COURT:  Somebody will come here and find the

1  passcode for you.  But I can turn it on and off here

2  easily enough.

3          MR. LEVIN:  Okay.  Thank you.  I think the

4  passcode should be there.  Look at the back of the --

5  BY MR. LEVIN:

6  Q.   So again this is the menu that you previously

7  identified having viewed on Mr. Montes's AutoDialer123.com

8  website.  Were any of the people calling you and leaving

9  these prerecorded messages calling regarding the 8 Figure

10 Dream Lifestyle business?

11 A.   Yes, they were.

12 Q.   Were any of the people that were calling you and

13 leaving these prerecorded messages calling about the

14 Enagic alkalized water business?

15 A.   Yes, they were.

16 Q.   Were any of these people that were calling you and

17 leaving these prerecorded messages calling you about the

18 MMM or SSM that you identified earlier?

19 A.   Yes, they were.

20 Q.   And what did you believe those acronyms stood for?

21 A.   MMM is Millionaire Marketing Machine and SSM is

22 Secret Success Machine.

23 Q.   And then scrolling down to the bottom, were any of

24 these people that were calling and leaving you prerecorded

25 messages calling about the TiDOM business that you

1  mentioned?

2  A.   Yes.  That's Dana Ehrlich, TiDOM/Elite Marketing

3  Alliance.

4  Q.   And now I'm going to show you and pull up on the

5  screen what's previously been marked as Plaintiff's

6  Exhibit No. 5.  Now, at the bottom right-hand corner this

7  says *Page 1 of 66*.  Hopefully we won't need to take the

8  time to have you identify all 66 pages.  But do you

9  recognize the first page of this document?

10 A.   Yes, I do.

11 Q.   And what does that look like to you?

12 A.   Those are the actual *Call Detail Records* from my

13 phone carrier, Republic Wireless.

14 Q.   And what phone number are these records for?

15 A.   That's for the 212-9191.  It's at the very top.

16 Q.   Okay.  And how did you obtain these records?

17 A.   I got it from my phone carrier via subpoena.

18 Q.   Okay.  I'm now going to display the first page of

19 what was previously marked as Plaintiff's Exhibit No. 6.

20 Do you recognize this document?

21 A.   Yes, I do.

22 Q.   What does this appear to be to you?

23 A.   Same, call records for a different phone number from

24 my phone carrier.

25 Q.   And which phone number does that relate to?

1  A.   That's 331-7261.

2  Q.   And who did you say that your phone carrier was?

3  A.   Republic Wireless.

4  Q.   This document states at the top *Bandwidth.com*.

5  A.   Bandwidth.com is a very large phone provider.  They

6  do wholesale -- various telecom services.  At the time

7  Republic Wireless was a subsidiary of Bandwidth.com.  So

8  to get those phone records was, strictly speaking, to

9  Bandwidth.com, but Republic Wireless was a subsidiary.

10 They were really spinning off as a separate company.

11         MR. TROST:  Object as hearsay again.

12         THE COURT:  It's not really hearsay.  I don't

13 know that there's a foundation for it though.  How does he

14 know all this?

15 BY MR. LEVIN:

16 Q.   How do you know this, Mr. Cunningham?

17 A.   I spoke with the chief legal officer for -- or

18 emailed the chief legal officer of Bandwidth.com.

19 Q.   But regardless, these are from your cellular phone

20 provider?

21 A.   Correct.

22 Q.   And it is for one of your three cellular phone

23 numbers?

24 A.   Correct.

25 Q.   Okay.  Thank you.  I'm now on the display of what's

1 been marked as Plaintiff's Exhibit No. 7. And again we

2 won't go through all 268 pages here. But just looking at

3 the first page, do you recognize this?

4 A. Yes. This is again *Call Detail Records* from my phone

5 provider for my phone number 615-348-1977.

6 Q. And again how did you obtain these documents?

7 A. Via subpoena.

8 Q. And for the record again now I'll display what's been

9 previously marked as Plaintiff's Exhibit No. 8. Do you

10 recognize this first page of this 111-page document?

11 A. Yes. This is again *Call Detail Records* from my phone

12 provider for 615-212-9191. And at the top it says

13 *Republic Wireless, Incorporated*.

