UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CRAIG CUNNINGHAM,

             Plaintiff,          Case No. 16-CV-761-JDP

     vs.

MICHAEL MONTES, et al.,          Madison, Wisconsin
                             June 10, 2019
             Defendants.       2:16 p.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT EXCERPT - **FIRST DAY** OF JURY TRIAL
          **TESTIMONY OF MICHAEL MONTES**
     HELD BEFORE CHIEF JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Law Offices of Todd M. Friedman, P.C.
        BY:  DAVID B. LEVIN
            STEVEN G. PERRY
        333 Skokie Boulevard
        Suite 103
        Northbrook, Illinois  60062

For the Defendants:

        Axley Brynelson, LLP
        BY:  KEVIN D. TROST
        2 East Mifflin Street
        Suite 200
        Madison, Wisconsin  53703

             CHERYL A. SEEMAN, RMR, CRR
               Federal Court Reporter
           United States District Court
        120 North Henry Street, Room 410
          Madison, Wisconsin  53703
              1-608-261-5708

1                          **I-N-D-E-X**

2    PLAINTIFF'S WITNESS          EXAMINATION                PAGES

3    MICHAEL MONTES        Adverse by Mr. Levin          3-66

4                        **E-X-H-I-B-I-T-S**

5    PLAINTIFF'S EXHIBITS                    IDENTIFIED  RECEIVED

6    Ex. 14 - Sign-Up Form                      15          -
     Ex. 15 - Drop-Down Menu                    16          -
7    Ex. 23 - Video                             44          -
     Ex. 24 -    "                              47          -
8    Ex. 26 - Missouri Judgment                  7          -
     Ex. 27 - Mississippi News Release          53          -
9    Ex. 28 - Zochnet Invoice                   65          -
     Ex. 29 - Montes Deposition                  4          -
10   Ex. 34 - Subpoena                          57          -
     Ex. 35 - Subpoena Response                 59          -

11

12                            ***

13        (Trial proceedings at 2:16 p.m.)

14             THE COURT:  You can call your next witness.

15             MR. LEVIN:  Thank you, Your Honor.  The plaintiff

16   will call Mr. Michael Montes to the stand.

17          **MICHAEL MONTES, PLAINTIFF'S WITNESS, SWORN**

18             THE COURT:  Move your chair up a little bit, if

19   you would --

20             THE WITNESS:  Yes.

21             THE COURT:  -- so you're right in the -- that

22   should be good enough.  It might be a little close.  We'll

23   adjust as needed.  Go ahead, Mr. Levin.

24             MR. LEVIN:  Thank you, sir.

25

1    <u>ADVERSE EXAMINATION</u>

2  BY MR. LEVIN:

3  Q.    Could you please state your full name for the record?

4  A.    Michael James Montes.

5  Q.    And you are one of the defendants in this lawsuit,

6  correct?

7  A.    Yes, sir.

8  Q.    And the other defendant company you've identified as

9  TollFreeZone.com, Incorporated?

10 A.    Correct.

11 Q.    Do you have any ownership interest in that company?

12 A.    I did, yes.

13 Q.    And were you the sole owner of that company?

14 A.    I was.

15 Q.    Okay.  And is that company still operating under that

16 name?

17 A.    You'll have to ask Mr. Cunningham.  He filed it in

18 his name.

19 Q.    I'm asking you if --

20 A.    It's not under me anymore.

21 Q.    I'm asking you if TollFreeZone.com is still

22 operating.

23 A.    Not under my name, but it is under Mr. Cunningham.

24 Q.    When did you start operating as TollFreeZone.com?

25 A.    I would have to look at my records.  I don't recall

1  off the top of my head.

2  Q.    Do you have any rough estimate of what time frame

3  that was?

4  A.    Not off the top of my head.  I'd have to look.  If

5  you have prior testimony, I'm sure it's in there.

6  Q.    Okay.  Yes, we do.  In the exhibit book in front of

7  you, if you could please open it up to what was previously

8  marked as Exhibit No. 29.  And the exhibit that we're

9  looking at will actually be in front of the tab.  It's

10  listed as 29.  So the first page identifies this as the

11  deposition transcript from January 14th, 2019.  If you

12  could please turn to page 22 of the transcript.

13  A.    Okay.

14  Q.    And before we read from that transcript, can you tell

15  me, why did you stop operating under the name

16  *TollFreeZone.com*?

17  A.    It was with the State of California, we had no longer

18  done what we were supposed to do to maintain the

19  corporation, so it was a dead corporation.

20  Q.    What do you mean, "it was with the State of

21  California"?

22  A.    Well, we originally filed that corporation in the

23  State of California.  But if you don't file certain things

24  with the State of California, or any state really, with --

25  for a corporation, they will deem it null and void, so

1  then it's no longer a corporation.  It's an abandoned

2  corporation.

3  Q.   Did you take any steps to reinstate the corporation

4  under that name?

5  A.   No.

6  Q.   Was there any reason for that?

7  A.   We had found out that we had a judgment against it

8  from the State of Missouri, so there was no point in

9  opening that back up.

10  Q.   What would a judgment in the State of Missouri have

11  to do with anything?

12  A.   Well, they filed a lawsuit against TollFreeZone and

13  got a judgment against it, so we let the corporation go.

14  There was no point in reopening it.

15  Q.   So you were concerned about the State of Missouri

16  coming --

17  A.   After TollFreeZone.

18  Q.   -- after TollFreeZone trying to collect that money?

19  A.   Correct.

20  Q.   Okay.  Actually, if you could turn back to page 10 of

21  the deposition transcript that you have in front of you.

22  What is the current name of the business that you operate

23  under?

24  A.   We currently operate under MyAdGuys, LLC.

25  Q.   Is it MyAdGuys.com?

1  A.    .com, LLC, correct.

2  Q.    And when was that corporation or LLC formed?

3  A.    I want to say June of last year, maybe before.

4  Q.    Okay.  So on page 10 of the deposition transcript --

5  first of all, do you recall having your deposition taken

6  in this case on January 14th of this year --

7  A.    Yes.

8  Q.    -- correct?

9  A.    I remember I did it.

10  Q.    Okay.  And I asked you, beginning on line 3:  "Is

11  your business incorporated or formed as an LLC?"

12        You said:  "It's formed as an LLC."

13  A.    Correct.

14  Q.    I asked you:  "What's the name of the company?"

15        "MyAdGuys.com, LLC."

16        "And under what state's laws was that LLC formed?"

17        And you said:  "Florida."

18        "And when was it formed?"

19        You said:  "June of 2018."

20        But then you also said:  "Maybe it was June of 2017."

21  A.    Yeah, I don't recall.  It was when -- it was after --

22  right about the time Mr. Cunningham got a default judgment

23  against me.

24  Q.    So was the reason that you stopped operating as

25  TollFreeZone.com because of a judgment that was entered

MICHAEL MONTES - ADVERSE

1  against you from Mr. Cunningham or from the State of

2  Missouri or for some other reasons?

3  A.    State of Missouri.

4  Q.    When was that judgment entered by the State of

5  Missouri?

6  A.    I don't recall, but I'm sure you guys know.

7  Q.    Okay.  If you could please turn in the exhibit book

8  in front of you -- I'm sorry.  Please turn to what's

9  marked as Exhibit No. 26.  Have you ever seen this

10  document before?

11  A.    Mr. Cunningham showed this to me, yes.

12  Q.    And does this appear to you to be a copy of the

13  judgment that was entered in the State of Missouri?

14  A.    It does.

15  Q.    Okay.  Can you see what the date of that judgment is?

16  A.    It looks like December 4th, 2015.

17  Q.    Where are you reading that date from, sir?

18  A.    The front page.

19  Q.    Are we looking at the same document, because I'm

20  seeing June 18th of 2012.

21  A.    "Jackson, Mississippi (December 4, 2015) - Following

22  yesterday's monthly" --

23          THE COURT:  We're not looking at the same

24  document.

25

1  BY MR. LEVIN:

2  Q.   Okay.  Please turn back one exhibit to No. 26.

3  A.   Oh, I see what you mean.  They're all in front.

4  Okay.  All right.

5  Q.   Okay.  So do you agree that the date of the judgment

6  in Missouri was June 18th of 2012?

7  A.   I do.

8  Q.   Does that appear to be correct to you?

9  A.   Yes.

10  Q.   Okay.  But you did not form the MyAdGuys.com, LLC

11  until either June of 2017 or June of 2018?

12  A.   Correct.

13  Q.   So what business name were you operating under

14  between 2012 and 2017 or 2018?

15  A.   Well, my name was on the bank account, so it was

16  under me.

17  Q.   Your name personally?

18  A.   Mm-mm.

19  Q.   Okay.  And TollFreeZone --

20       THE COURT:  We need a "yes" or a "no" to make a

21  clean record.

22       THE WITNESS:  Okay.

23       THE COURT:  So that was an affirmative answer;

24  you said yes, it was under your name personally?

25       THE WITNESS:  It was, but it also had

MICHAEL MONTES - ADVERSE

1  TollFreeZone's name still on it.  I never took it off.

2  BY MR. LEVIN:

3  Q.   So you still have a bank to this day that has

4  TollFreeZone.com on it?

5  A.   I don't.  Mr. Cunningham took that through the

6  judgment.

