UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CRAIG CUNNINGHAM,

             Plaintiff,         Case No. 16-CV-761-JDP

    vs.

MICHAEL MONTES, et al.,         Madison, Wisconsin
                              June 11, 2019
              Defendants.     9:10 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT EXCERPT - **SECOND DAY** OF JURY TRIAL
        **TESTIMONY OF MICHAEL MONTES**
     HELD BEFORE CHIEF JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Law Offices of Todd M. Friedman, P.C.
        BY:  DAVID B. LEVIN
            STEVEN G. PERRY
        333 Skokie Boulevard
        Suite 103
        Northbrook, Illinois  60062

For the Defendants:

        Axley Brynelson, LLP
        BY:  KEVIN D. TROST
        2 East Mifflin Street
        Suite 200
        Madison, Wisconsin  53703

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708

1                          **I-N-D-E-X**

2   DEFENDANTS' WITNESS        EXAMINATION              PAGES

3   MICHAEL MONTES          Direct by Mr. Trost          3-33
                            Cross by Mr. Levin          33-48
4                           Redirect by Mr. Trost       48-52
                            Recross by Mr. Levin        52-53

5                        **E-X-H-I-B-I-T-S**

6   PLAINTIFF'S EXHIBITS                  IDENTIFIED   RECEIVED

7   Ex. 1  - Call Spreadsheet                26           -
8   Ex. 15 - Drop-Down Menu                  10           -
    Ex. 28 - Zochnet Invoice                 20           -

9   DEFENDANTS' EXHIBITS

10  Ex. 501  - Terms of Use                   6           -
11  Ex. 502  - Caller ID Database            27           -
    Ex. 502A -        "                      44           -

12

13                            ***

14      (Trial proceedings at 9:10 a.m.)

15          THE COURT:  All right.  Let's bring our jury in.

16      (Jury in at 9:10 a.m.)

17          THE COURT:  Good morning.  Welcome back.  And I

18  believe we're going to now have the defense case.

19  Mr. Trost.

20          MR. TROST:  Sure.  Call Mike Montes to the stand.

21          THE COURT:  Very good.  Mr. Montes, we don't need

22  to swear you in again, but I'll remind you that you're

23  still under oath.

24          THE WITNESS:  Yes, sir.

25      **MICHAEL MONTES, DEFENDANTS' WITNESS, PREVIOUSLY SWORN**

<u>DIRECT EXAMINATION</u>

BY MR. TROST:

Q.   Good morning.  Can you tell us your name?

A.   Yes.  Michael James Montes.

Q.   Now, everyone has heard from you once already when Mr. Cunningham called you to the stand, but we haven't really gotten to know you.  Can you tell everyone a little bit about yourself, about your background?

A.   Sure.  Well, I attended San Diego State University as a youngster.  I got married at 23.  We have a beautiful daughter who is married now and 27.  I just found out last week I'm going to be a grandfather for the first time, so I'm happy about that.  It's a little boy.  I got a son who's 16 and is driving me crazy because he's driving. That's a challenge.

    And I've been in the autodialing business since 1998 part time and full time since 2000.  We've seen a lot of changes in the industry.  We try to adjust to them.  And so I've been doing that.

    I started my career early on in the mortgage banking field, so I was in finance for a long time.  And I didn't like the business, so I got out of it and started doing what I do today.

    And I got into politics early as a robocalling system.  I've been doing mostly politics since about 2001.

1  And we've done quite a few elections since then, here and

2  internationally.  We do probably about a dozen different

3  countries on a regular basis as their elections come up.

4       And that's pretty much it.  I work a lot.

5  Q.   I think there was some testimony yesterday you

6  assisted with I guess a Republican group out of Michigan.

7  Do you serve one side of the spectrum exclusively?

8  A.   No.  When people call and ask which party we are, we

9  tell them we're the green party.  If your money is green,

10  we'll party.  But we don't have a preference.  We're

11  bipartisan.

12       I have done lots of Democrats and Republicans and

13  Independents and literally Green Party people.  We will do

14  any campaign for anybody running for anything.  So we've

15  done school board people.  We've done -- you name it.  I

16  mean, a guy running for dog catcher, we'll do it, so --

17  Q.   Other than political clients, what other type of

18  clients does TollFreeZone.com have?

19  A.   So we, of course, as you've heard, we have a couple

20  of commercial clients, but we do a lot of charities as

21  well.

22       I am big with Right to Life, so they will call me.

23  We just did one for all of Texas.  And we do the Right to

24  Life of Michigan, we do the National Right to Life.  We'll

25  do their fundraisers.  So they will call their membership

MICHAEL MONTES - DIRECT

1  and ask for funds and then we transfer them to a live

2  person.  So we'll do lots of stuff like that.

3      We do municipalities, so if you have the need for

4  emergency notification.  We don't charge them by the

5  minute in that case.  We just charge them a membership fee

6  because they never use it, it seems like.  But we have to

7  have it ready in case there's an emergency.

8      We do lots of school notifications.  I even donate

9  the school notification to my son's school.  So if a

10 parent -- if a teacher or a principal wants to call out

11 that Friday is a snow day, we do that.  We did that here

12 in Wisconsin for several schools around the Somerset area

13 where I lived and we do it in California, probably about a

14 half a dozen other states where I have at least one school

15 that is on the platform.

16 Q.   Now, this case is about commercial clients?

17 A.   Yes, sir.

18 Q.   Do you have concerns about people using the system as

19 commercial clients to make calls that violate the TCPA?

20 A.   Always, yeah.  I mean, we don't want them violating

21 the TCPA.  And so, you know, we'll ask them what you're

22 doing.  It's not that we don't care; it's just that, you

23 know, if they call us and say, "I want to do this," a lot

24 of businesses will call people their *former clients* or

25 their *current clients* and that's legal.

MICHAEL MONTES - DIRECT

1      In the case of some of the people you heard

2   yesterday, they claimed they were calling businesses.

3   There's no TCPA violation about calling businesses.  A

4   business can call another business.  No problem.

5      But there are some fail-safes that we wanted to make

6   sure that we had in our system, which is one of the

7   reasons we chose this platform.

8   Q.   Okay.  And with regards to the concerns about the

9   TCPA, did you have those concerns back a few years ago,

10  like 2015?

11  A.   Yeah.  That's why we have the terms of use on there.

12  They have to know that they have to adhere to the TCPA.

13  It's in our terms of use.

14  Q.   Okay.  I'm going to show you what's been marked as

15  Exhibit 501, since you just mentioned it.  Can you tell us

16  what this is?

17  A.   This is our *Terms of Use*.

18  Q.   Okay.  Are you able to scroll from your screen or do

19  you need me to scroll?

20          THE COURT:  He's not.

21  A.   You need to scroll.

22  Q.   Okay.  And generally speaking, you know, if we scroll

23  through the terms of use, it's a lot of, you know, legal

24  language.  What's important about the terms of use to you?