14 Q. I'm now showing you what's been previously marked as

15 Plaintiff's Exhibit No. 9.

16 A. Yes. These are my phone records, *Call Detail*

17 *Records*, for 331-7261. Again this one says *Republic*

18 *Wireless* at the top.

19 Q. And finally I'll display what's been marked as

20 Plaintiff's Exhibit No. 10. What's the first page of this

21 388-page document?

22 A. *Call Detail Records* for 348-1977, also my phone

23 number from my phone carrier, Republic Wireless.

24        THE COURT: Just to clarify, so we have six

25 exhibits here, two for each of the three phone numbers.

1  So what's the difference between -- why separate

2  documents, if you could?

3       MR. LEVIN:  In fact, I was just going to ask

4  Mr. Cunningham that myself.

5       THE COURT:  And then we're at the point where we

6  need to take the lunch break.  Because you've gone through

7  those documents, let's wrap up on these and then this will

8  be a good breaking point then.

9  BY MR. LEVIN:

10 Q.   Okay.  And so, Mr. Cunningham, if you could please

11 explain for Judge Peterson and the jury, do you know why

12 we have two separate sets of phone records for each of the

13 three phone numbers?

14 A.   Certainly.  They're basically for separate periods of

15 time where I obtained the phone records, the ones from

16 2015 to about -- it's about 18 months.  And then the other

17 one is from basically the end of 2016 through 2017.  And

18 like I said, they're just -- one was from, strictly

19 speaking, the legal entity Republic Wireless and the other

20 one was from Bandwidth, the name of the parent company of

21 Republic Wireless.

22 Q.   Okay.  Thank you.  And then just to tie this

23 together, if you could just turn in the book in front of

24 you to what was previously marked as Plaintiff's Exhibit

25 No. 11.

CRAIG CUNNINGHAM - DIRECT

1        THE COURT:  I don't know that the jury needs to

2   worry about this.  I think we've already covered this.

3   This is just to establish the basis for the admission of

4   the document; is that right?

5        MR. LEVIN:  Correct.

6        THE COURT:  I've already admitted it, so we don't

7   need to go into the inside baseball stuff about this

8   declaration unless there's something substantive you want

9   with it.

10       MR. LEVIN:  No.  Thank you, Your Honor.  I think

11  that would be a fine point to break then.

12       THE COURT:  All right.  Very good.  Okay.  So

13  we'll take our lunch break now.  We'll reconvene -- I'll

14  give you a full hour, so we'll reconvene at 1:35.  I'll

15  remind you that I have a hearing at one that should get

16  done.  So if we're a little bit late getting back, you can

17  blame that one on me.  So we will see you at 1:35.

18       (Jury out at 12:33 p.m.)

19       THE COURT:  We will resume at 1:35, too.  Same

20  warning about the hearing that I have at one.

21       MR. LEVIN:  Do we have to move anything here?

22       THE COURT:  No.  We'll do it in another

23  courtroom.  That's fine.  Keep your stuff here.  Thank

24  you.

25       (Lunch recess at 12:34 p.m. until 1:45 p.m.)

1          THE COURT:  All right.  Let's bring the jury back

2  in and we can continue.

3          MR. TROST:  Judge, can we deal with a couple

4  issues first?

5          THE COURT:  I'm sorry.  I guess we have a couple

6  of issues.

7          MR. TROST:  Briefly.

8          THE COURT:  Have a seat.

9          MR. TROST:  Can we have a standing instruction to

10  this witness about testifying about obvious hearsay type

11  of topics?  We've had that come up a couple of different

12  times and stuff has just tumbled out of his mouth and it

13  seems to be an emerging trial tactic.

14          THE COURT:  I wouldn't go so far as to say it's a

15  trial tactic.  You objected a couple of times.  I

16  sustained them.

17      It's fair to make the observation that you have to

18  testify on the basis of what you know firsthand.  You

19  can't just tell us that people told you that certain

20  things are true.  But I think it's really an instruction

21  to counsel that that's what you have to build your case on

22  is actually admissible evidence, not just hearsay

23  statements.