7  Q.   If I'm asking you questions that are yes or no, I'd

8  appreciate it if you'd just answer "yes" or "no."

9  A.   Yes, sir.

10  Q.   And certainly when your attorney is questioning you,

11  he'll have an opportunity to elaborate however you choose.

12  A.   Okay.

13  Q.   Thank you.  So again I'm still not clear.  At what

14  point did you stop operating as TollFreeZone.com?

15  A.   Well, officially whenever it was that the corporation

16  was killed off by my inaction to file the paperwork.

17  That's when that officially would have been over.  That

18  doesn't mean that the TollFreeZone wasn't still out there

19  in the community; it just means that I couldn't operate

20  under -- I couldn't open up anything under TollFreeZone

21  anymore.

22  Q.   So you were using that name, but it wasn't a

23  corporation; is that what you're saying?

24  A.   Correct.  Yes.

25  Q.   Did TollFreeZone provide services to its customers

1   which allowed them to make autodial telemarketing calls?

2   A.   Absolutely.

3   Q.   And what about robocalls --

4   A.   Same thing.

5   Q.   -- is that a system that you've ever used?

6   A.   Yeah.  Same thing.

7   Q.   What do those terms mean to you?

8   A.   Automated dialing, a robocall or an autodialer, is

9   when you take a prerecorded message and you send it out

10  through the phone lines.  And in our case we can send out

11  a hundred thousand a minute if we wanted to.  And we

12  deliver them onto either an answering machine or we play

13  them to a live person.  And that live person, depending

14  upon the customer's options, decides whether they want to

15  just play a message to you or if they want an interactive.

16      And that's another term that rarely gets brought up.

17  It's called *IVR*, which is "interactive voice response."

18  So if, for instance, you get a call and it asks you to

19  press 1 to be transferred, that's an IVR, which is also a

20  robocall, which is also an autodial.  So maybe that's too

21  detailed, but in answer to your question.

22  Q.   And some of those autodial calls, when the caller

23  answers they're hearing a prerecorded message as opposed

24  to a live person on the other end of the line?

25  A.   On those, yes.

1  Q.   And some of those messages could be similar to the

2  ones that we heard this morning?

3  A.   Absolutely.

4  Q.   What about *ringless calls*, do you know what that term

5  means?

6  A.   Yes, sir.

7  Q.   Okay.  Is that another business service that your

8  company provides?

9  A.   Yes.  We have a website called *RinglessCalls.com*.  At

10 RinglessCalls.com, the reason we have it is because most

11 of our political people, they have to separate cell phones

12 from landlines, so we will autodial or robocall the

13 landlines for them.

14        THE COURT:  I'm going to suggest that we

15 concentrate on answering Mr. Levin's questions.

16        THE WITNESS:  Okay.

17        THE COURT:  And then Mr. Trost can ask you to

18 elaborate --

19        THE WITNESS:  Okay.

20        THE COURT:  -- if it's necessary for your

21 purposes.  But it will be a lot more efficient if we just

22 concentrate on the question before you.

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Go ahead, Mr. Levin.

25

1  BY MR. LEVIN:

2  Q.   Again, please, if you could just briefly describe,

3  what is a ringless call.

4  A.   So a ringless call is a server-to-server data drop

5  and its sole function is to drop a voice mail into a cell

6  phone's voice mail without the phone ringing.  So it's no

7  longer a phone call, now it's a server-to-server data

8  drop.

9  Q.   Are you familiar with a company called *Technologic*?

10  A.   I am.

11  Q.   And do you do business with them?

12  A.   I do -- or I did.

13  Q.   What kind of company is Technologic?

14  A.   Technologic is the owner of the dialer system that we

15  offered that Mr. Cunningham has in question.

16  Q.   So what relation would Technologic have to the calls

17  that are at issue in this case?

18  A.   So Technologic owns the platform that we utilize,

19  that we chose to utilize, for sending out robocalls or

20  autodials.

21  Q.   So your customers who were placing autodial calls or

22  robocalls, those calls would actually be sent from

23  Technologic's hardware?

24  A.   Yeah.  We pay them monthly to be a member and so

25  we -- we're what's called a *reseller*.  And so we will

MICHAEL MONTES - ADVERSE

1   instruct customers how use that platform.  We have plenty

2   of videos so they can use it.

3   Q.   And for every one of those calls that one of your

4   customers makes on the Technologic platform, do you earn

5   money from that?

6   A.   Yes.  We earn money by the minute.  So it's a way to

7   facilitate people that use minutes.  That's how we get

8   paid: it's per minute.

9   Q.   Would it be fair to characterize you as sort of a

10  middleman, I guess you could say, that you are bridging

11  the gap between Technologic and people that want to place

12  the autodialed calls or the robocalls?

13  A.   No.  I wouldn't say I'm the middleman because we

14  lease the system to utilize, so --

15  Q.   And you're well-versed in how to use the Technologic

16  system to place high volumes of automated calls?

17  A.   Correct.  I am, yes.

18  Q.   And people who sign on with you, customers who sign

19  on with you to place those calls, you train them in on how

20  to use that system?

21  A.   Yes, yes.  We have videos on how to use so they can

22  self-fulfill their order.

23  Q.   Where's Technologic located?

24  A.   I believe they're in Panama.

25  Q.   Have you ever spoken directly with anybody at

MICHAEL MONTES - ADVERSE

1  Technologic?

2  A.   No.  I've emailed a lady named Danella (ph).

3  Q.   How did you become affiliated with Technologic

4  without ever even speaking to somebody there?

5  A.   So there was a guy named Scott Presta.  And Scott

6  introduced me to the platform and he got me an account

7  with them and got me set up as a reseller.

8  Q.   As far as you know, does Technologic have any

9  employees in the United States?

10  A.   Not that I'm aware of.

11  Q.   And you've never spoken to anyone at the company?

12  A.   No.

13  Q.   Do you have access to records of the phone calls

14  placed by your customers through Technologic's system?

15  A.   Yes.

16  Q.   So you have the ability to look up records of what

17  numbers were called --

18  A.   Up to a certain date, yes.

19  Q.   -- dates and times of calls, things like that?

20  A.   Correct.

21  Q.   There was some conversation this morning about the

22  Autodialer123.com website.  That is your website, correct?

23  A.   Yes, sir.

24  Q.   And did you use that website when you were operating

25  under the name *TollFreeZone.com*?

MICHAEL MONTES - ADVERSE

1  A.   We did.

2  Q.   Do you use that website currently when you're

3  operating under the *MyAdGuys.com* name?

4  A.   Yes, sir.

5  Q.   I'm now showing you, it's also in the book in front

6  of you, what's previously been marked as Exhibit No. 14.

7  Does this appear to be an accurate representation of the

8  sign-up form on the Autodialer123.com website?

9  A.   I believe so, yes.

10  Q.   Okay.  And if somebody wants to do business with you

11  and start placing automated calls, robocalls,

12  telemarketing calls, they just fill out this form or how

13  does that work?

14  A.   Yeah.  They would fill out this form and I would

15  create an account for them and send them back their user

16  ID and password and direct them to the website to watch

17  the videos.

18  Q.   And you have a menu on this website about halfway

19  down the page where somebody can select their type of

20  business?

21  A.   Yes, sir.

22  Q.   Okay.  Why is that relevant to you?

23  A.   It really isn't.  If we got a call from somebody,

24  we'd try to put their name there so they felt like they

25  were at the right place, but we really didn't care who

 1  they were.

 2  Q.   Okay.  So you don't personally care for what purpose

 3  people are making these calls?

 4  A.   I don't, no.

 5  Q.   I'm showing you what we also discussed this morning

 6  and was marked as Exhibit No. 15.  Does that appear to

 7  you, and I can zoom in if we need to, but does that appear

 8  to you to be an accurate representation of the selections

 9  on the drop-down menu on your sign-up form under *Type of*

10  *Business*?

11  A.   Yes, sir.

12  Q.   And are you familiar with some of these companies?

13  A.   I know -- I've heard of them and that's why they're

14  on there, yeah.

15  Q.   Okay.  So have you heard in the past of a company

16  called *8 Figure Dream Lifestyle*?

17  A.   I have.

18  Q.   And do you know what sort of product or service they

19  sell?

20  A.   You know, I never really got to understand what it

21  was they sold.  But they were supposed to be, like most of

22  these guys, they were supposed to be selling to

23  businesses, so I don't care what they were selling.

24  Q.   The next one on the list is *Kyani*, maybe is how it's

25  pronounced, K-Y-A-N-I.  Do you know what that is?

1  A.   I don't.  I might have gotten a call from a company

2  called *Kyani* and put it on there.

3  Q.   Okay.  So are you the one who would have determined

4  what selections were placed on this menu?

5  A.   Yes.

6  Q.   But as we sit here today, you don't know what Kyani

7  is?