25  A.   That they agree to adhere to the TCPA.

MICHAEL MONTES - DIRECT

1  Q.    Okay.  And where is that in there?

2  A.    It should be towards the bottom I think.  Okay.

3  Q.    In that paragraph that starts *Subscriber*?

4  A.    Yeah.

5            THE COURT:  What page are we on?

6            MR. TROST:  It looks like it's on page 6.

7  BY MR. TROST:

8  Q.    Does it specifically talk in there about reference to

9  TCPA as well as --

10 A.    It does.

11 Q.    -- the National Do Not Call Registry?

12 A.    Correct.

13 Q.    Why did you add the terms of use to your system?

14 A.    Well, we wanted to: (a) protect us; and (b) let our

15 customers know that there's, you know, there's some

16 important information they need to know about whether or

17 not they can make a call to someone.  And so it's -- it

18 was prudent to put that on there so that they knew that

19 they had to -- if they're going to utilize our system to

20 call out, that they adhere to the clause.

21 Q.    Is complying with the terms of use something that's

22 voluntary?

23 A.    It is.  But if they don't agree to it, we don't hook

24 them up.

25 Q.    Okay.  That's what I was getting at.  If somebody is

MICHAEL MONTES - DIRECT

1 going to use their system, do they have to sign onto the

2 terms of use?

3 A.   They do.

4 Q.   It's kind of like, you know, when you have the big --

5 you know, you log onto your bank or something and they

6 say, you know, "By agreeing to use this site, you agree to

7 our terms of use" and you have to click on that to accept

8 it?

9 A.   Correct.  And every time they do go to a login page,

10 our terms of use is on our website, so they know it's

11 there.

12 Q.   Okay.

13 A.   They can go back and read it any time.

14 Q.   Besides the terms of use, are there other safeguards

15 or fail-safes that you have incorporated into the system

16 to either prevent or discourage people from using the

17 system in a way that violates the TCPA?

18 A.   Yes.  When they are loading their data, they can

19 select -- excuse me -- they can select to scrub against

20 the federal no-call list that's in the system.

21      They can choose to scrub cell phones out.  So if

22 they're a company that shouldn't be calling cell phones,

23 they can scrub them out.

24      We have time parameter safeties on there so that they

25 don't violate the "9 a.m. to 9 p.m." law.

MICHAEL MONTES - DIRECT

1    We also mandate that they give us a valid caller ID.

2  So if they crash the car, we have their license plate

3  number, we know who did what.  So if anybody calls me,

4  which happens frequently -- people will say, "Who called

5  my phone?"

6    "Well, what was the caller ID?  I can look up the

7  caller ID and tell you who it was."

8  Q.   All right.  You gave us a list of a few different

9  things.  Now, the do-not-call-list option and the

10  cell-phone-scrub option, can you explain why those are

11  options?

12  A.   Yeah, because you're not supposed to call cell phones

13  virtually at all unless you're a politician.  And even

14  they are now not allowed to call cell phones, so we have

15  that scrub in there for them.

16    We have the DNC in there.  So if you're a valid

17  telemarketer and you need to still adhere to the

18  do-not-call list, you can scrub it.  But, you know, as

19  pointed out here, they also have to be a member of the

20  no-call list.

21  Q.   Are there any -- are there other features built into

22  your system related to the caller ID?  Can somebody block

23  their caller ID from going out?

24  A.   No, never.  You cannot -- our system -- number one,

25  some systems out there will allow you to put

MICHAEL MONTES - DIRECT

1  *Not Available.*  You've probably gotten those calls where

2  it says the phone number is not available.  We don't allow

3  that.  You have to show a valid caller ID, period, end of

4  story.  They cannot change it themselves.  They cannot

5  input it themselves.  We have to put it in for them so we

6  know who they are.  So if they mess up, we know who

7  they are.

8       We do not generate, our system has no ability to

9  automatically generate, a spoofed number.  For

10 explanation, a spoof is where some telemarketing companies

11 have the ability to spin out caller IDs that are

12 erroneous.  So -- and some will even try to match your

13 area code or your phone number with the caller ID that

14 they're displaying so you're more apt to pick it up.  Our

15 system does not allow for that because it's very illegal.

16 Q.   Now, there's been some discussion about different

17 commercial groups and the discussion yesterday was

18 centered around this drop-down menu that was on the

19 Autodialer123 website.  Do you recall that discussion?

20 A.   Yes, sir.

21 Q.   All right.  Let me just bring it up here.

22            THE COURT:  What exhibit are you showing?

23            MR. TROST:  I brought up Exhibit 15.

24            THE COURT:  Thank you.

25

MICHAEL MONTES - DIRECT

1  BY MR. TROST:

2  Q.   Are the general categories of these groups ones you

3  added to the system?

4  A.   Yes.  If we got a call from any of these people, we

5  would add it to our system for a little while.  We didn't

6  do it all the time.  But yeah, I tried to add them if they

7  called.  That way they knew that they were at the right

8  place.

9  Q.   Do you have any idea when different groups were added

10  to the system?

11  A.   Not off the top of my head.  But whenever they

12  called, we at the time would do that.

13  Q.   Okay.  Was there a range of years over which --

14  A.   Probably starting in 2014.

15  Q.   Okay.  What can you tell us about the different

16  groups that appear on the drop-down menu?

17  A.   Well, we went over most of them yesterday.  I can

18  only tell you that they called and were interested in

19  using our system.  And then we had *Mortgage/Finance*, so I

20  have a couple of mortgage companies that will call out to

21  their mortgagees that they're late on their payment, so

22  they utilize our system for that.  Let's see what we have.

23  Q.   With these types of groups, with your background in

24  the industry, are these groups loyal to a particular

25  website platform?

1  A.    No, not at all.

2  Q.    You chuckled.  Can you explain?

3  A.    Yeah.  It's not unusual for us to get a call, set

4  up -- take the time to set up a whole campaign -- or I'm

5  sorry, a customer so that they can, you know, do their

6  campaign and never show up again, never hear from them

7  again.  They went off and talked to somebody else.  We'll

8  never hear from them again.

9      We have had a number of people who've set up their

10  accounts with us and sent us money.  We have never heard

11  from them again.  And that's because they went off to some

12  other vendor or they decided not do it at all or who

13  knows why.

14      But yeah, a lot of them -- like most of these guys

15  called us.  We put them on the system, some of them even

16  went through our system, but most of them were using a

17  number of other platforms in a big way.

18  Q.    What are some of the other platforms that are out

19  there?

20  A.    Well, there's a big one that a guy who pretty much

21  owns most of these people and he uses a system called

22  *Stratex*.

23  Q.    Okay.  And who's that?

24  A.    It's a Canadian-based autodialer company.  And so he

25  uses -- he is the guy who does most of the people who are

MICHAEL MONTES - DIRECT

1   on the system here.

2       It's a funny business.  These guys will get mad at

3   him and call me, "Well, I want to get an account with you

4   again."  Those are usually the guys that don't show up.

5   But yeah, we've set up accounts for these people.

6   Q.   What are some of the other platforms that are out

7   there?  You said "Stratex."

8   A.   So Stratex, CallFire, Data Central.  There's

9   another -- there's the one I was with, Shoutpoint.  That's

10  a big one.  There are probably a thousand others I can't

11  name.  I mean, if you type in *autodialer* or *robocall* on

12  Google, you'll get a thousand platforms.

13  Q.   Is there any way to tell if a call came through one

14  platform or another?

15  A.   No, not from the recipient's perspective.

16  Q.   Yeah.  And we heard yesterday snippets from this kind

17  of call that you jumped on with the Elite Marketing

18  Alliance.  Do you remember that --

19  A.   I do.

20  Q.   -- yesterday afternoon?  Do you have any comments

21  about that presentation?