24      So next issue.

25          MR. TROST:  Second issue briefly is there was a

1  lot of discussion about some of these telemarketers --

2  Kaplan, Maurer, Dana Ehrlich -- and their businesses.  I

3  would suggest that that type of testimony has opened the

4  door to questioning Mr. Cunningham about his prior

5  involvement, including his prior lawsuits involving these

6  telemarketers.

7         THE COURT:  I'm not sure I understand what you

8  mean by that.  What do you want to go into?

9         MR. TROST:  Just confirm that he has sued these

10  telemarketers in separate actions.

11         THE COURT:  No.  I don't think that's relevant.

12  Anything else?

13         MR. TROST:  No.

14         THE COURT:  All right.  Let's bring the jury in.

15     (Jury in at 1:51 p.m.)

16         THE COURT:  All right.  Welcome back.  With that,

17  we can continue with Mr. Cunningham's examination.  Go

18  ahead, Mr. Levin.

19         MR. LEVIN:  Thank you, Your Honor.

20  BY MR. LEVIN:

21  Q.  Mr. Cunningham, if you could please turn back to what

22  we were looking at previously, the spreadsheet that you

23  prepared we marked as Exhibit No. 1.

24  A.  Yes.

25  Q.  And at the top of the first page that I'm now

CRAIG CUNNINGHAM - DIRECT

1  displaying for the jury, could you describe for me what

2  each of these columns show?  It may seem obvious, but just

3  for the record.

4  A.    So first the left column, under *Montes Calls*, that's

5  just the basic title for the document that I created and

6  it lists the caller IDs that I identified as being

7  associated with Mr. Montes.

8      Next is the phone number that I received the calls on

9  and the corresponding dates for that phone number.  So as

10  an example, I received a call from 313-209-4524 on April

11  12th, 2017, to 615-212-9191 for that first row.  And then

12  the final right-hand column in bold is the total for calls

13  to 615-212-9191 or 31 calls.

14  Q.    And so where it says from 212-9191, were those calls

15  that you made from that number or calls that were placed

16  to that number?

17  A.    Those were calls to.  I was just being a little

18  unclear when I put that together.

19  Q.    Okay.  So that was just an error on your part?

20  A.    Yes.  These were all received calls to me.

21  Q.    Okay.  And the *31 Calls* number that you mentioned at

22  the top of the right-hand column, is that for the entire

23  document or what portion of it?

24  A.    This is just the calls at the time that I had

25  identified to 615-212-9191.  So it's not for the entire

1  document; it's just for those -- the subset of calls that

2  I had identified at the time.

3  Q.   So for that -- you're talking about that first

4  section before the bold heading that appears a little bit

5  further down the page there?

6  A.   Right.

7  Q.   Okay.  And then to the right of that bold heading you

8  have a number of *39 Calls*.  So what portion of the

9  document does that pertain to?

10 A.   And let me explain this.  So as there are two sets of

11 phone records from Republic Wireless, that's kind of how I

12 went through.  So I went through one set.  And as I said,

13 it's basically end of 2016 forward.  And the other set of

14 call records are I believe starting in 2015 to the middle

15 to end of 2016.

16     So I basically went through one document, totaled the

17 calls, and I went through the other document, totaled the

18 calls for the phone number.  So under *Call to*

19 *615-212-9191*, that's from the first or earliest call

20 records that I had from -- just because they're separate

21 documents, so I kind of went through them separately

22 instead of doing it all together.

23 Q.   Okay.  And then if you could turn to the next page of

24 that document, please, which I'm now displaying for the

25 jury.  We have another heading and a number, *49 Calls*.  So

CRAIG CUNNINGHAM - DIRECT

1  again this may seem obvious, but if you can just explain

2  that for the jury.

3  A.   Certainly.  These are calls to 615-348-1977, one of

4  my phone numbers.  You have the caller IDs listed below

5  that.  Then you have the dates in the middle column --

6  again this is from the first spreadsheet or first set of

7  phone records in 2015 -- and then the total of 49 calls

8  based on the *Call Detail Records*.

9  Q.   So there's 49 calls then in the section below that?

10 A.   Correct.

11 Q.   And then lastly, on the third page, we have another

12 heading and another number of 57 calls.  Could you explain

13 that, please?

14 A.   Same thing.  These are the caller IDs below, date in

15 middle column and then the total on the far right.