8  A.   No.

9  Q.   What about *World GN*, do you know what that is?

10  A.   I don't off the top of my head.

11  Q.   *Fast Home Biz*, do you know what that is?

12  A.   I remember talking to them, but I don't know if we

13  ever got anything out of them.  But they were kind of a

14  network marketing company.

15  Q.   *Elite Profit System*, do you know what that is?

16  A.   I'm not sure what they sold, but I remember talking

17  to them.  That's why they're there.

18  Q.   *Karat Bars*, do you know what that is?

19  A.   They're a company that sells gold.

20  Q.   *Enagic*, do you know what that is?

21  A.   Yeah.  They're a water purification company.

22  Q.   *MMM*, do you know what that stands for?

23  A.   Millionaire Marketing Machine, something like that.

24  Q.   Do you know what kind of company that is?

25  A.   I think it's a network marketing company.

1   Q.   And *SSM*, below that, do you know what that is?

2   A.   Hang on.  It is -- it will come to me.

3   Q.   Secret Success Machine --

4   A.   Yes.  There you go.

5   Q.   -- is that maybe what it is?

6   A.   Yes.

7   Q.   Is that also what you're referring to as a network

8   marketing company?

9   A.   I believe so, yeah.

10  Q.   When you use that term *network marketing company*,

11  what does that mean to you?

12  A.   It means that people will -- these guys will call a

13  business.  And if somebody -- one of these businesses

14  wants to add to their business by doing whatever they're

15  selling, then they sign them up.  So it's a network.

16  Q.   They're selling to businesses?

17  A.   That was what they told me.

18  Q.   Who's "they"?

19  A.   The people who signed up here.  Like, for instance,

20  Millionaire Marketing Machine, that was Kevin Cassanova I

21  think and his claim was that they were all calling

22  businesses.  And the reason they said they were calling

23  businesses --

24  Q.   Thank you.  You've answered question, Mr. Montes.

25  A.   Okay.  All right.

1  Q.   *TiDOM*, towards the bottom of the page, T-I-D-O-M, do

2  you know what that is?

3  A.   Yeah.   That's Dana Ehrlich's company.

4  Q.   Who's Dana Ehrlich?

5  A.   One of the network marketers.  I think you heard her

6  call this morning, but I don't know that that came from

7  us.

8  Q.   But in none of these cases, you don't know exactly

9  what these network marketers are selling --

10  A.   Yeah.

11  Q.   -- what sort of product or service it is?

12  A.   Oh, I do, yeah.  Enagic was that water purification

13  system.  The Karat Bars sold gold.  I don't know what

14  Millionaire Marketing Machine was or Secret Success

15  Machine, what they were selling.  I think those were

16  personal improvement products.  I don't know.

17  Q.   Are you familiar with the Telephone Consumer Protect

18  Act?

19  A.   I am.

20  Q.   Have you heard of that before this case started?

21  A.   I have.

22  Q.   And are you aware that there are certain restrictions

23  that federal law places on automated calls and prerecorded

24  messages that are sent to consumer cell phone?

25  A.   Absolutely.

1  Q.   And you're familiar with the fact that there are

2  certain restrictions that are placed on telemarketing

3  calls?

4  A.   I certainly am.

5  Q.   But yet it's not important to you to know what sort

6  of product or service the people that are using your

7  system are selling?

8  A.   No, because it's up to them.  They also have to know

9  the telecommunication laws.  It's in our contract under

10  the *Terms of Use* and our system has the ability --

11  Q.   Thank you, Mr. Montes.

12  A.   Okay.

13  Q.   You've heard the name *Jerry Maurer* here today?  I

14  think you mentioned it yourself.

15  A.   Yes, sir.

16  Q.   You're familiar with him?

17  A.   I am.

18  Q.   And are you aware that your name was listed on one of

19  his websites or blogs as someone he was recommending to

20  place calls?

21  A.   I was.

22  Q.   How about Brian Kaplan, are you familiar with him?

23  A.   I am.

24  Q.   And is he someone who has used your services in the

25  past?

1  A.   I don't believe so.  He has referred people to us

2  though.

3  Q.   So people that he does business with in his various

4  network marketing businesses, as you've called them --

5  A.   Yes, sir.

6  Q.   -- you've done business with those people?

7  A.   Absolutely.

8  Q.   And you're earning money yourself for every minute

9  that these people are placing calls through your system,

10  correct?

11  A.   Yes.  That is what we do.

12  Q.   Did you mention earlier that your system allows calls

13  to be placed up to a hundred thousand calls in a minute if

14  somebody wanted to do that?

15  A.   Yes.

16  Q.   Did I hear that correctly?

17  A.   Yes.  We do presidential elections.  We have to have

18  that capability.

19  Q.   Okay.  So if I wanted to place a hundred thousand

20  telemarketing calls to a wide range of people in the

21  course of a minute or a few minutes, is there any way that

22  I could do that on my own without the assistance of a

23  company like yours?

24  A.   No.  You couldn't hand dial a hundred thousand calls

25  a minute.  You would need a robocalling or automated

1  telecommunications company to do that for you.

2  Q.   Like your company?

3  A.   Correct.

4  Q.   During the years of, let's say, 2015 and 2016, do you

5  have any idea what percent of your clients were business

6  telemarketers as opposed to politicians or other clients?

7  A.   Yeah.  It's probably between 10 and 15 percent were

8  commercial and the rest is political.  Those were big

9  years for us.

10 Q.   Okay.  If you could turn back to the deposition

11 transcript that's marked as Exhibit No. 29 and if you

12 could please turn to page 99 of the transcript.

13 A.   Okay.  I'm sorry.  It's 29?

14 Q.   Yes.  I apologize.  The way that these were put

15 together, the --

16 A.   Gotcha.

17 Q.   -- exhibit is in front of the tab with the number on

18 it.

19 A.   Okay.

20 Q.   This is the transcript on 1/14/2019 --

21 A.   Okay.  Gotcha.

22 Q.   -- page 29.  If you can see, starting on line 17, I

23 was asking you some questions:  "Let's go back a few years

24 when you were operating TollFreeZone in 2015."

25 A.   Mm-mm.

1  Q.   "Can you give me an estimate, as to the autodialing

2  campaigns that you help set up for your customers, what

3  percentage were political candidates as opposed to

4  telemarketing sales?"

5       You responded:  "Every year the bulk of our revenue

6  comes from political and we have -- we do have a handful

7  of commercial people.  And back then we probably were

8  doing a little bit more.  We were probably doing about 30

9  percent commercial."

10      "What about 2016, what percentage would you say was

11  commercial?"

12      "I'd have to say it was probably about the same."

13      So in January you told me that it was 30 percent.

14  Today you're saying it was 10 to 15 percent?

15 A.   Yeah.  I mean, I'm estimating.  And if that's what I

16 said back then, then that was an estimate, too.  So, yeah,

17 without looking at numbers then and without looking at

18 numbers now, I'm estimating.

19 Q.   But regardless of what that percentage is, again

20 these people are paying you for the service of being able

21 to use your portal to Technologic's system to place high

22 volumes of automated telemarketing calls?

23 A.   Yes.

24 Q.   Does your system allow for the recipient of the call

25 to have the option to opt out of receiving future calls?

1    A.    It does.

2    Q.    Is that a feature that is mandatory or --

3    A.    It is.

4    Q.    And do you keep records of people that press whatever

5    number it is to opt out of receiving future calls?

6    A.    We do.

7    Q.    You personally?

8    A.    It's on the system.  They can pull it up at any time.

9    Q.    You provide assistance to your customers in setting

10   up and running their robocall campaigns, correct?

11   A.    For our political clients.  Commercial clients are on

12   their own.  They have to go to the website to learn how to

13   use it.  We don't do anything with it.

14   Q.    Okay.  You provide technical support for them, don't

15   you?

16   A.    Sure.  If they have a question on how to use the

17   system, they can call us.

18   Q.    Okay.  There's a toll-free number on your website,

19   right?

20   A.    Correct.

21   Q.    And that number goes directly to your cell phone?

22   A.    It does.

23   Q.    Okay.  And you're available pretty much every

24   business day of the week to answer technical support

25   questions for anyone who's using your system?

1  A.    Correct.

2  Q.    Do you have an estimate as to approximately what

3  percentage of your customers call you and take advantage

4  of that technical support?

5  A.    I don't.  We get calls from time to time.  People

6  want to know how to load their data or call and record

7  their message, whatever, and we can tell them how to do

8  that.

9  Q.    Can you please turn back to page 41 of the deposition

10  transcript in front of you there?

11  A.    Mm-mm.  Okay.

12  Q.    If you could take a look at starting, say, line 17 on

13  page 41, I asked you:  "You make yourself available to

14  provide support assistance to people that are trying to

15  set up their accounts?"

16        You said:  "Yes."

17        "How often do you receive calls with people seeking

18  assistance of that?"

19        Your answer:  "Quite a bit."

20        I asked you:  "Can you please define 'quite a bit'

21  for me?"

22        And your answer:  "Probably half.  Half the customers

23  call me and say, 'I can't log in.'"

24        So was that testimony a fair estimate, that about

25  half of your customers call you with technical support

MICHAEL MONTES - ADVERSE

1  issues?