22  A.   It was just a presentation.  I don't know that we

23  ended up getting anything out of it.

24  Q.   Do you even know when it was?

25  A.   What's that?

1  Q.   Do you even know when the presentation was?

2  A.   I don't recall.  It was a long time ago.

3  Q.   Yeah.

4  A.   These guys have it, so I'm sure they could tell you.

5  But I made the presentation.  I tried to get their

6  business.  We didn't get a lot out of it.

7  Q.   What was the subject of the presentation?

8  A.   Showing them how the system works, which is always

9  our goal, because if we're going to set up an account for

10  them, they need to know how to use it.

11  Q.   Is that the same type of presentation you'd give to

12  any other of a variety of groups, whether political or --

13  A.   Yeah.  It doesn't matter; the system is the same no

14  matter who uses it.  They just have to know how to use it.

15  And it's pretty much the same presentation except all at

16  once.  That's what that was, was an all-at-once

17  presentation versus the segmented presentations we have on

18  our website and YouTube where we go by topics on how to

19  use this.

20  Q.   And do you remember yesterday we went through a whole

21  series of videos yesterday afternoon --

22  A.   Yes.

23  Q.   -- on how to use the system?

24  A.   Correct.

25  Q.   Are those videos that are specific to commercial

MICHAEL MONTES - DIRECT

1 telemarketers?

2 A.   No, no, actually not.

3 Q.   Are they just general in nature?

4 A.   They're actually tailored more towards our political

5 people because I mentioned in there, you know, I

6 deselected the no-call list because I'm used to doing that

7 for political people.

8 Q.   Have there been groups that have messaged with you to

9 sign up for an account and you've turned them away?

10 A.   Yeah.   We had -- it was actually a political person.

11 We had a guy call us who said that he wanted to dial at

12 midnight with the opponent's phone number as a caller ID

13 so that it would upset their constituents.   Some of these

14 guys get pretty dirty.

15     But we told them, "No."   Not only does our system not

16 allow us to do that, there's no way to break that setting.

17 But we said, "No, not going to happen."

18 Q.   Have there been any commercial telemarketing type of

19 clients that you've turned away?

20 A.   Yeah.   We turned down a student-loan guy and we

21 turned down a home-warranty guy.

22 Q.   Why is that?

23 A.   Well, they were going to go out there and just call

24 everybody.   That's not my cool.

25 Q.   And the people that you do sign up on the commercial

1 side, what's your understanding of what they're -- who

2 they're supposed to be calling?

3 A.   If you're on the commercial side, you're supposed to

4 be calling businesses, because there's no laws against

5 calling businesses, or if you're calling consumers, it has

6 to be your consumer group.

7      So you have I believe six months to contact someone

8 who contacted you who said they were, you know, interested

9 in your product or whatever, you can call them back.  But

10 because they called you first, you have the right to call

11 them back because they essentially said, "I'm your

12 customer.  I'm interested."

13 Q.   Can you walk us through the process briefly of what

14 you do when somebody, you know, say David Levin, calls,

15 contacts Mike Montes and wants to sign up for an account?

16 Tell us about what happens.

17 A.   So if they called me and said they wanted an account,

18 we would direct them to the website to sign up.  Once they

19 gave us their information, including their caller ID, we

20 would go into the system, establish that account, send

21 them a user ID and password, and then send them the

22 information on the website where they can watch the videos

23 and let them know that if they have any questions to call.

24 Q.   And how long of a process -- how much involvement is

25 that for you in what you just described?

MICHAEL MONTES - DIRECT

1  A.   Depends on how busy I am.  But from start to finish,

2  I can set up an account in less than ten minutes.

3  Q.   And from that point, how much involvement do you have

4  with the user using the account?

5  A.   Depends on who the user is.  So again our focus is

6  politicians, so they are labor intensive.

7  Q.   Why is that?

8  A.   Because they will ask me for reports on a regular

9  basis.  And that's what I spend most of my time doing is

10  generating reports.  So in my mind, once we -- once

11  somebody has called me and said, "Okay.  We're going to do

12  the call," they go ahead and do the call, now the

13  political consultant, which is who most of my clients are

14  in the political arena -- I don't really deal a lot with

15  the candidates themselves, it's all political

16  consultants -- so they want to get paid.

17       So in order for them to get paid, I have to print out

18  a report showing exactly what happened.  And if they're

19  doing automated polling, then that's even more time

20  sensitive.  It takes a long time to generate that report,

21  sort it all out, find all the answers, put it in a format

22  that someone can read.  So I'm busy doing that.

23       So there's a lot of time that goes into a political

24  client versus a commercial client.  A commercial client

25  will call me and ask me a question once in a while, but

1  that's about it.

2  Q.   Once a commercial client sets up an account, unless

3  they contact you, do you necessarily have any more

4  involvement --

5  A.   No.

6  Q.   -- with them?

7  A.   No.

8  Q.   When they set up an account, is that when they also

9  load their -- tell you what their caller ID is?

10  A.   Yes.

11  Q.   Okay.

12  A.   So if there's any question, we can go back and find

13  them and find out who they are.

14  Q.   Just as an aside, on the money side of your business,

15  do commercial clients bring in a lot of money for you?

16  A.   Not as much as political people.  Most of these guys

17  that were there labeled, they would sign up for a hundred

18  bucks.  That's the other reason I don't want to spend a

19  lot of time on them, because there's no money in it.  If

20  they give me a hundred dollars, I'm probably making $25.

21  Q.   And you're talking about the commercial people?

22  A.   Yeah.

23  Q.   On the flip side of that, what's the monetary nature

24  of the political client?

25  A.   It's much bigger.  If that same client did that same

1  volume, there would probably be $500 there.

2  Q.   Why is that?

3  A.   Well, politicals get charged a lot more.  There's --

4  and we're at an industry-standard pricing.  So although

5  the industry doesn't set the standard, I know what the

6  competitors charge and I'm right there with them.  So

7  there's a lot more money in politics.  And the politicians

8  also know that the consultants have to pay me first,

9  because the politicians have a tendency to not pay after

10  the campaign is over.

11  Q.   Now, because a lot of your business is political in

12  nature doing political polling, that type of thing,

13  what -- does that mean it's necessarily cyclical, every

14  two or every four years?

15  A.   No, not at all.  There is a campaign of some sort

16  going on every day of every week of every month and so

17  we're busy with that, for the most part.  And even when

18  the campaign is not a campaign, it's always a campaign.

19       The people who are voted in get X amount of dollars a

20  year for communication with their constituents.  They've

21  figured out that it's good to use that as campaign dollars

22  when they're not running so that they can stay in the

23  forefront of their constituents' minds.

24       So they'll call out.  Like the other day I did a call

25  for a guy named Weaver, who's a state senator in Chicago.

1  And so we called for him and got people to show up at his

2  coffee-and-questions event on a Friday morning and we do

3  that for him regularly.  So he goes around the state when

4  he's not in office and talks to his constituents at these

5  little events.  And so he's one example of how they use

6  those communication dollars.

7  Q.   Jumping to a topic, a different topic, yesterday

8  there was an exhibit marked Exhibit 28 that had a list of

9  all the different accounts.  Do you remember that exhibit?