16 Q.   Is this for the number 212-9191 again?

17 A.   Yes, I believe so.  Yes.

18 Q.   So if we count up all the calls below that which move

19 onto the next page, we should see that there are 57 total

20 calls?

21 A.   Correct.

22 Q.   And if we add up the four numbers in the four

23 headings, that should give us the total number of calls

24 that you were able to identify on your Republic records

25 that you believe are connected to customers of Michael

1  Montes?

2  A.    Correct.

3  Q.    And were some of these calls placed to you regarding

4  the business that was identified earlier as 8 Figure Dream

5  Lifestyle?

6  A.    Yes, they were.

7  Q.    And were some of these calls made to you about the

8  business identified as the Millionaire Marketing Machine?

9  A.    Yes.

10  Q.    What about the Secret Success Machine?

11  A.    Yes.

12  Q.    What about the Enagic water filtration system you

13  mentioned?

14  A.    Yes.

15  Q.    Okay.  And Elite Marketing Alliance, or TiDOM, do any

16  of these calls relate to that?

17  A.    Yes, absolutely.

18          THE COURT:  Mr. Cunningham, it's not clear to me

19  exactly how you linked these particular calls to customers

20  of Mr. Montes or what you think are customers of

21  Mr. Montes.  So, for example, start with the ones that say

22  *Unknown* under *Caller ID*.  How do you tie that call to the

23  defendants in this case?

24          THE WITNESS:  Yes, Your Honor.  So it's with the

25  app that I have.  I can create notes.  I can search for a

CRAIG CUNNINGHAM - DIRECT

1  certain number.  I can see if, you know, 303-800-6458, how

2  many times did that call me for the -- whatever subset of

3  data that I have.

4      So basically I just went through the app that I have,

5  wrote down the caller IDs.  And some of them were unknown,

6  but I would still have the date and the time and I could

7  go to the phone records and say, okay, well, I have an

8  unknown call October 19th, 2015.  And I just go to the

9  phone records and say, okay, this is an unknown call

10 October 19th, 2015.

11         THE COURT:  And you have the recording of the

12 actual call; is that what that is?

13         THE WITNESS:  Yes, Your Honor, either a recording

14 or I have it in my, you know, phone save screenshot.

15 That's just how I would do it at the time.

16         THE COURT:  Okay.

17         THE WITNESS:  Ideally, recordings are the best.

18 But I could identify them as they were coming in, because

19 it's any given day or time I could be at the gym, I would

20 be driving.  I would identify them as best I could.

21         THE COURT:  All right.  Go ahead, Mr. Levin.

22         MR. LEVIN:  Thank you.

23 BY MR. LEVIN:

24 Q.  And you believe that all of the calls that are

25 reflected on this spreadsheet were either automated calls,

1  as you described earlier, and/or the prerecorded messages

2  like the ones that we listened to earlier?

3  A.   Correct.

4         MR. LEVIN:  I have nothing further for

5  Mr. Cunningham.  Thank you.

6         THE COURT:  Very good.  All right.

7  Cross-examination.

8                  <u>CROSS-EXAMINATION</u>

9  BY MR. TROST:

10  Q.   Good afternoon, Mr. Cunningham.

11  A.   Good afternoon.

12  Q.   Nice to see you again.

13  A.   Likewise.

14         THE COURT:  Let me ask you to pull your

15  microphone over just a little bit closer, Mr. Trost.

16  BY MR. TROST:

17  Q.   Since we're talking about Exhibit 1, let's stay on

18  that one.  At the beginning of Exhibit 1, at the heading

19  you say *Montes Calls*.  That's your opinion, your belief,

20  correct?

21  A.   Correct.

22  Q.   That's part of your claim?

23  A.   Yes.

24  Q.   And as far as Exhibit 1 goes, none of those -- none

25  of the -- no part of that record details what you believe

1  the substance of that call concerned, correct?

2  A.   No.  They're based on phone records.

3  Q.   You have to go back to the audio recordings in order

4  to --

5  A.   Yes.

6  Q.   -- make a determination?

7       Now, generally the calls you are seeking compensation

8  for here were calls you received during 2015 to 2017; is

9  that correct?

10 A.   Yes, that's the time frame.

11 Q.   All right.  Now, in 2015 you were retired; is that

12 true?