2  A.   If it's half, it could be a hundred percent, I'm

3  always there for them.  If they need to know how to log

4  on, I can help them.

5  Q.   Well, is it a few, is it half, is it a hundred

6  percent?

7  A.   Let's go with half.

8  Q.   When you were operating as TollFreeZone.com, whether

9  incorporated or not, any idea about how many of these

10  support calls you would receive on an average day?

11  A.   I don't know.  I don't know.

12  Q.   Okay.  Then if you could please turn to page 55 of

13  the deposition transcript.

14  A.   All right.

15  Q.   Starting at the very top of the page, do you see

16  where it says I was asking you:  "Back when you were

17  operating as TollFreeZone.com and you were doing more the

18  telemarketing autodialer accounts, at that time

19  approximately how many support calls, support questions,

20  would you receive per day?"

21       Your answer:  "Probably a dozen."

22       So is that fair --

23  A.   That's fair.

24  Q.   -- that you receive about a dozen --

25  A.   Sure.

MICHAEL MONTES - ADVERSE

1  Q.   -- technical support calls from your customers every

2  day?

3  A.   That sounds fair.

4  Q.   Well, I don't want to put words in your mouth.  It

5  was your answer.

6  A.   Okay.

7  Q.   That was incorrect?

8  A.   That's what I said and that's probably true.

9        THE COURT:  I'm going to instruct counsel and the

10  witness to let each other finish.  You particularly,

11  Mr. Montes --

12        THE WITNESS:  Yes, sir.

13        THE COURT:  -- you have to let the question get

14  finished before you answer because the court reporter has

15  to take everything down.  Let's not make her life

16  impossible.  It's hard enough as it is.

17        THE WITNESS:  Gotcha.

18        MR. LEVIN:  My apologies to everyone, especially

19  the court reporter.

20  BY MR. LEVIN:

21  Q.   Do you ever conduct training sessions for your new

22  customers?

23  A.   We have.

24  Q.   And do you know which customers you've done that for

25  in the past?

1  A.   Not off the top of my head.  No, I wouldn't be able

2  to tell you.  The training is very important because they

3  have to know how to use the system.

4  Q.   But you don't specifically remember anyone you

5  provided those training sessions for?

6  A.   I don't off the top of my head.

7  Q.   Have you ever conducted seminars over the internet or

8  what we sometimes call *webinars* for certain people to

9  learn how to use your system?

10 A.   Well, we did one with Dana Ehrlich's group and we did

11 a phone call with her.  And so we -- I basically tried to

12 sell them on using the system.

13 Q.   You've mentioned these technical support videos that

14 you direct your customers to watch?

15 A.   Yes, sir.

16 Q.   Okay.  These are available on YouTube?

17 A.   Yes, sir.

18 Q.   And are they also somewhere on your website or

19 anywhere else?

20 A.   Just on YouTube.  The links are on our website so

21 that you can easily get to YouTube and watch the video.

22 Q.   Do you have any idea how many of these videos you've

23 made?

24 A.   I don't remember.  We've made a lot of them.

25 Q.   Would you say it's more than 20?

1  A.   I don't know.  We can go to YouTube and look.

2  They're all there.

3  Q.   More than 50?

4  A.   I wouldn't say more than 50.

5  Q.   Somewhere between 20 and 50?

6  A.   Sure.

7  Q.   That's the best estimate you can give me?

8  A.   That's -- sure.

9  Q.   I'm not asking you to agree with me, Mr. Montes; I'm

10 just asking what you recall.

11 A.   Okay.

12 Q.   And that is the best estimate?

13 A.   That would be, without looking at YouTube, that would

14 be the best estimate.

15 Q.   Okay.  And what sort of topics do these videos cover?

16 A.   So it's very important that our customers know how to

17 use the system because they're the ones that have to use

18 it.  So we go from how to load your data, how to scrub

19 against the no-call list, how to scrub the cell phone list

20 if you're going to take cell phones out of your list, how

21 to get a report, how to basically do everything you can to

22 launch a campaign.

23 Q.   Prior to working with Technologic, did you work with

24 a different company to provide autodialer services for

25 your customers?

1  A.   I did.

2  Q.   What was the name of that company?

3  A.   Shoutpoint.

4  Q.   Shoutpoint?

5  A.   Yes, sir.

6  Q.   And when did you cease working with Shoutpoint,

7  approximately what date?

8  A.   2014 I think.

9  Q.   Okay.  So when you stopped working with Shoutpoint

10  and you started working with Technologic, did you have to

11  personally learn how to use Technologic's system?

12  A.   Yeah.  Scott showed me how to do it.  It's a super

13  easy system, so that's why we liked it.

14  Q.   Easy for someone with experience in the telemarketing

15  field or easy for anybody?

16  A.   Easy for anybody.

17  Q.   Okay.  And somebody who has no experience placing

18  automated calls can just sit down and start using the

19  system?

20  A.   If they watch the video, sure, yeah.  It's pretty

21  easy.

22         THE COURT:  I'm starting to get confused here.

23  Are we talking about your system or are you talking about

24  Technologic?

25         THE WITNESS:  It's one in the same.

MICHAEL MONTES - ADVERSE

1          THE COURT:  Well, I guess what I'm getting at

2    here -- maybe put it this way:  Why do they need you?  If

3    it's so easy to use Technologic, why couldn't Dana Ehrlich

4    or whoever just go right to Technologic and use it?

5          THE WITNESS:  They don't know about Technologic.

6          THE COURT:  Okay.  And so you just -- you happen

7    to know it and so they end up going to you?

8          THE WITNESS:  Correct.

9          THE COURT:  But it's simple enough that they, if

10   they knew about Technologic --

11         THE WITNESS:  They wouldn't need me.

12         THE COURT:  -- they would just go directly to

13   them?

14         THE WITNESS:  Correct.

15         THE COURT:  Okay.  All right.  That clarifies

16   things for me at least.  I don't know -- it's up to you,

17   Mr. Levin -- if you can get to whatever it was you were

18   after, but go ahead.

19   BY MR. LEVIN:

20   Q.   So you mentioned some of the topics that these videos

21   cover.  We have a few of them here that we're going to use

22   in evidence in this case that we'd like to play for the

23   jury --

24   A.   Okay.

25   Q.   -- and we'll ask you some questions about that.

1  A.   Okay.  Great.

2       (Video played.)

3  BY MR. LEVIN:

4  Q.   Okay.  Mr. Montes, was that your voice on that video?

5  A.   Yes, sir.

6  Q.   So this is one of the instructional videos that you

7  prepared?

8  A.   Yes, sir.

9  Q.   And what exactly are you instructing people how to do

10 here?

11 A.   I'm telling them how to take data out of an existing

12 campaign, so if they put data in and it's not the campaign

13 they meant to put in.  It happens more than you think.

14 Our political consultants will dump data into a campaign,

15 then they go, "Oh, no, that's the wrong message we put in

16 there."  And they need to pull the data out and then they

17 need to dump it into a new campaign.  They need to know

18 how to do that, so we show them how to do that.

19 Q.   You mentioned in the video 115,000 leads?

20 A.   Mm-mm.

21 Q.   "Leads" meaning what exactly?

22 A.   Phone numbers.

23 Q.   So that represents 115,000 phone numbers to which

24 these telemarketing calls could be transmitted?

25 A.   Correct.

1      MR. LEVIN:  All right.  Let's move on to the next

2   one then.

3       (Video played.)

4   BY MR. LEVIN:

5   Q.   Okay.  Mr. Montes, again was that your voice on the

6   video?

7   A.   Yes, sir.

8   Q.   And is this one of the instructional videos that you

9   created for your customers?

10  A.   Yes, sir.

11  Q.   What we're looking at here, was this your web browser

12  on your computer that you were recording the video from?

13  A.   Yes, sir.

14  Q.   All right.  And the website that's listed there,

15  DialerLeads.com, what is that exactly?

16  A.   It's just a URL that I own that I put to the

17  Dialer.To.

18  Q.   And the Dialer.To that you see below that, what is

19  that?

20  A.   Dialer.To, that's actually the name that Technologic,

21  Inc. gave to the website.

22  Q.   So what we're looking at here is your computer logged

23  into Technologic's automated dialer system?

24  A.   Yes, sir.

25  Q.   Okay.  And what were you instructing your customers

1  on how to do in this video?

2  A.    So when we do a national campaign, you don't want --

3  number one, our system will not allow you to dial past

4  9 p.m. or before 9 p.m -- or 9 a.m.  You can't go outside

5  those parameters.  It's not legal.

6      So but if you wanted to call from, let's say, 5 p.m.

7  to 7 p.m. in each time zone, the system will divvy up

8  the -- if you set it this way the system will divvy up the

9  data and will only call between 5 and 7 in Central or

10  Eastern and then wait until Central and then wait until

11  Mountain and then wait until Pacific.  And that way you're

12  getting to the people at the time you want to call them in

13  their time zone as opposed to the top time parameter.  And

14  if you just did that, it would do just that in whatever

15  time zone this account is in.