10  A.   No.

11  Q.   Okay.  Why don't you take a look at the screen.  And,

12  you know, I think it was about 1,200 pages of --

13  A.   Oh, those, yeah.

14  Q.   Yeah.  Are these all people that signed up for

15  accounts through your system?

16  A.   Yes.

17  Q.   Does that necessarily mean that the accounts were

18  ever used?

19  A.   No.

20  Q.   Do you have an idea of, you know, how often people

21  sign up for accounts and then either don't use them or

22  maybe use them once or something like that?

23  A.   I don't have a number, but I know it's quite a few.

24  Q.   Okay.  With respect to commercial clients, do you

25  have any involvement in the message that a commercial

MICHAEL MONTES - DIRECT

1  client sends out?

2  A.    No.

3  Q.    Do you have any involvement in setting when their

4  calls go out?

5  A.    No.

6  Q.    And I think you testified other than like there's

7  time restrictions built into the system, right --

8  A.    Correct.

9  Q.    -- that don't let the calls go out, you know, during

10 certain time periods like the middle of the night?

11 A.    Correct.

12 Q.    For commercial clients, are you involved in selecting

13 who receives a call?

14 A.    No.  They bring their own data.

15 Q.    For these commercial clients, are you involved in

16 selecting how the calls go out?

17 A.    No.

18 Q.    In fact, you've been talking about calls.  Does your

19 system allow text messages?

20 A.    No.

21 Q.    For commercial clients, do you run the call

22 campaigns; do you make the calls?

23 A.    I don't.

24 Q.    Brief aside, Mike, do you get commercial

25 telemarketing calls to your cell phone?

MICHAEL MONTES - DIRECT

1  A.   All the time, yeah.  They're annoying as all out.  I
2  hate them.
3  Q.   You took care of my second follow-up question.
4  A.   Yeah.  I don't like them as much as anybody else.
5  And a lot of them are doing the illegal things that we
6  don't do.  Like I can't tell you how many times I get a
7  call, it's a commercial telemarketing call, and it's my
8  phone number.  How am I calling my own -- that's spoofing.
9  You can't do that.  That's very highly illegal.  We don't
10 do that.
11 Q.   That's something that's not allowed through your
12 system?
13 A.   Correct.
14 Q.   Now, there's been testimony about the dialer system
15 that TollFreeZone.com uses, this Dialer.To?
16 A.   Correct.
17 Q.   Can you explain how that dialer works, from your
18 experience?
19 A.   Where do we begin?  It's a super easy process.  What
20 would you like to know?
21 Q.   Well, I think you mentioned people that are using
22 your system load their own phone numbers into the system
23 and then the dialer shoots it out.
24 A.   Correct.
25 Q.   And maybe that's a, you know, a loose term.

1  A.   And to make sure that they don't shoot out all of

2  their database by accident, we have built in a data

3  library.  And I don't know, maybe this is in the weeds,

4  but you load your data into the data library and then you

5  can take out -- let's say you load 10,000 numbers.  You

6  can pull out 2,500 of those numbers and load them into a

7  campaign, where a lot of dialers will only let you load

8  the whole list once.  And then they forget by accident and

9  now they've upset a whole bunch of people and they didn't

10  mean to.

11      Ours does not allow you to do that if you don't want

12  to.  You can only segment your data so that you can only

13  do 2,500 out of the 10,000 versus the whole 10,000.

14  Q.   Now, does the dialer generate numbers at random to

15  call or are you required to use a list?

16  A.   No.  We do not have that ability.  The system has no

17  ability to generate a phone number.  You intentionally

18  load a list and that list are the only phone numbers it

19  will call.  There are no generating numbers.

20  Q.   There was some testimony yesterday about numbers that

21  were or were not preserved within Technologic's --

22  Dialer.To system.  Do you recall that?

23  A.   I do.

24  Q.   I believe the testimony is when you went to search

25  for those numbers, they weren't there anymore?

1  A.    Correct.  Yeah.

2  Q.    And why did you believe the call records would still

3  be there?

4  A.    Every system I used prior to this system kept the

5  records *ad nauseam*, so they're there from 2000.  I know

6  that if I go to Shoutpoint, which is the system I used to

7  use, that Jaime, the owner, still has those records.

8  Q.    Had Technologic ever sent you any kind of, you know,

9  caller-record-number retention policy or anything like

10  that?

11  A.    No.  I've never seen a record retention policy from

12  them.  But in my -- what I do every day, it never dawned

13  on me to look back and go, how far back do they keep the

14  records, because what I do every day is I provide those

15  records.  I have to do reporting for all of these

16  political people.

17      So when I send them a report, it's usually within the

18  same week.  I don't really -- I don't have a mindset of

19  looking back that far because I don't get asked for that.

20  I get asked what's going on this week so that those guys

21  can get paid.  They have to provide a report.  So I

22  just -- it never dawned on me, because of my history with

23  Shoutpoint and other dialers, dialer platforms, that they

24  would purge the database.

25  Q.    Now, there was also some testimony about a

MICHAEL MONTES - DIRECT

1    long-distance carrier, Connexum?

2    A.    Yes.

3    Q.    And you were a rep for that company?

4    A.    Right.

5    Q.    And what does that mean you did as a rep?

6    A.    So as a rep -- this is a totally separate entity, by

7    the way -- so even though they're the long-distance

8    company for Technologic, I actually worked for them as a

9    reseller of telecommunications services.

10        So we went to other telephone companies, if you will,

11   other dialer platforms, other companies that utilize long

12   distance, and I would sell them our Connexum's services.

13   So if they needed a long-distance carrier, we would sell

14   them that.  And then of course I would get paid on the

15   minutes that they use for whatever it was.  Connexum is a

16   phone company.  So that's what I did for them.

17   Q.    Now, as a former rep, do you have any insight into

18   whether Connexum is a common carrier for dialer companies?

19   A.    They are, yeah.  They are a common carrier for a

20   whole bunch of different companies.  Dialer companies is

21   just part of it.

22   Q.    Let's jump back to TollFreeZone.com, okay?

23   A.    Okay.

24   Q.    Talk about caller IDs.  I think you testified caller

25   IDs cannot be blocked on the system --

MICHAEL MONTES - DIRECT

1  A.   No.

2  Q.   -- correct?

3  A.   Correct.

4  Q.   And the caller IDs can't be spoofed?

5  A.   Cannot.

6  Q.   And you keep a log of the caller IDs?

7  A.   We do.  That is permanently in our system.

8  Q.   Why do you do that?

9  A.   So I can tell someone when I get called, which

10 happens frequently, who called this person from your

11 system and I can go look up the caller ID and tell you

12 exactly who that was.

13 Q.   Is a user operating through TollFreeZone.com able to

14 use a caller ID other than what they've registered with

15 you?

16 A.   No.  They have no ability to put a caller ID in.  Not

17 that it would matter, because if they registered -- if

18 they were able to and they registered it with the system,

19 it would be registered to their name always.  So I would

20 always be able to just look up whose caller ID it was and

21 tell you who used our system to call what.

22 Q.   Now, I'm going to show you what the plaintiffs marked

23 as Exhibit No. 1.  I believe this is the testimony about

24 the calls -- specific calls that Mr. Cunningham is suing

25 you about in this case.  Is that your recollection as

1  well?