13 A.   For a little bit of the time I guess.  That is not a

14 really good categorization of it.  I had sold a business

15 and was taking some time and working on fitness and a few

16 other things personally.

17 Q.   And during the 2016 time frame you were retired,

18 true?

19 A.   For -- again there's not a unique categorization for

20 it.  After I sold a business and had some money.  I mean,

21 that's the closest way I would describe it.

22 Q.   And if you had previously testified that during 2016

23 you were retired, would you go with that testimony that

24 you previously gave?

25 A.   That's the closest categorization that I would give

1  for it.

2  Q.   All right.  And when you received these calls during

3  2015 to 2017, you were a Tennessee resident?

4  A.   For part of it.

5  Q.   Okay.  And part of it you were a Texas resident?

6  A.   Correct.

7  Q.   Now, we've already talked a little bit about the

8  audio recordings that you made of the various calls,

9  right?

10  A.   I've answered questions about them, yes.

11  Q.   And you used an app on your phone?

12  A.   Yes.

13  Q.   And you used that app with regards to all three of

14  your cell phones, right?

15  A.   It's a good app.  A like it.

16  Q.   And we've heard several of these recordings.

17  Mr. Montes' voice wasn't on any of the recordings that we

18  heard here in court, true?

19  A.   Correct.

20  Q.   And in fact all the recordings that you've made for

21  all the various calls don't have Mr. Montes' voice on it,

22  true?

23  A.   Correct.

24  Q.   In fact, if Mr. Monte's voice was on it, we probably

25  would have heard it here today, right?

1    A.    The recordings are what they are.  You can't make

2    anyone's voice to be on them or not be on them.  It's just

3    that's what I heard and that's what I recorded.

4    Q.    None of the audio messages said they were -- nothing

5    on those messages or recordings said they were from

6    TollFreeZone.com, did they?

7    A.    No.

8    Q.    Was there anything you saw in the electronic data of

9    any of those calls that tied those calls to

10    TollFreeZone.com?

11    A.    Could you explain to me as far as "electronic data"?

12    Q.    Sure, anything of the electronic signature with

13    respect to any of the calls as far as data on your end

14    that tied the calls to TollFreeZone.com.

15    A.    All I know is that my phone rang and people were

16    pitching me for these get-rich-quick schemes that I

17    tracked back to Montes.  So I'm not sure if the phone

18    ringing, if you're trying to -- I'm not sure what you're

19    really asking.

20    Q.    Okay.  Now, with all these calls that you're seeking

21    compensation for, on a number of occasions you continued

22    talking with the people that called, right?

23    A.    Yes.

24    Q.    And in fact some of the examples we've heard this

25    morning kind of illustrate that, don't they?

1  A.   The calls this morning were just prerecorded

2  messages.

3  Q.   Sure.

4  A.   I don't think any of them are me actually talking

5  back and forth with any of them.

6  Q.   Sure.  Fair enough.  Now, you didn't just hang up?

7  A.   Sometimes I did and sometimes I left messages.

8  Depends on if I have time and what's going on.  I have

9  other things to do other than talk to telemarketers all

10  day long.

11  Q.   Sure.  Would you agree that sometimes when you're

12  talking with telemarketers you use an alias?

13  A.   On a few occasions I have.  Generally I just use

14  *Craig Cunningham*.

15  Q.   But on a few occasions you have?

16  A.   Yes.

17  Q.   Okay.  Would you agree that as shown by Exhibit 4B,

18  one of the calls we heard this morning, that when you were

19  given the option to press a certain number to opt out from

20  future calls, you didn't take -- didn't do that, right?

21  A.   Correct.

22  Q.   You started this lawsuit back in November 2016,

23  right?

24  A.   Correct.

25  Q.   And you started it yourself?

1  A.    Correct.

2  Q.    It was only within the last year that you retained

3  Attorney Levin?

4          MR. LEVIN:   Objection.

5          THE COURT:   What's the relevance?

6          MR. TROST:   It's kind of establishing when

7  Mr. Cunningham was doing things for himself in this

8  lawsuit.

9          THE COURT:   All right.   Overruled.   Go ahead.

10  BY MR. TROST:

11  Q.    When you filed the lawsuit, you chose not to sue any

12  of the people or companies that you talked with on the

13  phone in these calls, correct?