16      So this account is in Central.  So if I set it from

17  5 to 7 Central, that means it's ringing from 6 to 8

18  Eastern and 4 to 6 Mountain and 3 to 5 Pacific, because

19  it's going all at once.

20  Q.    So your customers have to go to your website,

21  DialerLeads.com, before they can log into Technologic's

22  calling system?

23  A.    It's just an easier URL for them to remember.

24  Q.    But any of these people could go directly to

25  Technologic and set up their own account and do the same

1  thing?

2  A.   They could, yes.

3  Q.   If they knew they existed?

4  A.   If they knew it existed.

5        THE COURT:  And also why don't you just tell us,

6  to make sure we all know, what a URL is.

7        THE WITNESS:  So a URL is just a website.  So I

8  can go to GoDaddy and get a URL, which is a website or a

9  web domain.  So I can get ABC.com and I can point that to

10 whatever I want to.

11      So most websites are built that way.  They're built

12 on a server and then they have this long IP address.  And

13 you point your web domain name to that IP address and it

14 will go there forevermore.

15      So if I don't want to remember 10.92.110.0, I can

16 point a named IP or a named URL or web domain name to that

17 IP address.  Nobody has to remember those numbers; they

18 just remember MikeMontes.com.  And so for sake of ease, we

19 got a web domain appointed there.

20      MR. LEVIN:  Okay.  Let's move on to the next

21 video.

22     (Video played.)

23 BY MR. LEVIN:

24 Q.   Okay.  Mr. Montes, it looks like the sound cut off

25 there at the end, but was that your voice on that video?

1  A.   Yes, sir.

2  Q.   And essentially what are you instructing people to do

3  in that video?

4  A.   I'm showing them how to load data into the data

5  library.  So let's say you have 15 campaigns and you have

6  voters in Nebraska and California and wherever, right?

7  And you want to load those up separately as separate

8  databases; you don't want to combine them.

9      So you would load them into the data library.  That

10 way when you go to launch your campaign, those databases

11 are there.  And you could label them however you want so

12 you can go get them in the future.

13     And then but if you need to pull them out, there's a

14 way to pull them out.  Let's say you wanted to keep them

15 and you didn't want to use this system.  Then you pull

16 them out, go use whatever system you're using.

17 Q.   Okay.  At one point in that video you -- it showed

18 you unchecking the box that said *Global DNC*?

19 A.   Yes.

20 Q.   And what is Global DNC?

21 A.   So the federal no-call list is in our system.  And if

22 you're a political guy, the problem with that is you load

23 your data and it will be no more because most numbers are

24 on the DNCL, do-not-call list.  I'm sure many people here

25 have their number on it.

1 Q.   And then I believe I saw below that entry one that

2 said *Customer DNC*?

3 A.   Yes.  Every customer in our system, if you're going

4 out with a call to someone, you're supposed to put on

5 there, if you're going to a live person, you're supposed

6 to put press whatever tone you want to assign -- it can be

7 1 through 9, 0 through 9 -- to be removed.

8       And so there is a removal feature that will, if you

9 press -- let's say 9 is a removal number and you press 9,

10 then your number is now on the DNC of that customer's

11 bucket of do-not-calls so that that customer will not call

12 you then.  It's one of the safeguards we have.

13 Q.   But there's a little check mark next to there like

14 you could uncheck it and turn that off?

15 A.   You can check it or uncheck it, yeah.  Our schools

16 need that because they don't want to scrub against any

17 DNCs that they got a problem.  They want to call out and

18 reach everybody.

19 Q.   Okay.

20 A.   So they can't -- a DNC would kill the purpose of

21 calling out under an emergency situation, so we have to

22 have the ability for the customer to uncheck that.

23 Q.   Can we agree here, Mr. Montes, that this case does

24 not have anything to do with calls placed by schools or

25 municipalities or politicians?

1  A.    Yeah, but you need to know why the function is there.

2  You're asking me that.

3  Q.    But anybody has access -- all your customers use this

4  same interface?

5  A.    They all use the same interface.

6  Q.    Okay.  And then I also saw an entry next to those

7  that said *Militant DNC*.  What does that mean?

8  A.    So Militant DNC are people that you just don't ever

9  want to call.  Mr. Cunningham's phone numbers are on our

10  militant as of this lawsuit.  So these are people that you

11  just never want to talk to or call because they've told us

12  somewhere along the line, "Never call me again."  And we

13  have 7 million of them in that list.

14  Q.    And is that a list, these Militant DNCs, that you

15  maintain for the use of all your customers?

16  A.    All of them if they want to use it, yeah.

17  Q.    Okay.  So it's not specific to one or another; that's

18  something -- a list that's cultivated by all of your

19  users?

20  A.    Correct.  And if they want to make it -- let's say

21  that we have a political campaign that says "I don't want

22  to scrub against the Militant because they don't have to,"

23  then we can program them out.  I can take that out so they

24  don't have to.  But we leave it in there for virtually

25  everybody else.

1      THE COURT:  How many videos are you going to deal

2   with, Mr. Levin?  Let me tell you the reason I'm asking.

3   We probably could use an extra break in the afternoon.  So

4   maybe we'll take an early break and then take one more

5   toward the end of the day.

6      MR. LEVIN:  Yeah.  That would be great.  I

7   actually just had a -- however you want to do it, but I

8   had a couple more questions about something we saw in this

9   one and then --

10      THE COURT:  No, I wouldn't cut that off.  Finish

11  up on this video and then we'll take a -- we'll just take

12  a short one.  We'll take ten minutes and then we'll --

13  we'll do two 10-minute breaks instead of one 15-minute

14  break.

15      MR. LEVIN:  Okay.  Thank you.

16  BY MR. LEVIN:

17  Q.   Mr. Montes, I backed the video up here a little bit.

18  We're still towards the end at 5 minutes, 55 seconds into

19  the video.  And would this be the desktop of your business

20  computer that we're looking at?

21  A.   Yeah.  I recorded these on my laptop.

22  Q.   Okay.  It looks like there's a number of WAV

23  recordings that you have saved to your desktop here?

24  A.   Okay.

25  Q.   Do you know what any of these are?

MICHAEL MONTES - ADVERSE

1  A.   Probably not.  *Reed* would have been a --

2  Q.   How about the one that I'm pointing out with the

3  cursor here where it says *Water Press 1*, do you know what

4  that is?

5  A.   I don't, but probably an Enagic MP3?

6  Q.   And down here at the bottom, it's kind of hard to

7  see, but do you see here at the bottom where it says

8  *30Second* --

9         THE COURT:  Mr. Levin, on the screen that's not

10  our laptop, it's our screen there, you can use your

11  fingertip and you can actually highlight there.  It

12  actually shows up better.

13  BY MR. LEVIN:

14  Q.   Here we go.  Do you see one here at the bottom that

15  says *30SecDana*?

16  A.   Yes.

17  Q.   Would that have anything to do with Dana Ehrlich?

18  A.   Maybe, maybe not.  I'm not sure without listening to

19  it.  We have a lot of Danas.

20  Q.   So do you think any of these are recordings of

21  prerecorded messages that your customers were sending out?

22  A.   It's entirely possible.  Let's say yes.

23  Q.   Would you normally maintain those on your own

24  personal system?

25  A.   No, not unless they send them to us and we had to

MICHAEL MONTES - ADVERSE

1   show somebody physically how to load them.

2   Q.    Okay.  So you've done that for people before, you've

3   loaded those messages up into the system for them?

4   A.    We've done a lot of that for the politicals and we

5   might have done a couple for the commercial guys, but I

6   can't remember any specific instances.

7               MR. LEVIN:  Okay.  That's all the questions I

8   have about this video.

9               THE COURT:  Very good.  Let's take an afternoon

10  break, come back at 3:27ish, so ten minutes.  Thank you.

11          (Jury out at 3:17 p.m.)

12              THE COURT:  We have a juror who's a little bit

13  drowsy, so I thought we needed to break this up a little

14  bit, maximize the attention span that we have.

15              MR. LEVIN:  Sounds fine.

16              THE COURT:  We'll take ten minutes, we'll come

17  back.  We'll probably do another ten minutes before we --

18  when we get into the 4:15 area.  See you in 10 minutes.

19          (Recess at 3:18 p.m. until 3:35 p.m.)

20              THE COURT:  Let's bring our jurors back.

21          All right.  Mr. Levin, you can continue.

22              MR. LEVIN:  Could we reactivate the screens?  It

23  looks like it's activated over here.

24              THE COURT:  There we go.

25

1  BY MR. LEVIN:

2  Q.   Okay.  Mr. Montes, this will move on to the next

3  video we have.

4       (Video played.)

5  BY MR. LEVIN:

6  Q.   Okay.  Mr. Montes, once again was that your voice on

7  the video?

8  A.   Yes, sir.

9  Q.   And this is one of the training videos you recorded

10 that's available through your website?

11 A.   It is.

12 Q.   And what were you showing your customers how to do in

13 this video?

14 A.   Just if you load data into the system and let's say

15 you selected the national DNC, but you didn't mean to.

16 And now you get your data and you see you loaded a million

17 pieces, but then you only have 300,000 left.  And you go,

18 "What happened?"