2  A.   Yes, sir.

3  Q.   All right.  Did you -- and --

4        THE COURT:  What exhibit are you showing?

5        MR. TROST:  Exhibit No. 1.

6  BY MR. TROST:

7  Q.   And I believe Mr. Cunningham testified the numbers

8  that showed up on his caller ID were the ones in the left

9  hand -- are in the left-hand column there going down?

10 A.   Correct.

11 Q.   And did you take all those numbers and compare them

12 against the caller IDs that are in your system?

13 A.   Yes.  We have over 6,000 caller IDs registered in our

14 system and they can be sorted by numeric.  So I can start

15 at 200 and go on up to 999.  And I looked up every one of

16 these caller IDs to see if they're on our system.

17 Q.   Do you remember what the result of that comparison

18 was?

19 A.   Yeah.  I think we found -- I found 10 -- 10 or 11

20 caller IDs that went through our system and I have the

21 customer number as to who they were.

22 Q.   Right.  And take a look at what's been marked as

23 Exhibit 502.  Is this a spreadsheet that -- a list that

24 you put together?

25 A.   I did, from Cunningham's list of complaints.

MICHAEL MONTES - DIRECT

1  Q.   All right.  And what is the -- walk us through the

2  list.  Tell us what it shows.

3  A.   So on the left-hand side I got the caller ID from

4  Mr. Cunningham's list.  And then in the *Result* I labeled

5  whether or not that was in our list of 60-something, a

6  hundred, caller IDs, and they're there.

7  Q.   And I guess we can't see it all at one time.  But as

8  I scroll through, the ones that match are highlighted in

9  yellow, right?

10  A.   Correct.

11  Q.   And did you compare the caller IDs that matched to

12  the number of calls that Mr. Cunningham listed on the

13  system -- I mean, listed on his Exhibit No. 1?

14  A.   No, because without the call records, I can't tell

15  you.

16  Q.   Sure.

17  A.   Yeah.

18  Q.   Did you look -- did you take the caller IDs that

19  matched and then count up the number of calls from Craig

20  Cunningham's list --

21  A.   Oh, yeah.

22  Q.   -- to count the number of calls?

23  A.   This list is shorter because on Mr. Cunningham's list

24  I believe there's a bunch of duplicates.

25  Q.   Sure.

1  A.   So I can only tell you if this caller ID is on our

2  system.  And because Technologic purges its records, I

3  can't tell you how many times they were called --

4  Q.   Okay.

5  A.   -- but I can tell you who they were.

6  Q.   Okay.  And with respect to the caller IDs that don't

7  match the ones in your system, what is that -- what's that

8  mean to you?

9  A.   It means we never called for them.

10  Q.   That those calls never came through your system?

11  A.   They did not come through our system.

12  Q.   With respect to the 11 caller IDs that match caller

13  IDs in your database, does that mean those calls did come

14  through your system?

15  A.   Yes, absolutely.  Yeah, the ones in yellow are --

16  well, no.  The ones in yellow are caller IDs that have

17  been registered to our system.

18  Q.   Correct.

19  A.   If -- I can't tell you if they actually made phone

20  calls without the records.

21  Q.   Okay.

22  A.   Okay.  So again I might have people on here who

23  registered and never did anything or -- but they probably

24  did because Mr. Cunningham put them on here because he

25  received a phone call from these people.

MICHAEL MONTES - DIRECT

1  Q.   As far as these account holders go, did you assist

2  any of them in sending out calls?

3  A.   No.  These are all commercial people.  We wouldn't

4  have -- we would have pointed them to the website.

5  Q.   Would these commercial telemarketing users -- do they

6  exclusively use your system?

7  A.   No, not at all.

8  Q.   Do you have any idea if these caller IDs could be on

9  somebody else's website platform?

10 A.   Oh, absolutely.  Yeah, yeah.  As I understand it,

11 most of these guys buy their caller IDs from 800LiNK or a

12 similar service, but that's the predominant one I see

13 being here.  So 800LiNK also would know who these people

14 are and they could use that caller ID on any system.  It

15 doesn't have to be on ours.

16 Q.   So if a caller ID shows up on Mr. Cunningham's phone

17 and it's one of these ones that's highlighted in yellow,

18 that could have come from your platform, could have come

19 from somebody else's platform?

20 A.   Absolutely.  Yeah.

21 Q.   Do you know if some of these other website platforms,

22 dialer companies, use Technologic?

23 A.   I know that there are other resellers on Technologic,

24 but I don't know who they are.

25 Q.   We've listened -- yesterday we listened to some of

MICHAEL MONTES - DIRECT

1  Mr. Cunningham's audio recordings of calls, right?  And we

2  just heard a snippet, a few of his calls, right?  Is that

3  "yes"?

4  A.   Yes, sir.

5  Q.   Okay.  She needs to take everything down.

6  A.   Oh, sorry.

7  Q.   Are there a lot of audio recordings?

8  A.   Mr. Cunningham sent a lot of them.

9  Q.   Yeah.  Did you listen to all of them?

10  A.   I did.

11  Q.   All right.  From your review of those audio

12  recordings, did Mr. Cunningham ever ask to be put on a

13  do-not-call list?

14  A.   I never heard him ask once nor did he press the tone

15  in the message to be put on a no-call list.

16  Q.   And what do you mean by "press the tone"?

17  A.   Well, in our system, one of the safeguards is you

18  have to give an opt-out.  And so in this case, if a

19  commercial guy went out there with a press, let's say, I

20  don't know, 5 or 9 or 8 or whatever the opt-out number is,

21  in our system you have to dictate, when these guys set up

22  their campaign, what the opt-out number is and in their

23  message they have to have that corresponding number to

24  opt out.

25       So a lot of times these guys will use 8 or 9 as the

1  number.  And so when they call out, the recipient would

2  hear, "Press," I don't know, "1" or "3" or "5 to be

3  transferred or press 9 to be removed."  And so I did not

4  hear any "press 9s" or "Press tone to be removed" or

5  whatever.

6  Q.   If somebody presses 9 or whatever the tone is to be

7  removed, does that information end up coming back to you

8  so that --

9  A.   Yes.

10  Q.   -- they won't be called upon?

11  A.   Yes.  That person who has that account, so if one of

12  these guys had somebody press 9 on their message, that

13  person now has that phone number in their personal no-call

14  list.  So there's the national no-call list and then

15  there's a personal no-call list and then there's the

16  militant no-call list.  And we get those numbers from

17  people who have absolutely told multiple people, "Don't

18  call me anymore."  And sometimes we even go and get the

19  buckets from other people and dump them into the master

20  no-call list or the militant so that we can stop bothering

21  people.

22  Q.   In your review of the audio recordings, did

23  Mr. Cunningham ever ask not to be contacted again?

24  A.   He did not.

25  Q.   Until after this lawsuit was started, did any of

1  Cunningham's three numbers appear on your system's

2  do-not-contact list?

3  A.   Yeah.  We put it in there.  Yeah, we put it in there,

4  in the militant.

5  Q.   Until that time it was not in there, correct?

6  A.   I don't believe so, no.

7  Q.   All right.  And from your review of the recordings,

8  he never asked it to be put in there either?