14          THE COURT:   Okay.   That's not relevant.   I'm

15  going to --

16          MR. TROST:   Okay.

17  BY MR. TROST:

18  Q.    With respect to the calls that you're seeking

19  compensation for from the defendants here, do you have any

20  evidence that Mr. Montes physically dialed any of the

21  calls himself?

22  A.    No.

23  Q.    And you already agree that his voice doesn't appear

24  on any of those recordings, correct?

25  A.    I don't think I heard his voice on any recording.

1  Q.   Are you aware that there are multiple other website

2  platforms that allow people to make dialer calls much like

3  the defendants' platform?

4  A.   I have heard of a few, although I have not seen any

5  of them associated with the businesses that were calling

6  me.

7  Q.   So you were not aware that people like Kaplan,

8  Maurer, and Dana Ehrlich used other platforms to make

9  calls?

10 A.   I just went on the YouTube videos where Dana is

11 talking with Michael Montes to conclude that they probably

12 do business together.  I went off of Jerry Maurer's

13 website where he recommended Michael Montes again to

14 conclude that they probably do business together.

15          MR. TROST:  Move to strike that answer as

16 nonresponsive to the question.

17          THE COURT:  Overruled.

18          MR. TROST:  All right.

19          THE COURT:  The answer stands.

20 BY MR. TROST:

21 Q.   Do you have any information that Dana Ehrlich, Kaplan

22 or Maurer, use other website platforms?  Yes or no.

23 A.   I'm not sure which platforms.  Again obviously they

24 said they use Montes, but I'm not sure of what other --

25 you know, all the platforms that they've had to their

 1  disposal, what they've used or not used.

 2  Q.    Let's talk about a different topic --

 3  A.    Okay.

 4  Q.    -- cell phones.  You know you have three of them?

 5  A.    I do.

 6  Q.    And we know it's not through Verizon or U.S. Cellular

 7  or some service provider that most of us know about,

 8  right?

 9          MR. LEVIN:  Objection.

10          THE COURT:  Overruled.  Go ahead.

11  A.    I don't know.  I think Republic is pretty popular.  I

12  mean, they're not from -- I think they're out of North

13  Carolina, but reasonably popular.

14  Q.    Now, your calling plan has an unlimited number of

15  minutes, correct?

16  A.    Yes.

17  Q.    And the records that you've introduced as Exhibits 5

18  to 10 were records you received by sending a subpoena

19  yourself, correct?

20  A.    All of them, correct.

21  Q.    Were those subpoenas that you sent in this case?

22          MR. LEVIN:  Objection.

23          THE COURT:  What's the basis?

24          MR. LEVIN:  The discussion that we had this

25  morning before we selected the jury.

1        THE COURT:  Overruled.  I'll allow it.  Go ahead.

2   A.   Could you repeat that question, please?

3   Q.   Sure.  The records that you received weren't sent --

4   were sent -- you received as a result of sending a

5   subpoena, correct?

6   A.   Correct.

7   Q.   And it wasn't a subpoena that you sent in this case?

8   A.   Correct.

9   Q.   I'm going to ask you to take a look at what's been

10  marked by the plaintiffs as Exhibit No. 11.  I believe

11  this is the -- one of the *Declarations of Custodian of*

12  *Records* related to those call records, basically a

13  certificate of authenticity.  Is that a document that

14  you've seen before that you're familiar with?

15  A.   Yes.

16  Q.   All right.  And if you look at Paragraph No. 3, does

17  it say "I'm in receipt of a Civil Proceeding Subpoena

18  Request served on Republic Wireless, signed by Attorney,

19  requesting specified records of the business named below"?

20  A.   Yes.

21  Q.   You're not an attorney, right?

22  A.   That's correct.

23  Q.   Do you know if an attorney signed the subpoena with

24  regards to these records?

25  A.   I'm not real sure.  I guess you would have to ask

1 Ethan Grossman.

2 Q. And you're referring to Ethan Grossman because he's

3 the guy that signed that certificate --

4 A. He is.

5 Q. -- as far as you know?

6 A. I'm not sure what you mean.

7 Q. All right. I'll withdraw the question. Are you

8 aware of the federal Do Not Call Registry?