19      And you can go in there and in this case it was

20 duplicates.  The person -- the file that I loaded, I

21 intentionally did duplicates for this demo to show that we

22 weeded out all the duplicate numbers so that you are not

23 calling the people on the do-no-call list.  It's one of

24 the safeguards.  We don't want you out there banging away

25 at people more than one time, that's it, our clients don't

MICHAEL MONTES - ADVERSE

1 either.

2 Q.   Okay.  I've backed the video up here to 1 minute and

3 60 seconds and there's this number here that you had

4 mentioned or referred to.  It looks like 399,447.

5 A.   Mm-mm.

6 Q.   Does that represent phone numbers?

7 A.   Phone numbers, yes.

8 Q.   So that's nearly 400,000 phone numbers --

9 A.   Correct.

10 Q.   -- to which automated calls will be placed?

11 A.   If that was your list, yes.

12 Q.   Okay.  And then backing the video up further to the

13 beginning, do you see the three campaign names that are

14 listed there --

15 A.   Yes.

16 Q.   -- in that first column on the left?

17 A.   Uh-huh.

18 Q.   And the bottom one says *MMM Initial*?

19 A.   Yeah.

20 Q.   Is that possibly the Millionaire Marketing Machine

21 that was mentioned earlier?

22 A.   Either that or it was my initials but I typed one too

23 many Ms.

24 Q.   But your full three initials are not -- your middle

25 name is not M?

1  A.   I would have typed one too many Ms, that's it.  This

2  is a demo account, so -- but it could have been.

3         MR. LEVIN:  Okay.  Let's move on to the next one

4  then.

5     (Video played.)

6  BY MR. LEVIN:

7  Q.   Okay.  That one was a little hard to hear.  We had

8  the volume up as high as it will go now.  But nonetheless,

9  Mr. Montes, that was your voice on the video?

10  A.   It was.

11  Q.   And is this one of the videos that you created to

12  train your customers on how to use your system?

13  A.   Yes, how to load or how to do a test call so that you

14  can make sure you have your right message in there.

15  Q.   Okay.  And under -- I know this is a demo, but under

16  *Name* on the top left it says *Water*.  Is there a reason for

17  that?

18  A.   Yeah.  That was probably a Kagan demo.

19  Q.   And what is Kagan?

20  A.   Kagan Water, one of the drop-down-list people that

21  you asked about.

22  Q.   Is it like Enagic that you mentioned?

23  A.   Enagic, yeah.

24         MR. LEVIN:  Moving on to another video, which is

25  Exhibit No. 23.

MICHAEL MONTES - ADVERSE

1    (Video played.)

2  BY MR. LEVIN:

3  Q.    Okay.  Mr. Montes, once again that is your voice on

4  the video?

5  A.    Yes, sir.

6  Q.    And this is one of the training videos that you

7  created for your customers?

8  A.    Yes, sir.

9  Q.    And what is it that you're describing in this video?

10  A.    Just how to start and stop a campaign.

11  Q.    What does the word *campaign* mean to you in this

12  context?

13  A.    So if you have launched a call and you're

14  broadcasting out your message and you want to stop the

15  campaign, you just come in here and find your campaign and

16  go into this setup here and it's stopped or hit *Start* if

17  you want to start it.

18         THE COURT:  Could you clarify one thing for me

19  here?  Earlier you had talked about how this system could

20  do a hundred thousand calls in a minute.  And so I can't

21  imagine that these campaigns would take very long to run

22  at that rate.  And so maybe the bit about how many lines

23  you want to use is a way of sort of pacing it.  That's a

24  concept here that I don't really seem to understand.  Like

25  it shouldn't take very long to do these campaigns, but you

1  must consciously space them out?

2         THE WITNESS:  Yes, sir.  So what happens is if --

3  so here's a case in point:  Last week we did a call for a

4  Texas Right to Life.  They were out fundraising, but they

5  only have five people to take inbound calls for people who

6  want to donate.  So we have to slow it way down so the

7  channels or the lines have to come way down to maybe

8  five -- maybe one line per person waiting to take the

9  funds, because we can't overload them.  And this system

10  actually has a functionality so that we stay within the

11  law of not drop calls because you can't drop calls.

12         THE COURT:  What does that mean, a drop-call?

13         THE WITNESS:  A drop-call means that I have you

14  on the line with me and I'm talking about you donating

15  funds and you got a call and you wanted to talk to me

16  about that.  But now you're on hold for more than X amount

17  of seconds and then you hang up or we hang up on you and

18  that is a drop-call and that is illegal.

19       So what we have to do is in our system, if it's a

20  live telemarketer we're sending the calls to, it has a

21  number in it.  You can tell the system I have five agents

22  waiting and I want, let's say, ten phone lines going at

23  once.  So if one gets on the phone, two lines shut down;

24  if all five are on the phone, all ten lines shut down; so

25  that we're no longer generating calls to come into a call

MICHAEL MONTES - ADVERSE

1  center that can't take them, because under those -- under

2  the guidelines for that type of call, there's a law that

3  says you can't have people on hold longer than a few

4  seconds --

5          THE COURT:  All right.

6          THE WITNESS:  So we can't have dropped calls, so

7  our system has a safeguard in it to prevent that.

8          THE COURT:  I think I get it.  Go ahead,

9  Mr. Levin.

10         MR. LEVIN:  Thank you, Your Honor.

11     Okay.  The next video we have is what's been labeled

12  as *Plaintiff's Exhibit No. 24*.  I'll play that now.

13     (Video played.)

14  BY MR. LEVIN:

15  Q.   Okay.  Mr. Montes, you probably know what I'm going

16  to ask you, but once again was that your voice on that

17  video?

18  A.   Yes, it was.

19  Q.   And this is one of the training videos that you

20  created for your customers?

21  A.   For a customer, yeah.

22  Q.   Okay.  And what were you showing this customer how to

23  do here?

24  A.   So we designed this specifically for the Michigan

25  Republican Commission and they have a whole -- they were

1  going to bring us a whole lot of people to make their

2  robocalls during an election year.

3      We never ended up really launching this or using it

4  because we ended up -- they would never even do this.

5  They would just call me.  So we just -- I just ended up

6  taking their calls and helping them out, sadly.  I wish

7  they would have used this because it would have made life

8  a lot easier, but we just took their calls anyway.

9  Q.   I think at the end of the video you invited anyone

10 who's listening to text you with questions.  Do you often

11 take questions from your customers via text message as

12 well?

13 A.   Sure.  Yes.

14      MR. LEVIN:  Okay.  The last video that we're

15 going to play here is one that we have talked about

16 already.  Unless anyone has any objection, I wasn't

17 planning on playing the full 1 hour and 21 minutes, but

18 just a few minutes to verify what it is and so that the

19 witness can explain it to us.

20      (Video played.)

21 BY MR. LEVIN:

22 Q.   Okay.  I think we'll pause it there.  Mr. Montes, was

23 that your voice, not at the beginning of the video but

24 towards the end before we just paused it?

25 A.   Yes.

MICHAEL MONTES - ADVERSE

1  Q.   And we talked about this earlier; it was mentioned.

2  Is this the web seminar that you conducted for Dana

3  Ehrlich?

4  A.   I did.

5  Q.   Okay.  And the businesses that she is involved in are

6  called *Millionaire Marketing Machine* --

7  A.   Millionaire Marketing Machine.

8  Q.   *Elite Market Alliance*?

9  A.   Yep.

10  Q.   And the *TiDOM* business, that was that other one,

11  correct?

12  A.   I don't think it was part of this, but maybe.  But

13  she's part of that.

14  Q.   Yes, that's one that she's part of?

15  A.   Yeah.

16  Q.   Okay.  It looks like total time on this video is over

17  an hour and 20 minutes.  There's still well over an hour

18  left that we haven't played.  Can you describe for me

19  generally what took place during the balance of this hour?

20  A.   Yeah.  Absolutely.  So Dana wanted me to talk to her

21  people and show them how the system worked.  And Dana had

22  a guy named Jack something-or-other working for her team

23  that knew how to operate the system, so he was going to

24  run her calls for all her people.  So my interaction

25  mostly, if I was going to end up working with these guys,

1  was through Jack.

2  Q.   Excuse me, Mr. Montes.  I'm asking what took place on

3  the video.

4  A.   Okay.  So I went through the video and explained how

5  to utilize the system essentially.

6  Q.   The Technologic dialer system that we've been talking

7  about?

8  A.   Right.  Yep.

9  Q.   And then you answered questions from the other people

10  who were participating?

11  A.   Correct.

12  Q.   Do you ever run call campaigns for your clients?

13  A.   I do, yeah, for politicians.

14  Q.   You never run them for business telemarketers?

15  A.   No.  These guys all run themselves.  That's why our

16  training videos are so important.

17  Q.   Do you recall in your deposition in January having

18  some discussion regarding running call campaigns for your

19  customers?

20  A.   I don't.  Do you want to enlighten me?

21  Q.   Sure.  Would you please turn to page 117 of the

22  deposition transcript?  It's Exhibit 29, if you still have

23  that open, the one that's dated January 14th, 2019 at the

24  top.