9  A.   He never asked to be put in there.

10         MR. TROST:  Thank you, Mr. Montes.

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  Cross-examination.

13         MR. LEVIN:  Thank you, Your Honor.

14                  CROSS-EXAMINATION

15  BY MR. LEVIN:

16  Q.   Mr. Montes, at the beginning of your testimony you

17  vaguely mentioned some changes in the industry that you

18  are trying to adjust to.  Were you specifically referring

19  to the Telephone Consumer Protection Act?

20  A.   Yes.

21  Q.   And then what exactly has your company done in the

22  last, say, four years to try to adjust to the requirements

23  of the TCPA?

24  A.   Well, the same adjustment that we took back in the

25  day.  We used to not have any no-call list in 2000, we had

1  no no-call list on our system.  And then when the TCPA

2  came out, when we put a TCPA scrub in there, we got the

3  no-call list back then and we put it in there.  So any

4  data that got loaded would be scrubbed against it.

5  Q.   So, I'm sorry, I'm a little confused.  It's an

6  adjustment that you made in the last four years, but you

7  made it back in the day?

8  A.   No, no.

9  Q.   I don't understand what you're saying.

10  A.   Like I started with.  That's the same adjustment we

11  made back then.

12  Q.   When is "back then"?

13  A.   Back in 2000, 2001, whenever the TCPA came out.

14  Q.   Do you know exactly when the TCPA was enacted?

15  A.   Not off the top of my head, but it was in the early

16  2000s.

17  Q.   If I told you it was in the early 1990s, would you

18  dispute that?

19  A.   No, but they didn't have a list back then, the

20  National Do Not Call Registry.

21  Q.   So how does that relate to customers of yours placing

22  automated calls or sending prerecorded messages to

23  individuals' cell phones without their consent?

24  A.   We have a block on our system that the customers can

25  choose to scrub no call or cell phones out.

1  Q.   And that would likely block out the vast majority of

2  phones in use in this country today; would you agree with

3  that?

4  A.   Maybe, maybe not.

5  Q.   Consumers' phones, anyways?

6  A.   Consumers' phones, but they're not supposed to be

7  calling consumers, not unless they're their customer.

8  Q.   Okay.  You keep bringing up different anecdotes and

9  descriptions of situations that you use with your

10 political clients.

11 A.   Correct.

12 Q.   Okay.  But again you understand this case is not

13 about any calls from any politicians, right?

14 A.   Correct.

15 Q.   And this case is not about any calls from any school

16 districts or municipalities?

17 A.   Correct.

18 Q.   And the people that we talked about yesterday and

19 that are listed on that drop-down menu that we keep

20 looking at, all of those businesses had referred people to

21 you that were customers of yours at at least some point in

22 time, right?

23 A.   Correct.

24 Q.   And you testified in your deposition, as we discussed

25 yesterday, that in 2015 and 2016, when the bulk of the

1  calls at issue in this case were made, those commercial

2  clients were about 30 percent of your business?

3  A.   If that's what I said, yeah.

4  Q.   And you made money from them, right; you weren't

5  doing that work for free?

6  A.   No.  What business does?

7  Q.   And do you bill your clients, your commercial

8  clients, or do you require them to prepay?

9  A.   No.  They all have to prepay.

10  Q.   Repeatedly throughout your testimony you've used the

11  word "we."  So I just want to make sure, when we're

12  talking about the business TollFreeZone.com, was there

13  anyone else involved in that business other than you?

14  A.   No, just me.

15  Q.   Okay.  And when we're talking about the business

16  MyAdGuys.com, your new name that you're operating under,

17  is there anyone else involved in that business?

18  A.   No, just me.

19  Q.   Okay.  So when you use the term "we," it's really

20  just you that you were talking about?

21  A.   Sure.

22  Q.   You also mentioned that you are concerned about your

23  clients violating the TCPA.  Do you ever -- when a

24  commercial client signs up with you, do you ever ask

25  specifically, "What sort of product or service are you

1  going to be selling with these phone calls?"

2  A.   Not usually.

3  Q.   And in fact some of the businesses that we've talked

4  about again that are listed on that drop-down menu, I

5  believe you said yesterday that you really didn't know

6  exactly what they were selling, right?

7  A.   Correct.

8  Q.   Do you ever ask to listen to the prerecorded messages

9  that they're going to send through your system?

10 A.   Not usually.

11 Q.   Do you ever ask to double-check their call data,

12 maybe match it up against a do-not-call list, anything

13 like that?

14 A.   No.  That's their prerogative.

15 Q.   So you don't really monitor their use of your system

16 in any way, correct?

17 A.   No.

18        THE COURT:  Is that correct?

19        THE WITNESS:  That is correct.

20 BY MR. LEVIN:

21 Q.   And they agree to your terms of use and that's good

22 enough for you?

23 A.   Correct.

24 Q.   We also saw in one of the videos and I asked you some

25 questions yesterday about the customer's ability to

1  uncheck the box that would scrub for the do-not-call list,

2  the national list or the internal list or the militant

3  list.  And I believe you said your customers do have the

4  option to opt out of those lists, correct?

5  A.   Not the militant list.  We have to uncheck that for

6  them.

7  Q.   So they do have the option to opt out of the national

8  do-not-call list or their own internal list of people that

9  press 8 or 9 or whatever number it is?

10  A.   No.  Those actually go into their -- oh, yeah, yeah.

11  I'm sorry.  Yes, yes, they can opt out of that bucket.

12  Q.   Do you ever double-check any of your commercial

13  clients to insure that they are using those lists?

14  A.   No.

15  Q.   So even if Mr. Cunningham's phone numbers were on the

16  national do-not-call list, if one of your customers using

17  your system unchecked that box, that would still allow

18  calls to go through to his phone, right?

19  A.   Correct.

20  Q.   In any of your videos do you train your clients on

21  the requirements of the Telephone Consumer Protect Act?

22  A.   We don't.

23  Q.   Are you aware specifically of any of your clients who

24  have violated the TCPA?

25  A.   No.

1  Q.   They may or they may not?

2  A.   They may or may not.

3  Q.   Okay.  But we do know that there was a substantial

4  judgment entered against your company in the state of

5  Missouri for violation of its state telemarketing laws,

6  correct?

7  A.   That's what they claim.

8  Q.   Okay.  And we know that the State of Mississippi

9  claims to have fined your business over $400,000 for

10  violating its state telemarketing laws, correct?

11  A.   Correct, both cases which were not adjudicated and

12  one I didn't even hear about until Cunningham told you.

13  Q.   Thank you.  If the question is "yes" or "no," would

14  please just answer "yes" or "no"?

15  A.   All right.  Yes.

16  Q.   As we discussed yesterday, after you found out about

17  the Missouri judgment and the Mississippi, you did not

18  contact either state to find out what those cases were

19  about, correct?

20  A.   Correct.

21  Q.   You did not look into which of your customers may

22  have been responsible for those fines being entered

23  against your business, correct?

24  A.   Correct.

25  Q.   And you haven't paid any portion of either of the

1  judgment or the fine?

2  A.    No.

3        MR. TROST:  Your Honor, I'm going to object to

4  this ongoing line questioning.

5        THE COURT:  We've covered it pretty adequately.

6        MR. LEVIN:  Thank you.

7  BY MR. LEVIN:

8  Q.    Your system does allow you though to --

9        THE COURT:  Hold on a minute.

10       (Brief recess.)