9 A. Yes.

10 Q. Were you aware of this registry back in 2015?

11 A. Yes.

12 Q. At that time did you register any of your three phone

13 numbers that are at issue in this case on that registry?

14 A. No.

15 Q. To this day are any of those three phone numbers

16 registered with the Do Not Call Registry?

17 A. No. I don't think so.

18        MR. TROST: All right. That's all the questions

19 I have for you.

20        THE COURT: Any redirect?

21                    REDIRECT EXAMINATION

22 BY MR. LEVIN:

23 Q. Mr. Cunningham, Plaintiff's Exhibit No. 11, the

24 certificate signed by somebody named Ethan Grossman that

25 Mr. Trost was just asking about, how did you obtain these

1 certificates?

2 A.   It was sent to me by Subsentio as part of the

3 complete phone records, *Call Detail Records*, in the

4 subpoena response that -- just to clarify, Subsentio does

5 the subpoena processing for Bandwidth and they also do it

6 for Republic Wireless.  So Subsentio is basically a

7 third-party compliance company that does this.  So that's

8 what I received from them in response to the subpoenas:

9 The records and the certificate of authenticity from the

10 custodian of records.

11 Q.   So a subpoena was sent to Republic Wireless and you

12 got back those records that we looked at briefly this

13 morning along with these certificates?

14 A.   Correct.

15 Q.   Mr. Trost asked you if you ever continued speaking

16 with some of the people who were placing these calls to

17 you.  I believe you said that you did?

18 A.   Yes.

19 Q.   Okay.  During any of those conversations did you tell

20 those people that you were consenting for them to call you

21 again?

22 A.   No.

23 Q.   Did you ever tell them that you were interested in

24 their business opportunities?

25 A.   Yes.  I would learn more about it to, you know, get

1 more information about it and try and figure out who's

2 calling and how they're making calls and so forth.  You

3 know, if I am aggressive with them, then they're probably

4 going to clam up and not tell me any more information.  So

5 I've got to be a little bit of -- you know, got to talk to

6 them and get them to let their guard down so they'll tell

7 me the information I'm looking for.  It's all part of the

8 investigation and inquiry into the facts of who's making

9 these calls.

10 Q.   But again you didn't consent to any automated calls

11 or prerecorded messages?

12 A.   No.

13 Q.   You didn't invite any of these people to call you or

14 leave prerecorded messages?

15 A.   No.  Before the calls, generally I didn't know who

16 these people were or the businesses that they were

17 associated with until the phone rang and I did some

18 investigation to figure out who they are and what they're

19 trying to sell me this time.

20 Q.   Mr. Trost asked you if you used an alias during some

21 of your conversations with these people and I believe you

22 said that you sometimes did?

23 A.   Yes.

24 Q.   Why did you do that?

25 A.   If they had called several times -- it's really odd.

1 I'll get calls from the same person maybe six months apart

2 or three months apart.  They'll call with, like I said,

3 one program and then they'll come back with a different

4 one.

5      Now, if they're making many calls a day, they may not

6 remember exactly -- you know, basically they couldn't

7 remember that we talked before.  And if it sounds like the

8 same person, then I might use a different alias or if they

9 called a different number, I use a different name at the

10 time, again to just try and figure out who they are and

11 why they're calling and how they're making the calls.

12           MR. LEVIN:  Nothing further.

13           THE COURT:  All right.  Thank you,

14 Mr. Cunningham.

15      (Witness excused at 2:16 p.m.)

16                            * * *

17

18

19

20

21

22

23

24

25

1          I, CHERYL A. SEEMAN, Certified Realtime and Merit

2   Reporter, in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 10th day of June, 2019, before

5   the Honorable James D. Peterson, Chief Judge of the

6   Western District of Wisconsin, in my presence and reduced

7   to writing in accordance with my stenographic notes made

8   at said time and place.

9   Dated this 5th day of July, 2019.

10

11

12

13

14

15                          _____/s/_____

16                          Cheryl A. Seeman, RMR, CRR
                            Federal Court Reporter
17

18

19

20

21

22

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means unless
24  under the direct control and/or direction of the
    certifying reporter.

25