25  A.   Okay.

1  Q.   Okay.  So starting at line 10, there was some

2  discussion of the description of you running call

3  campaigns.  Do you recall questions of that nature?

4         THE COURT:  I'm sorry.  What page are we on?

5         MR. LEVIN:  117.

6         THE COURT:  117.  Thank you.  Go ahead.

7  BY MR. LEVIN:

8  Q.   So your answer at line 13:  "Yeah.  I mean, when

9  people say, 'Oh, you know, can you run my call campaign?'"

10        "'Well, if you sent me your data and your WAV file or

11  your audio message and your caller ID, I could load them

12  into your account for you and I can show you how to do

13  it.'"

14        "And mostly that's why I'm on a lot of training

15  calls, because I can take their data and show them how to

16  do it in their account."

17        "QUESTION:  Then do you ever move forward from that

18  point and actually initiate the calls?"

19        "ANSWER:  I have.  But it's their account, it's their

20  data, it's their message.  I have hit *Send* or *Start*."

21  A.   Yeah, for my politicians, sure.

22  Q.   So it's your testimony here today that during this

23  deposition that had nothing to do with political calls

24  related to this case, you were not talking about the

25  commercial clients?

MICHAEL MONTES - ADVERSE

1 A.   No.  I don't launch commercial clients.  That's why

2 we train them.

3 Q.   But when they call you and they ask you to walk them

4 through the process and show them what to do, you say

5 "no"?

6 A.   No.  I have, on occasion, walked people through the

7 process.  We've gone to a website.  I've done online

8 training showing them the website and the videos.

9 Q.   So you're drawing a distinction between walking them

10 through the process while they're on the phone and doing

11 it by yourself sometime later?

12 A.   Correct.  Yeah.  My whole goal with commercial

13 people, when we have them, is to show them how to do it.

14 We're not -- I don't have time for them.  We're busy with

15 other stuff.

16 Q.   Okay.  Can you please turn back to Exhibit No. 26?

17 A.   Okay.

18 Q.   We talked about this a little earlier.  This is a

19 copy of the judgment that was entered against

20 TollFreeZone.com, Incorporated in Missouri.  Do you recall

21 when you first found out that this judgment had been

22 entered against you?

23 A.   I don't.

24 Q.   What did do you when you first found out about it?

25 A.   Nothing.

1   Q.   Did you take any steps to look into how this might

2   have happened?

3   A.   I did.

4   Q.   Did you take any steps to look into what sort of laws

5   the State of Missouri thought were being violated?

6   A.   No.

7   Q.   Did you take any steps to look into which of your

8   customers might have been responsible for those calls?

9   A.   I didn't.

10  Q.   Did you make any changes to your business practices

11  as a result of this judgment having been entered against

12  you?

13  A.   Yeah.  We decided that we're not going to call

14  Missouri anymore.

15  Q.   Have you ever paid any part of this judgment to the

16  State of Missouri?

17  A.   No.

18  Q.   So other than setting your system so that no calls

19  can be placed to the State of Missouri, you did not take

20  any other action when you found out that this judgment had

21  been entered against your company?

22  A.   Correct.

23  Q.   Okay.  Could you then turn to the next exhibit, No.

24  27?  This is the Mississippi Public Service Commission

25  news release announcing a $440,000 fine against

1 TollFreeZone com.  Do you recall when you first found out

2 about this fine having been entered against TollFreeZone

3 in Mississippi?

4 A.   I do.

5 Q.   And by date or approximate time frame, can you tell

6 me when that was?

7 A.   I think it was in the deposition of the last lawsuit

8 Cunningham had against me.

9 Q.   Well, I asked you for a date.

10 A.   I don't know what date that was, so you'll have to

11 look it up.

12 Q.   Do you recall what year that was?

13 A.   I think it was last year.

14 Q.   So you're talking about 2018?

15 A.   Yeah, I think so.

16 Q.   Okay.  Once you found out about this, did you contact

17 the State of Mississippi to find out what it might have

18 been about?

19 A.   Nope.

20 Q.   Did you look into why it was that you were just

21 hearing about it for the first time on a press release?

22 A.   No.

23 Q.   Did you look into what Mississippi state laws they

24 were claiming you had violated?

25 A.   No.

1  Q.  Did you look into which of your customers' phone

2  calls might have been responsible for these fines?

3  A.  I did not.

4  Q.  And have you ever paid a portion of these fines --

5  A.  I have not.

6  Q.  -- to the State of Mississippi?

7  A.  No.

8  Q.  Okay.  But did you block your system from placing

9  further calls to Mississippi?

10  A.  I did.

11  Q.  And other than that, you -- did you take any other

12  action as a result of finding out about this --

13  A.  No.

14  Q.  -- besides just blocking calls to that state?

15  A.  No.

16  Q.  You also blocked the state of Tennessee -- excuse me,

17  you blocked your system from placing calls to the state of

18  Tennessee as a result of Mr. Cunningham's lawsuit against

19  you, correct?

20  A.  We have.

21  Q.  And you testified earlier that -- I'm sorry.  When

22  you first found out about the judgment in the State of

23  Missouri is when you allowed the TollFreeZone.com

24  corporation to lapse in California; is that correct?

25  A.  I believe so, yeah.

1  Q.  Have you ever monitored your clients -- your

2  customers that are placing telemarketing calls to insure

3  that they are complying with the Telephone Consumer

4  Protection Act or any other laws?

5  A.  Nope.  That's what our terms of use is for.  Our

6  terms of use is meant so they know they have to adhere to

7  it.

8  Q.  And you didn't monitor your customers before you

9  found out about the judgment or the fine in these two

10 states and you haven't done it since then, correct?

11 A.  Correct.

12 Q.  You didn't think that maybe after these two incidents

13 and sizable fines against your business totalling over

14 $500,000 that you might want to stress some more

15 compliance?

16 A.  Yeah.  We put the terms of use on there.

17 Q.  So by putting these terms of use on your website, you

18 believe that absolves you of any concerns related to the

19 calls your customers are placing?

20 A.  Yes, because they agree to it.

21 Q.  When did you first become aware that this particular

22 lawsuit had been filed against you?

23 A.  Oh, gosh.  I don't recall.  It was -- Kevin would

24 know because I called him immediately.

25 Q.  If I told that your attorney first filed his

1 appearance in this case on June 1st of 2017, does that

2 sound like about around that time frame when you first

3 found out?

4 A.   Yeah.

5 Q.   And you've known since June 1st of 2017 that this

6 lawsuit related to phone calls, the records of which were

7 located on Technologic's system, correct?

8 A.   Correct.

9 Q.   And you knew that this lawsuit related to records of

10 calls that were placed to Mr. Cunningham through

11 Technologic's system, correct?

12 A.   Correct.

13 Q.   And you've had access to that system the entire time

14 that this lawsuit has been pending, correct?

15 A.   Yes.

16 Q.   Okay.  If you could please turn to towards the back

17 of the binder that you have in front of you there.  Take a

18 look at what's been marked as Exhibit No. 34.  Are you

19 looking at the *Subpoena to Produce Documents*?

20 A.   Yes.

21 Q.   Okay.  Have you ever seen this before?

22 A.   Yes.

23 Q.   And this is a copy of the subpoena that was served on

24 you by my client in this case; is that correct?

25 A.   Correct.

1  Q.  And in this subpoena we were asking you to bring

2  certain documents and records related to your business to

3  your deposition on January 14th of 2019; is that correct?

4  A.  Correct.

5  Q.  And on January 14th of 2019 did you produce those

6  documents?

7  A.  I don't believe so.

8  Q.  Okay.  Do you need me to refresh your recollection as

9  to that or do you recall?

10  A.  I don't recall, so why don't you tell me.

11  Q.  Okay.  Then if you could please turn back to Exhibit

12  No. 29, your deposition transcript from January 14th of

13  2019, at page 22.

14  A.  Okay.

15  Q.  Okay.  So starting towards the bottom of the page at

16  line 21, I said to you:  "Okay.  So this, I will represent

17  to you, is a subpoena that we issued in this case

18  requesting that you produce certain documents and records

19  here at the time of your deposition today.  Did you bring

20  any of those requested documents or records with you?"

21      Continuing on page 23:

22      "ANSWER:  No."

23      "Do you intend to produce any of these documents or

24  records that we requested in the subpoena?"

25      And you answered:  "I do not."

1    So does that refresh your recollection that you did

2 not produce the records at the time of your deposition?

3 A.   It does.

4 Q.   So if you could please turn back to Exhibit No. 34 to

5 the subpoena itself.  In the next-to-the-last page of that

6 exhibit there are -- unfortunately, the pages aren't

7 numbered.  Sorry about that -- but there are four numbered

8 paragraphs on there, 14 through 17.

9 A.   Okay.

10 Q.   And do you see at the bottom where, in paragraph 17,

11 it's requesting "All documents reflecting records of calls

12 placed on behalf of any individuals or entities identified

13 and the documents produced pursuant to No. 16 above, to

14 telephone numbers" -- and then it lists Mr. Cunningham's

15 three phone numbers?