11       THE COURT:  I hope I didn't miss anything.  We're

12  having some equipment installed next door.  I told them

13  they can wait until we're finished.

14       MR. LEVIN:  Thank you.

15       THE COURT:  You may proceed.

16  BY MR. LEVIN:

17  Q.    So, Mr. Montes, your system does allow you to block

18  calls from being placed to an entire state, right?

19  A.    Correct.

20  Q.    And you've done that in Missouri?

21  A.    Correct.

22  Q.    And you've done that with Mississippi?

23  A.    Correct.

24  Q.    You did that with Tennessee --

25  A.    Correct.

MICHAEL MONTES - CROSS

1  Q.   -- because of this lawsuit?

2  A.   And Florida.

3  Q.   And in your deposition did you testify that you also

4  did that in Indiana?

5  A.   We do it in Indiana and Oregon.

6  Q.   So you do maintain some control in not allowing your

7  customers to call certain states?

8  A.   Correct.

9  Q.   And why is that?

10  A.   Well, those states have state laws also on top of the

11  federal laws and we just want to help our clients stay out

12  of trouble.

13  Q.   You made the comment, the analogy I guess you would

14  say, that if one of your customers crashes the call --

15  their car, excuse me, you'll have their driver's license.

16  And then you talked about how you sometimes may get calls

17  with complaints about certain customers using your system.

18  A.   Yes.  I've gotten a couple complaints from states

19  that want to know who called.  So attorney generals will

20  contact me and say, "This is not about your company, but

21  we want to know who called from this caller ID."  And I

22  can look it up and send it over to them.

23  Q.   Okay.  So you do have the ability to do that?

24  A.   Yes.

25  Q.   Is it your claim that after you performed the web

seminar that we watched a little bit of yesterday for Dana

Ehrlich and her marketing group, are you claiming that you

made no money from those people after that?

A.    What I'm claiming is I might have made some money off

of those people.  They may have sent me a few customers.

But my gut was we didn't get back what I spent my time

doing that seminar.  I really didn't get back what I

anticipated.

Q.    Okay.  So you were hoping to actually get a lot more

business from them?

A.    Sure.  Yeah.

Q.    You mentioned that -- when your attorney was

questioning you about the missing records from

Technologic, I think you mentioned that when you were

working for Shoutpoint they would keep those records

indefinitely?

A.    Yeah.  Jaime told me that they keep those records.

Q.    Who's Jaime?

A.    Jaime is the owner of Shoutpoint.

Q.    So you don't know, because you never tried to look

them up; you're just basing that on what someone else told

you?

A.    Based on the owner's -- the guy who developed the

site, sure.

Q.    Did you ever ask someone at Technologic how long they

1  maintained their phone records?

2  A.   No.  I never needed to.

3  Q.   Do you recall making another video, sort of in the

4  same way as the ones we looked at yesterday of your

5  computer screen that, your attorney sent to me showing you

6  trying to look up some of those records in the Technologic

7  system?

8  A.   Yes, sir.

9  Q.   And when did you create that video?

10  A.   I don't recall.  Recently.

11  Q.   Approximately how long ago was it; within the last

12  two, three months?

13  A.   Yeah, probably.

14  Q.   And that was the first time you tried to look up any

15  of those records?

16  A.   Correct.

17  Q.   And did you look up the records -- excuse me, did you

18  look through that system for every single caller ID that

19  Mr. Cunningham has claimed in this case were calls that

20  were received through your system?

21  A.   No.

22  Q.   So you don't really know if all those records would

23  have been available potentially or not?

24  A.   Well, I talked to a representative who told me --

25       MR. LEVIN:  I'm going to object then.

1  BY MR. LEVIN:

2  Q.   Do you know personally?

3  A.   No.

4       MR. LEVIN:  Your Honor, can we please switch the

5  input over to the plaintiff's side?

6       THE COURT:  Oh, sure.

7       MR. LEVIN:  Thank you.  I apologize.  I'm going

8  to have to do this another way.

9       THE COURT:  You need to tilt the camera up.

10 There you go.  You got it.  Keep going.  It will lock into

11 place when you get it all the way up.

12      MR. LEVIN:  Oh, I see.

13      THE COURT:  There you go.  I guess it won't lock.

14 Point it at the easel.  There you go.

15 BY MR. LEVIN:

16 Q.   Okay.  I apologize.  This isn't the ideal way to do

17 this.  I don't have this one on my computer.  So this is a

18 document that was provided to me by your attorney that's

19 been previously marked as Exhibit 502A.  In looking at

20 this -- this is just the first page.  I'd be glad to show

21 you all three pages.  But do you know what we're looking

22 at here, Mr. Montes?

23 A.   Yes.  These are the phone numbers that Mr. Cunningham

24 claims he got a call from.  And I went into our caller ID

25 lookup and I found all the people that had called him.

1 Q.   Okay.  So we have a list here that stops towards the

2 bottom of the page and then you have some new headings and

3 a second list that begins there --

4 A.   Mm-mm.

5 Q.   -- which then continues onto the second page and the

6 top of the third page?

7 A.   Correct.

8 Q.   So can you tell me, is there a difference between

9 these two lists, the one that comprises most of the first

10 page and then the one that begins with the new headings at

11 the bottom of the first page and continues to the end?

12 A.   Yeah.  In the beginning you guys submitted the phone

13 numbers to look up on the first top page.  And then as

14 this case has progressed, you submitted more phone

15 numbers, so I looked those up, too.

16 Q.   Okay.  So this list comprises all of the phone

17 numbers --

18 A.   All of your complaints.

19 Q.   Let me finish my question.

20        THE COURT:  One at a time.

21 BY MR. LEVIN:

22 Q.   Let me finish my question.

23 A.   Sorry.

24        THE COURT:  Go ahead.

25

1 BY MR. LEVIN:

2 Q.   This list comprises your review of your system for

3 any caller IDs on any call lists that we have produced as

4 part of this litigation?

5 A.   Correct.

6 Q.   Okay.  And the number of 11 caller IDs that you

7 mentioned earlier, is that just the top part of this first

8 page before the new headings at the bottom?

9 A.   Correct, because when Kevin was showing this, we were

10 only looking at that one page.

11 Q.   Okay.  And then as we continue on to the second page,

12 we had some more numbers that are highlighted that you

13 looked up subsequently, correct?

14 A.   Correct.

15 Q.   And you found more caller IDs that are in your

16 system?

17 A.   Correct.  But I did not compare the two, so I don't

18 know if there's duplicates.

19 Q.   And there's actually one still on the third page as

20 well, correct?

21 A.   Correct.

22 Q.   So any of the highlighted caller IDs on Exhibit 502A

23 were caller IDs that you found in your system?

24 A.   Correct.

25 Q.   And I believe that you stated that doesn't tell you

1  how many calls might have been made to Mr. Cunningham from

2  those caller IDs, only that you found those caller IDs in

3  your system?

4  A.    Correct.

5          MR. LEVIN:  Does that light go off if I fold it

6  down?

7          THE COURT:  If you just fold it down, it will

8  shut off.  You've got to pull on that, kind of on the

9  elbow there.  There you go.