16 A.   Yes.

17 Q.   And we've already established you did not produce

18 those phone records on that date.  Now, if you could

19 please turn to the next exhibit, No. 35.

20 A.   Okay.

21 Q.   Okay.  And this is a response to that subpoena dated

22 December 26th of 2018.  Do you recall why you responded to

23 the subpoena from -- I'm sorry.  I'm sorry.  Turn to the

24 last page of Exhibit 35, if you will, where -- the

25 response to No. 17.  And do you see where it says it's

1  dated March 19th of 2019, about two months after your

2  deposition took place?

3  A.    Yes.

4  Q.    Do you recall why you responded to the subpoena in

5  March instead of in January?

6  A.    I'm sorry.  The question is?

7  Q.    At your deposition in January you said you did not

8  intend to produce any of the documents we requested in the

9  subpoena.

10  A.    Mm-mm.

11  Q.    Then your attorney did respond to that subpoena two

12  months later.  Do you recall what the reason was that he

13  or you decided to do that two months later?

14  A.    I don't.

15  Q.    Do you recall that the Court in this case entered an

16  order requiring you to produce those documents?

17  A.    Oh, right.  Yes.

18  Q.    So now, on March 9th of 2019, we're getting a

19  response to the subpoena.  And in response to our request

20  for documents reflecting records of calls that were placed

21  to Mr. Cunningham's telephone numbers, the response

22  states, "The responsive records from Technologic are not

23  available."

24  A.    Correct.

25  Q.    That's a true statement?

1  A.   True statement.

2  Q.   Okay.  How did you know they were not available?

3  A.   I logged into a few of the accounts and noticed that

4  records from that date era were no longer available.

5  Q.   Okay.  And when did you do that?

6  A.   Right about this time.

7  Q.   At any time between June 1st of 2017, approximately

8  when you first found out about this lawsuit pending

9  against you, and March 19th of 2019, any time prior to

10 that, did you attempt to extract those records from

11 Technologic's system?

12 A.   I did not.

13 Q.   But again you did have access to those records during

14 that entire time period?

15 A.   I did, yes.

16 Q.   So you never took any steps to try to download those

17 call records or preserve them in any way?

18 A.   I did not.

19 Q.   How long have you been in the telemarketing business?

20 A.   Full time since about 2000.

21 Q.   And how long were you operating under the name

22 *TollFreeZone.com*?

23 A.   Since 2005 I think.

24 Q.   Okay.  And prior to that what company did you work

25 for?

1  A.    Sound Media Group.

2  Q.    Did Sound Media Group provide generally the same sort

3  of services that you provide to your customers?

4  A.    Yes.

5  Q.    Okay.  So it seems like from that experience you'd be

6  very familiar with telephone companies and telephone

7  records and the policies that relate to them?

8  A.    Yes.

9  Q.    Were you surprised to find that those records were no

10  longer available in Technologic's system?

11  A.    Very, because every platform we've used before

12  retained all of them.

13  Q.    So you've never heard of -- well, if I use the term

14  *data retention policy*, does that mean anything to you?

15  A.    Yeah.  Technologic, Inc. never displayed one.

16  Q.    You've never, in all the years you've been in the

17  telemarketing business, heard of phone companies purging

18  records after a certain period of years?

19  A.    Yeah.  But ours at Sound Media Group and when I

20  utilized the other platform at -- I mentioned it

21  earlier -- they kept all the records for years and years

22  and years.  So yeah, it surprised me when Technologic,

23  Inc. had purged them.  My assumption is they would be

24  there.

25  Q.    But from June of 2017 to March of 2019, you never

1  made any effort to even check or find out if that was the

2  case?

3  A.    No.

4         THE COURT:  That is correct?

5         THE WITNESS:  That is correct, yes.

6  BY MR. LEVIN:

7  Q.    Are you familiar with a company called *Connexum*?

8  A.    Yes, sir.

9  Q.    And what kind of company is that?

10 A.    It's a long-distance company.

11 Q.    Okay.  And we all know what you mean when you say

12 *long distance*, but if you can just be a little more

13 descriptive.  To the best of your understanding, what sort

14 of services do they provide?

15 A.    Okay.  So I was a reseller for Connexum's

16 long-distance service as well.  And my job was to go get

17 other dialer companies to use Connexum's rate deck for

18 long distance.  Connexum is a reseller of AT&T's backbone.

19 They have a better price than you can get from AT&T.

20        So all the dialer systems in the country have what's

21 called an *LCR*, a "lease cost routing."  And in the dialer

22 system you can put one rate deck from one telco or

23 long-distance company like Connexum's, or AT&T or Sprint

24 or whatever, or you can put five of them.  And the LCR,

25 the lease cost routing, prior to the phone going out, will

decide what telco or long distance company offers the

least expensive rate for that route.  So Connexum is one

of the long-distance companies that a lot of the dialer

companies use because of their cost.

Q.   So if a call is placed by one of your customers, an

automated telemarketing call, it leaves Technologic

system, but it has to be routed through some company that

provides a long-distance server in order to make it to the

end user so their phone rings?

A.   Correct.

Q.   And are you currently still today a reseller for

Connexum?

A.   No.

Q.   How long ago did you stop doing that?

A.   About a year ago.

Q.   Okay.  If I told you that during your deposition you

mentioned twice that "I am a Connexum retailer" --

"reseller," in the present tense, would you --

A.   I'm still on there and I still earn commission from

some of the past clients, but I don't physically go out

and push them anymore.

Q.   And what does that mean as a reseller exactly?

A.   So as a reseller I'm basically -- when I was doing it

for them I was a long-distance rep.  So if a company

needed long distance for -- it didn't have to be a dialer;

1  it could be anything.  So if you wanted to set up, let's

2  say, a network of offices throughout the country, but you

3  wanted to look like you were all in one system, we could

4  do that through the long distance and some of the other

5  services that -- the net services that Connexum offered.

6  Q.   Mr. Montes, I'm now going to display what has

7  previously been marked as Plaintiff's Exhibit No. 28.

8  Your Honor.

9           MR. LEVIN:  This is the one confidential exhibit

10 we discussed.  It's my understanding we don't need to do

11 anything right now to protect that.

12          THE COURT:  I understand.  Go ahead.  You can

13 show it to the jury.

14          MR. LEVIN:  Thank you.

15 BY MR. LEVIN:

16 Q.   We don't have these on paper, Mr. Montes, because it

17 comprises well over a thousand pages.  But in taking a

18 look at this, the -- okay.  Looking at the beginning of

19 this, do you recall what this was that you produced to us?

20 A.   Yeah.  This is a bill from Robert Zoch, Zochnet.  He

21 was a gentleman appointed to me as a customer service

22 person for Technologic.

23 Q.   Well, not this one in particular, but this set of

24 documents of almost 1,300 pages that we previously marked

25 as this exhibit, do you recall what this is?  We can scan

MICHAEL MONTES - ADVERSE

1  through more of it if we need to.

2  A.    Yeah.  I believe these are all the invoices.

3  Q.    And did this exhibit also contain records of

4  communications with certain telemarketing customers of

5  yours?

6  A.    I believe so, yeah.

7  Q.    Okay.  And those are customers that we had requested

8  records of your communications with them through that

9  subpoena, correct?

10  A.    Correct.

11  Q.    Okay.  And so do you recall, do these records include

12  communications that you had with people who were selling

13  the 8 Figure Dream Lifestyle product through your system?

14  A.    Probably.

15  Q.    And do these records contain communications with

16  people who were selling the Millionaire Marketing Machine?

17  A.    Entirely possible, yeah.

18  Q.    Secret Success Machine?

19  A.    Sure.

20  Q.    TiDOM?

21  A.    Mm-mm.

22  Q.    Enagic?

23  A.    Yeah.

24  Q.    Okay.  And you include those because that's what was

25  requested in the subpoena the Court ordered you to comply

1  with?

2  A.    Correct.

3          MR. LEVIN:  Okay.  That's all the questions I

4  have for Mr. Montes at this time.

5          THE COURT:  All right.  Mr. Trost, do you want to

6  do your direct now or do you want to save for your case?

7  I'll give you your choice.

8          MR. TROST:  Yeah, I'll save my direct.

9          THE COURT:  Okay.  All right.  Very good.  You're

10  done for now, Mr. Montes.

11          THE WITNESS:  Yes, sir.

12        (Witness excused at 4:32 p.m.)

13                            ***

14

15

16

17

18

19

20

21

22

23

24

25

1        I, CHERYL A. SEEMAN, Certified Realtime and Merit

2 Reporter, in and for the State of Wisconsin, certify that

3 the foregoing is a true and accurate record of the

4 proceedings held on the 10th day of June, 2019, before

5 the Honorable James D. Peterson, Chief Judge of the

6 Western District of Wisconsin, in my presence and reduced

7 to writing in accordance with my stenographic notes made

8 at said time and place.

9 Dated this 5th day of July, 2019.

10

11

12

13

14

15                      /s/

16                      Cheryl A. Seeman, RMR, CRR
                      Federal Court Reporter

17

18

19

20

21

22

23 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless

24 under the direct control and/or direction of the
   certifying reporter.

25