10  BY MR. LEVIN:

11  Q.    You mentioned you listened to every one of the

12  recordings that we had turned over as part of the evidence

13  in this case?

14  A.    Correct.

15  Q.    Okay.  Can you give me any estimate as to how many

16  recordings that was?

17  A.    I thought there were 92.

18  Q.    You believe there was only 92?

19  A.    I thought so.

20  Q.    And did you take note of how the file names -- how

21  those recordings were saved on Mr. Cunningham's call app,

22  the file names that were created?

23  A.    No.  I didn't look at them because I got them as a --

24  I got them from the office, Kevin's office, as a login and

25  then they were listed, so I didn't look at the file name.

1   Q.   Okay.  So if those file names contained phone

2   numbers, caller ID numbers, you didn't look any of those

3   up?

4   A.   No.

5           MR. LEVIN:  That's all I have.  Thank you.

6           THE COURT:  All right.  Any redirect?

7           MR. TROST:  Yes.  Thank you, Your Honor.

8                     REDIRECT EXAMINATION

9   BY MR. TROST:

10  Q.   I want you to take a look at Exhibit 502A which was

11  just brought up in discussions with Attorney Levin.

12          THE COURT:  Are you going to put that up?

13          MR. TROST:  Yeah.

14          THE COURT:  I switched it over to your computer,

15  if that's where you're going.

16          MR. TROST:  Okay.  Thanks.

17  BY MR. TROST:

18  Q.   Now, Exhibit 502A is based on three different lists

19  of calls that Mr. Montes had submitted to you, right?

20  A.   Mr. Cunningham, yes.

21  Q.   Mr. Cunningham had submitted in this lawsuit, right?

22  A.   Yes.

23  Q.   Okay.  And from the testimony yesterday, he's only

24  going forward with one of those lists, right --

25  A.   I assume so.

1  Q.   -- just what's been marked as Exhibit 1?

2  A.   Okay.

3  Q.   Can you tell us, however, 502A is your work comparing

4  all three of Cunningham's lists against your caller ID

5  database?

6  A.   Correct.

7  Q.   Okay.  502 without the A, does that reflect your work

8  comparing just the list that Mr. Cunningham has gone

9  forward with against your caller ID database?

10  A.   I'm not sure which one is which.

11  Q.   Right.  I've got 502A up right now.

12  A.   Oh.

13  Q.   502, I believe that was the first one you put

14  together several months ago, right?

15  A.   Correct.

16  Q.   Does that reflect your work comparing the calls that

17  Cunningham has on his list, Exhibit 1 that he's moving

18  forward with, against your caller ID database?

19  A.   Correct.  Yeah.

20  Q.   Okay.  So in other words, the point is 502A has more

21  on it than what's really at issue in this case?

22  A.   Correct.  I looked them all up.

23  Q.   Okay.  The Missouri issue and the Mississippi issue,

24  were either of those situations where you had an

25  opportunity to challenge or be heard?

1  A.   I never heard about the Mississippi issue until

2  Mr. Cunningham showed me the judgment against me.

3  Q.   At your deposition?

4  A.   Correct.  And of course I don't have any money, so

5  I'm not going to pay it.  I can't.

6  Q.   Sure.

7  A.   And the Missouri one we got serviced and again it was

8  against TollFreeZone.  I had no money to hire an attorney

9  and we were broke.  And so I just decided to let

10  TollFreeZone, you know, take it.

11  Q.   It's your understanding both of those concerned state

12  law?

13  A.   As I understand it, they were both state law.

14  Q.   Not the TCPA?

15  A.   No.

16  Q.   And do either of those have any bearing on what Mr.

17  -- the calls that Mr. Cunningham is suing about here?

18  A.   Zero.

19  Q.   The do-not-call list and the cell-phone list that

20  people's call databases can be scrubbed against --

21  A.   Correct.

22  Q.   -- can you explain why it's optional instead of

23  mandatory --

24  A.   Oh, absolutely.

25  Q.   -- in your system?

1  A.   Yeah, yeah.  I mean, can I tell you why?

2  Q.   Yeah.  I hope you can.

3  A.   Okay.  All right.  With our political clients, they

4  don't want to scrub people out.  They want to reach all

5  the constituents they can.  With our fundraisers for Texas

6  Right to Life, they don't want to scrub anybody out

7  because they're calling all of their members.  With

8  schools, can you imagine if we didn't notify you because

9  you were on a no-call list?  So we have to be able to

10  scrub -- to deselect that so that some clients can reach

11  everybody.  That's why that selection is there.

12  Q.   That's why it's not mandatory?

13  A.   And on our commercial people, even the commercial

14  people, sometimes they don't need to use the TCPA -- or

15  the no-call list because they're calling current clients.

16  So if I'm going to collect on your -- call you to collect

17  your monthly mortgage payment or your credit card bill,

18  you're a customer, I have a right to call you, and so they

19  need to be able to deselect the federal no-call list.

20  Q.   And that would be because when you signed your

21  mortgage documents, you --

22       THE COURT:  I think he's explained it well

23  enough.

24       MR. TROST:  Fair enough.

25

1  BY MR. TROST:

2  Q.   Have you checked the national do-not-call list for

3  Craig Cunningham's number?

4  A.   I have.

5          THE COURT:  We've covered this.

6          MR. TROST:  Okay.

7          THE COURT:  He's not on the no-call list.

8          MR. TROST:  Fair enough.  We're done.

9          THE COURT:  Okay.  Very good.  Thank you,

10  Mr. Montes.

11          THE WITNESS:  Thank you.

12          MR. LEVIN:  Your Honor, may I ask questions on

13  redirect -- or recross?  Excuse me.

14          THE COURT:  Mr. Montes?

15       What is it that you'd like to address?

16       Have a seat for a second.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Go ahead.  Very briefly.  I think

19  we've covered the topics adequately, so I'll cut you off

20  if we go into anything repetitive.  But go ahead.

21          MR. LEVIN:  Thank you.

22                      RECROSS-EXAMINATION

23  BY MR. LEVIN:

24  Q.   You just mentioned that you represent mortgage

25  companies?

1  A.   We have in the past.

2  Q.   Are there any mortgage companies that are placing

3  automated calls to collect on accounts through your

4  system?

5  A.   No.  We no longer have them.  They use somebody else

6  now.

7  Q.   What about credit card companies, are there any

8  credit card companies using your system?

9  A.   Not at this point.

10          MR. LEVIN:  That's all.  Thank you.

11          THE COURT:  All right.  Thank you, Mr. Montes.

12      (Witness excused at 10:22 a.m.)

13                          ***

14

15

16

17

18

19

20

21

22

23

24

25

1          I, CHERYL A. SEEMAN, Certified Realtime and Merit

2 Reporter, in and for the State of Wisconsin, certify that

3 the foregoing is a true and accurate record of the

4 proceedings held on the 11th day of June, 2019, before

5 the Honorable James D. Peterson, Chief Judge of the

6 Western District of Wisconsin, in my presence and reduced

7 to writing in accordance with my stenographic notes made

8 at said time and place.

9 Dated this 5th day of July, 2019.

10

11

12

13

14

15                    /s/  _____

16                    Cheryl A. Seeman, RMR, CRR
                      Federal Court Reporter
17

18

19

20

21

22

23 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless
24 under the direct control and/or direction of the
   certifying reporter.
25